Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Nicholas S. Cady, OSB # 113463
541-434-1463 │nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

Kelsey Furman, OSB # 214184
kelsey@kswild.org
Klamath-Siskiyou Wildlands Center
562 A St.
Ashland, Oregon 97520

        *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER, CASCADIA WILDLANDS, OREGON WILD, and SODA MOUNTAIN WILDERNESS COUNCIL**, | Case No. 1:23-cv-00519 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, | (Environmental Matters – Violations of Federal Land Policy and Management Act 43 U.S.C. §§ 1701; National Environmental Policy Act 42 U.S.C. §§ 4321; Administrative Procedure Act, 5 U.S.C. §§ 701.) |
| Defendant. | |

## INTRODUCTION AND NATURE OF ACTION

1.      Plaintiffs Klamath-Siskiyou Wildlands Center ("KS Wild"), Cascadia Wildlands, Oregon Wild, and Soda Mountain Wilderness Council ("SMWC") (collectively "Plaintiffs"), challenge the Bureau of Land Management, Medford District, ("BLM" or "Defendant") approval of the Programmatic Integrated Vegetation Management for Resilient Lands ("IVM-RL Program") Finding of No Significant Impact ("FONSI") and Decision Record ("DR") (collectively, "Decision"), and the Late Mungers Determination of NEPA Adequacy ("DNA"). Defendant acted arbitrarily, capriciously, and contrary to the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 302, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701.

2.      The IVM-RL DR authorized the use of DNAs for Late-Successional Reserve logging; the BLM then used the DNA process to authorize the Late Mungers Integrated Vegetation Project ("Late Mungers Project") which, upon information and belief, includes two timber sales, Penn Butte and Late Mungers on BLM-administered lands located in the Applegate River watershed in Josephine County northwest of Medford, Oregon. The Late Mungers Project is the first site-specific decision to implement commercial timber sale activities contemplated in the IVM-RL Programmatic Environmental Assessment ("EA").

3.      This case is a challenge to a programmatic decision by the Bureau of Land Management that authorizes vegetation management activities in the Medford district. Although Plaintiffs challenge the decision's overall compliance with both procedural and substantive requirements, plaintiffs' primary concerns surround the authorization of intensive logging of older, complex forests that will reset them so they no longer function as reserves for habitat, for

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

which they were designated.  Therefore, plaintiffs request narrowly tailored relief to remedy violations of law set forth and alleged herein.

4.      This action seeks: 1) a declaration that the BLM violated FLPMA by authorizing a program and implementing projects, including but not limited to the Late Mungers Project, that are inconsistent with the applicable Resource Management Plan; 2) a declaration that the BLM violated NEPA and its implementing regulations by failing to complete an Environmental Impact Statement and by failing to take a hard look at, and adequately disclose and consider, the IVM-RL Program's environmental effects;  3) a permanent injunction against all commercial logging authorized by or implemented pursuant to the IVM-RL Program DR; and 4) the partial vacatur and remand of the commercial logging portions of the IVM-RL Program EA, FONSI, and DR, and Late Mungers DNA, and the DNAs for any other timber sales and any other timber sales authorized pursuant to and/or relying on the IVM-RL-DR and EA.

5.      Plaintiffs are not seeking relief regarding the IVM-RL Program and Late Mungers Project prescribed fire and non-commercial small diameter thinning treatments.

6.      The requested relief is narrowly tailored and necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

7.      Should Plaintiffs prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1346 and 1331 because this action involves the United States as a defendant and arises under the laws of the United States, including NEPA; FLPMA; and the APA; and applicable regulations.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

9.      A present, actual, and justiciable controversy exists between the parties. The requested relief is therefore proper under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 2201–2202.

10.     Plaintiffs have exhausted their administrative remedies by timely participation throughout the IVM-RL and Late Mungers DNA planning process. The challenged agency actions are subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the IVM-RL Program area is located within this judicial district. Defendant maintains an office in this judicial district.

12.     This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because the Late Mungers Project area is located in Josephine County and the BLM's office where the IVM-RL decision was signed is located in Jackson County. The events and omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Medford Division.

## PARTIES

**Plaintiffs**

13.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main office is in Ashland, Oregon. KS Wild has over 5,500 members, and 10,000 active supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and Northwest

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by implementation of the IVM-RL DR and Late Mungers DNA.

14.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members have visited and regularly use the Late Mungers Project area for a variety of professional and personal pursuits including viewing threatened and endangered species and their habitat. Implementation of the IVM-RL DR and Late Mungers DNA would irreparably harm the interests of Cascadia Wildlands and its members.

15.     Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Late Mungers Vegetation Management ("Late Mungers") Project area for hiking, recreation, bird watching, nature appreciation, and

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

other recreational and professional pursuits. Implementation of the IVM-RL DR and Late Mungers DNA would irreparably harm the interests of Oregon Wild and its members.

16.    Plaintiff SODA MOUNTAIN WILDERNESS COUNCIL ("SMWC") is a non-profit organization incorporated in Oregon and headquartered near Ashland, Oregon. SMWC has approximately 325 members and mails its newsletter to about ten times that many supporters, with most members and supporters concentrated in southern Oregon and northwestern California. SMWC is dedicated to protecting and restoring wildlands and preserving the outstanding biodiversity and biological connectivity of the botanically significant Siskiyou Mountains in southwest Oregon and northwest California and the surrounding forests and ecosystems. SMWC monitors federal public land activities to ensure that management complies with relevant federal laws, including environmental laws. SMWC also proposes designations that would better protect the area. SMWC has a specific interest in the lands in southwest Oregon managed by the BLM pursuant to the Oregon and California Revested Lands Sustained Yield Management Act ("O&C Act"), 43 U.S.C. § 2601; it monitors the Medford BLM District and BLM projects on O&C lands. SMWC members have visited and regularly use the Late Mungers Project area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of the IVM-RL DR and Late Mungers Project would irreparably harm the interests of SMWC and its members.

17.    Plaintiffs have organizational interests in the proper and lawful management of the public lands managed by the Medford District BLM. Plaintiffs have actively participated in the IVM-RL and Late Mungers administrative processes by reviewing BLM proposals and documents, conducting field exams, and submitting timely written comments regarding proposed BLM management activities.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

18.     Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, spiritual, and scientific interests if the IVM-RL DR and Late Mungers Project proceed as authorized. Plaintiffs and their members, supporters, and staff have concrete plans to return to the area where the Late Mungers timber sale units are located. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the logging of mature and old-growth forest stands located within the Late Mungers timber sale units.

**Defendant**

19.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the United States Department of the Interior and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations. It issued the IVM-RL EA and associated FONSI and DR authorizing the Late Mungers Project and associated timber sales.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

20.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

21.     Upon review under the APA, a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Furthermore, when an agency has acted without observance of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

**Federal Land Policy and Management Act (FLPMA)**

22.    Congress enacted the Federal Land Policy and Management Act in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. §§ 1701. Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). In FLPMA, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(A)(8).

23.    FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

24.    The BLM issued the Southwestern Oregon RMP for the Medford BLM District in 2016. The final 2016 Southwestern Oregon RMP ("2016 RMP") applies to the BLM lands covered by the IVM-RL DR, including the Late Mungers timber sales that flow from the IVM-RL DR.

25.    The 2016 RMP allocates varying amounts of land to six different land use categories, including Late-Successional Reserves ("LSR"), Riparian Reserves, and the Harvest Land Base ("HLB"). The HLB land use allocation is managed for sustained-yield timber harvest, balanced with other applicable objectives and directives. The LSRs are managed to, *inter alia*, develop, maintain, and promote northern spotted owl ("NSO") nesting, roosting, foraging, and dispersal habitat.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## National Environmental Policy Act (NEPA)

26.    Congress enacted the National Environmental Policy Act to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and simulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

27.    To accomplish these purposes, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

28.    The Council on Environmental Quality ("CEQ") has promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including the BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500. (1978).[1]

29.    NEPA requires all federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This detailed statement, known as the Environmental Impact Statement, or EIS, must describe the environmental impacts of the proposed action and alternatives to the proposed action. *Id.* An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1508.11, 1502.1 (1978).

---

[1] The BLM began IVM-RL on July 2, 2019, using the 1978 CEQ NEPA regulations (as amended), which are cited in this Complaint, not the 2020 CEQ NEPA regulations.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—9

30.    NEPA further requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

31.    In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. § 1508.27 (1978). In evaluating intensity, federal agencies must consider numerous "significance" factors, including impacts that may be both beneficial and adverse; the degree to which the proposed action affects public health or safety; any unique characteristics of the geographic area such as proximity to historic or cultural resources, parks lands, prime farmlands, wetlands, wild and scenic rivers or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; the degree to which the action may adversely affect an endangered or threated species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1)-(10) (1978).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—10

32.     If an agency is unsure if a federal action will have a significant effect on the

human environment, it may prepare an Environmental Assessment ("EA") to determine if an EIS

is required. 40 C.F.R. § 1501.4 (1978).

33.     After analyzing a proposed action, an agency may determine that it will have no

significant impact on the environment and decide to implement it. For an agency's decision to be

considered reasonable, a decision record and finding of no significant impact ("DR/FONSI")

must be issued containing sufficient evidence and analysis to show the decision is reasonably

supported by the facts. The agency must show a rational connection between the facts found and

the decision rendered. If the agency fails to consider important aspects of the problem in its

NEPA analysis, its decision is arbitrary and capricious.

34.     To support an agency determination of non-significance, NEPA documents must

consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40

C.F.R. § 1508.8 (1978). Direct effects are caused by the action and occur at the same time and

place as the proposed project. 40 C.F.R. § 1508.8(a) (1978). Indirect effects are caused by the

action and are later in time or farther removed in distances but are still reasonably foreseeable.

40 C.F.R. § 1508.8(b). Both types of impacts include "effects on natural resources and on the

components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic,

cultural, economic, social or health [effects]." 40 C.F.R. § 1508 (1978). Cumulative impact

results when the "incremental impact of the action [is] added to other past, present, and

reasonably foreseeable future actions" undertaken by any person or agency. 40 C.F.R. § 1508.7

(1978).

35.     NEPA requires that environmental information be available to public officials and

citizens before agency decisions are made and before any actions occur to implement the

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

proposed project. 40 C.F.R. § 1500.1(b) (1978). The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process. *Id.*

## FACTUAL AND ADMINISTRATIVE BACKGROUND

### The 2016 RMP

36.     The 2016 Southwestern Oregon RMP ("2016 RMP") provides overall direction for the management of all natural resources on BLM-administered lands in southwestern Oregon, including the lands at issue here, through management directions for different land use allocations. Those land use allocations include two main categories: the Harvest Land Base ("HLB") where commercial logging is the focus, and reserve allocations where the focus is on forest conservation and the retention of late-successional wildlife habitat. The IVM-RL Program proposes commercial logging within these reserve allocations, specifically the Late Successional Reserves ("LSRs") and Riparian Reserves.

37.     Under the 2016 RMP, the LSR land use allocation has management direction and objectives to protect stands of older, structurally complex conifer forest, maintain habitat for the NSO and marbled murrelet, and promote development of habitat for the NSO in stands that do not currently meet suitably habitat criteria.

38.     More specifically, the objectives for LSR include: 1) "Maintain nesting-roosting habitat for the northern spotted owl and nesting habitat for the marbled murrelet"; and 2) "Promote the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern spotted owl."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

39.     The 2016 RMP provides management directions for LSRs, including: 1) a requirement that all stands that are currently NSO nesting-roosting habitat are maintained, regardless of owl occupancy status; 2) a requirement that silvicultural treatments do not preclude or delay development of NSO nesting-roosting habitat in the stand and in adjacent stands by 20 years or more compared with no treatment.

40.     The 2016 RMP contains other wildlife management objectives to conserve and recover species that are Endangered Species Act ("ESA")-listed, proposed, or candidates and the ecosystems on which they depend.

41.     The 2016 RMP prohibits the incidental take of NSOs until implementation of a barred owl management program has begun.

42.     Until the barred owl management program has begun, the 2016 RMP relies on protection and maintenance of NSO nesting, roosting and foraging habitat in the LSRs to ensure that there will be no jeopardy to NSOs.

43.     The barred owl management program has not begun.

44.     The 2016 RMP contains no site-specific analysis of logging in the area covered by the IVM-RL EA or the Late Mungers DNA.

**The Integrated Vegetation Management for Resilient Lands**

45.     On July 3, 2019 the BLM initiated the "scoping period" for the IVM-RL Programmatic Environmental Assessment ("IVM-RL EA"). The scoping notice lists "restor[ing] fire-adapted ecosystems" and "contribut[ing] to the conservation and recovery of threatened and endangered species" as "[t]he purposes of the 2016 Southwestern Oregon Record of Decision and Resource Management Plan…" The notice states that the IVM "vegetation treatments are needed to achieve these RMP objectives."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—13

46.    On July 29, 2019,[2] Plaintiffs submitted scoping comments to the BLM. In their scoping comments, Plaintiffs raised concerns about the BLM's plan to commercially log tens of thousands of acres of forests in the reserves. Plaintiffs raised concerns that the large scale of this project would lead to a lack of site-specific analysis in the forthcoming programmatic EA. Plaintiffs were concerned that this broad-brush approach would lead to functional mature forests being logged, exacerbating fire-risks in the region and degrading and removing functional mature forests. The BLM's intent to log and remove NSO habitat in the LSRs validated and exacerbated these concerns.

47.    The BLM published draft IVM-RL EA Chapters 1 and 2 on October 29, 2019. Plaintiffs submitted timely comments on November 18, 2019. Plaintiffs again raised concerns about the BLM's flawed programmatic approach and improper tiering to the RMP, as well as the public's inability to provide meaningful and relevant comments without knowing impacts or even proposed activities at the site scale.

48.    On or around August 19, 2020, the BLM released the Complete IVM-RL Draft EA and associated Draft FONSI.

49.    On October 16, 2020, Plaintiffs submitted timely comments on the Complete IVM-RL EA. In the comments, Plaintiffs again raised concerns about the BLM's intent to log and remove NSO habitat in the LSRs. Plaintiffs warned the BLM that the programmatic IVM-RL is a significant action necessitating an EIS. Plaintiffs also stressed that the Complete IVM-RL EA still lacked the requisite site-specific analysis to justify heavy commercial logging in reserves.

---

[2] The scoping comments Plaintiffs submitted were incorrectly dated as July 29, 2018.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

50.    Plaintiffs raised concerns that severe extent of forest canopy removal proposed by the BLM, followed by replanting and the establishment of young plantations will increase fire risk and hazard in contravention of the project's purported purpose and need.

51.    Plaintiffs also requested that BLM prepare an EIS analyzing the effects of the IVM-RL program so that the projected effects of this logging could be quantitatively compared to the projected effects of not logging in the different areas proposed for logging.

52.    Other conservation groups and more than a thousand citizens submitted comments as well, raising concerns about the large scale of the IVM-RL, its inappropriate intensity given the area's designation as LSR, its likely adverse effects to wildlife, watershed values, recreation, and fire resiliency, and the need for an EIS.

53.    The BLM did not prepare an EIS analyzing and disclosing the impacts of the IVM-RL program.

54.    Instead, on March 2, 2022, the BLM released its Final IVM-RL EA. The BLM concurrently approved a FONSI, and "Programmatic" DR.

55.    The IVM-RL EA purports to analyze, and the DR authorizes, future unspecified vegetation management activities within approximately 684,185 acres of Public Domain Lands and Oregon and California (O&C) Railroad Revested lands in the BLM's Medford District.

56.    The treatment area encompasses about 234,104 acres of LSR and is home to many special status fish, wildlife, and plant species and their habitats. It also includes popular areas for camping, fishing, hiking, hunting, and other recreation.

57.    The IVM-RL DR selected Alternative C, as modified, authorizes the most commercial logging and the highest amount of temporary road construction out of all the alternatives considered in the EA.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

58.     The IVM-RL DR authorizes the following actions: 1) thinning of commercial trees (commercial thinning and selection harvest) resulting in a stand average relative density between 20 and 45 percent after harvest would occur within in all LUAs in the Treatment Area *except* for HLB, District Designated Reserve ("DDR")-Non-Suitable Withdrawn Timber Production Capability Classification ("TPCC"), and DDR-Area of Critical Environmental Concern ("ACEC"); 2) an annual maximum of 4,000 acres of commercial logging and a ten-year maximum of 20,000 acres (with 17,000 acres in LSR) of commercial harvest ; 3) an annual maximum of 6,500 acres of small-diameter thinning and a ten-year maximum of 60,000 acres of small-diameter thinning; and 4) an annual maximum of 7,500 acres of prescribed fire and a ten-year maximum of 70,000 acres of prescribed fire.



COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

59.     The DR also authorizes 10 miles of temporary road construction annually and up to 90 miles over 10 years. Under the IVM-RL DR, the BLM can cut and remove trees up to 36 inches in diameter and up to 180 years old.

60.     Despite the high intensity of proposed logging, the IVM-RL DR states that the take of NSO territorial pairs or resident singles "would not occur" under the Decision's authorized timber harvest activities. How the BLM purports to avoid take of spotted owls while removing extensive amounts of owl habitat is not elaborated upon or demonstrated in the EA or DR in a site-specific manner.

61.     The chosen alternative includes a variety of treatment prescription options or "themes" that "provide for the greatest flexibility for treating stands and treatment areas," specifically noting the number of acres available for treatment and flexibility in treatment prescriptions allowed.

62.     The "prescriptive themes" include: "Near Term NSO"; "Long-Term NSO"; "Fuels Emphasis", and "Ecosystem Resilience." The Ecosystem Resilience theme is further divided into "Open," "Intermediate," and "Closed."

63.     Within the 17,000 acres of approved commercial logging in LSRs, there are no acreage limits for implementation of the specific "prescriptive themes" adopted in the IVM-RL DR.

64.     Prescriptions based on the "Ecosystem Resilience-Open" theme will result in a stand average relative density (or Relative Density Index ("RDI")) between 20 and 45 percent, and will result in canopy cover of less than 40 percent, such that these stands will no longer provide NSO habitat.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—17

65.    Logging at higher intensities within this range (that result in an RDI between 20 and 30 percent), generally remove so much of the existing forest that it resets the stand's successional stage.

66.    The IVM-RL EA refers to areas logged at these higher intensities as displaying "open forest conditions."

67.    The IVM-RL DR also permits the BLM to log and create clearcuts or openings that can comprise up to 25 percent of the stand within these logged areas.

68.    The Final EA relies on NEPA analysis from the 2016 RMP for disclosure and analysis of effects on certain resources instead of analyzing these effects in the Final EA itself.

69.    Implementation of the IVM-RL EA involves a series of potential IVM-RL site-specific projects, such as the Late Mungers Project, that could take place over ten years or more.

70.    These future site-specific projects would be based on the IVM-RL DR and "[w]hen designing subsequent site-specific projects, the BLM would evaluate each project to determine if the project is adequately analyzed by the EA and the [2016 RMP] and whether the project conforms to this programmatic Decision for this EA."

71.    For each subsequent site-specific project involving commercial harvest treatments, the public involvement process "will be subject to Authorized Officer discretion and based on project specific circumstances[.]"

72.    On March 24, 2022, Plaintiffs filed an administrative appeal of the IVM-RL EA and DR with the Interior Board of Lands Appeals. At least seven other IVM-RL related IBLA appeals were filed. Plaintiffs' IBLA appeal was dismissed as moot on April 25, 2022.

//

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Northern Spotted Owl Habitat and IVM's Approved Late-Successional Reserve Logging**

73.    The northern spotted owl (*Strix occidentalis caurina*) ("NSO") is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The NSO occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including the IVM-RL and Late Mungers Project areas.

74.    Spotted owls rely on older, mature and complex forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

75.    Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the FWS listed the NSO as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted* Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

76.    Critical habitat was designated for the species in 1992 and revised in 2008, 2012 and 2021.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—19

77.    The 2012 critical habitat rule states that "primary constituent elements" of NSO critical nesting and roosting habitat

> typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly.

77 Fed. Reg. 71,905.

78.    In Southern Oregon, NSO nesting and roosting habitat consists of conifer stands with a multi-layered, multi-species canopy dominated by larger conifer overstory trees, canopy cover $\geq$ 60 percent, overstory tree diameter of $\geq$ 21" diameter at breast height (dbh), > 12 trees with 20" or greater dbh trees/acre, quadratic mean diameter ("QMD") > 15" dbh, basal area from 180 to 240 ft$^3$/acre (most often greater than 240 ft$^3$/acre), and a basal area from larger trees of > 30ft$^3$ for trees > 26" dbh.

79.    Sixty percent canopy cover is the "minimum canopy cover requirement" for NRF habitat.

80.    The Medford District of the BLM is within the range of the NSO.

81.    The 2016 RMP designated areas within the Medford District as LSR. The RMP prohibits logging in LSRs that precludes or delays by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment. This standard applies unless the logging is intended to address forest pathogens.

82.    The RMP contemplated logging in these habitat reserves "to speed the development of NSO nesting-roosting habitat or improve the quality of NSO nesting-roosting habitat in the stand or in the adjacent stand in the long term."

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

83.    In general, IVM-RL's Ecosystem Resilience-Open Treatments will remove existing spotted owl nesting, roosting, foraging, and dispersal habitat.

84.    The Ecosystem Resilience-Open treatments reduce canopy cover to less than 40 percent (treatment unit average), alters the structural diversity and dead wood in the stand or otherwise changes the stand so it no longer provides nesting, roosting, or foraging, or even dispersal habitat for owls. The removal of these key habitat features would reduce the roosting, foraging, and dispersal opportunities for owls in the action area, and lead to increased predation risk.

85.    The units that receive the Ecosystem Resilience-Open prescriptions would not be expected to provide functioning nesting, roosting or foraging habitat for decades post-treatment.

86.    Given that the IVM-RL EA and DR contain no cap on the amount of Ecosystem-Open logging prescriptions that can be applied across the 17,000 acres, the IVM-RL DR authorizes the removal of spotted owl habitat across this entire area.

87.    Even less-intensive treatments considered under the chosen Alternative C modified would still downgrade spotted owl habitat so the habitat no longer contains the habitat features associated with nesting, roosting, and foraging. Habitat is downgraded when the canopy cover in a nesting, roosting or foraging stand is reduced to 40-60 percent (treatment unit average) and other key habitat elements are removed, such as hunting perches. Such habitat alterations render that area unlikely for continue use as nesting, roosting, or foraging habitat. The removal of these key habitat features would reduce the roosting and foraging opportunities for owls and lead to increased predation risk by exposing owls to other raptors.

88.    Ultimately, the IVM-RL DR authorized commercial logging in 17,000 acres of LSR. Upon information and belief, within LSRs, at least 5,500 acres of NSO foraging habitat

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

will be lost (downgraded or removed), along with at least 100 acres of nesting and roosting habitat, and at least 2,800 acres of dispersal habitat.

89.     Of these 17,000 acres, at least 12,580 acres are designated critical habitat for the northern spotted owl.

90.     In order to determine whether the IVM-RL Program complies with the RMP standard that the BLM "[l]imit such silvicultural treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment," the BLM relied on the ORGANON model, a tree growth and yield simulator.

91.     Using ORGANON model, the BLM compared different logging levels against a no-action alternative. Logging prescriptions with RDI targets of 30, 40, and 45 percent were modeled across three sample forest stands. Two of these stands were considered owl foraging habitat and one was considered dispersal habitat. These forest stands are not actual areas proposed for logging, but rather were dry forest stands where habitat field evaluation and stand plot data was available.

92.     BLM did not model Ecosystem Resilience-Open prescriptions logging prescriptions with RDI of 20 percent. The IVM-RL NEPA documents did not disclose any modeling of the Ecosystem Resilience-Open theme (which generally has an RDI targets below 30 percent). The IVM-RL Program's Ecosystem Resilience-Open prescriptions will preclude or delay by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment. These higher intensity treatments were not designed to speed the development of spotted owl nesting-roosting habitat.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

93.    The modeling that BLM did disclose demonstrated that the logging prescriptions with RDI targets of 30 percent precluded or delayed by 20 years or more the development of NSO nesting-roosting habitat in the stand, as compared to development without treatment.

94.    The IVM-RL Program DR authorizes logging of existing mature and old-growth forest stands within the LSR land use allocation despite the BLM's own data and model illustrating that this logging will delay the establishment of nesting and roosting habitat conditions by more than 20 years in violation of the RMP.

**Threatened & Endangered Species Consultation with FWS**

95.    The Resilient Lands Programmatic Biological Opinion ("BiOp") covers forest management actions within the Medford District of the BLM and the South River Field Office of the Roseburg District of the BLM for a span of 10 fiscal years. It covers activities in LSR, including the activities authorized by the IVM-RL DR, as well as activities on the Harvest Land Base ("HLB"), and in Riparian Reserves.

96.    The BiOp found that the proposed actions, including the IVM-RL authorized activities, are likely to adversely affect NSO, marbled murrelet and coastal marten.

97.    The BiOp states that "[i]ncidental take of [NSO] is not reasonably certain under the proposed action because of the pre-project survey approach to document occupancy." It also states that since this consultation does not review individual projects, later "site-specific analysis" will occur.

98.    The BiOp notes that the proposed action includes the removal and downgrading of NSO nesting, roosting, and foraging habitat across several land use allocations, including LSR.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Implementation of IVM: Late Mungers Determination of**
**NEPA Adequacy and Timber Sales**

99.     On April 28, 2022, the BLM published the Late Mungers Integrated Vegetation
Management Project Draft Determination of NEPA Adequacy (DOI-BLM-ORWA-M070-2022-
0012-DNA) ("Late Mungers Project" or "draft Late Mungers DNA"). This project is "the initial
implementation-level project under the IVM-RL EA."

100.     On May 10, 2022, the BLM hosted a public webinar where pre-selected members
of the community were allowed three minutes to speak. The BLM noted that it was not using this
webinar as a chance to directly address speakers' concerns and that anything said during the
speakers' time was not an official comment and that all official comments needed to be written
and submitted. All fourteen speakers expressed opposition to the Late Mungers Project and/or
IVM-RL in general. Multiple speakers were muted mid-sentence after exactly three minutes.

101.     On May 14, 2022, the BLM held a community field trip to area within the Late
Mungers Project that have been designated for commercial logging.

102.     On or about May 25, 2022, Plaintiffs submitted comments on the draft Late
Mungers DNA.

103.     On February 9, 2023, the BLM issued the Decision Record ("DR") and Final
DNA for Late Mungers ("final Late Mungers DNA").

104.     The final Late Mungers DNA includes 830 acres for commercial harvest,
including 461 acres of Ecosystem Resilience – Open logging. Upon information and belief, these
acres will be divided into two timber sales, Late Mungers and Penn Butte.

105.     The final Late Mungers DNA indicates that clearcut gaps within the units will be
up to two acres in size. The final Late Mungers DNA also allows 1.9 miles of new temporary
road construction and landings.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—24

106.    The final Late Mungers DNA indicates that 1.5 acres of spotted owl nesting/roosting habitat will be removed to facilitate road and landing establishment, and 383 acres of foraging habitat will be removed or downgraded.

107.    The final Late Mungers DNA claims that the proposed activities will not preclude or delay the development of nesting/roosting habitat by 20 years compared to no treatment but does not include the data underlying this conclusion.

108.    The Late Mungers project is not intended to treat forests for pathogens.

109.    Upon information and belief there are 14 NSO home ranges within the Late Mungers Action area, all of which are in the LSR land use allocation. At least three of these sites have been occupied in the last five years. Habitat modification is proposed for all three of the occupied sites, including within the core use area of one of the sites, which is the area around the nest tree.

110.    The final Late Mungers DNA is not a NEPA document.

111.    Plaintiffs have exhausted their required administrative remedies with respect to the Late Mungers DNA and timber sales.

**FIRST CLAIM FOR RELIEF**
**(FLPMA and APA Compliance)**

112.    Plaintiffs reallege and incorporate all preceding paragraphs herein by reference.

113.    Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM has a duty to ensure that a site-specific project conforms to and is consistent with the governing Resource Management Plan. The IVM-RL Program is governed by the 2016 RMP.

114.    The 2016 RMP provides overall direction for all resources on BLM-administered lands in southwestern Oregon, including the lands at issue here, through management directions

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

for different land use allocations. Those land use allocations include LSRs and Riparian Reserves, which will be affected by the IVM-RL Program.

115.    Within the LSR land use allocation, the primary objective is to maintain and promote the development of habitat for the NSO and marbled murrelet. The LSR's management directions generally prohibit logging that downgrades or removes existing nesting and roosting owl habitat or precludes or delays development of NSO nesting-roosting habitat. NSO foraging habitat should be developed and maintained.

116.    The 2016 RMP specifically directs the BLM to apply logging treatments in the LSR "to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term." While these logging treatments can temporarily degrade owl habitat, the logging must not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment.

117.    As set forth below, BLM has failed to demonstrate that the IVM-RL EA, DR, and FONSI are consistent with these provisions 2016 RMP, and therefore BLM's decision is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

**Count 1: BLM failed to demonstrate that the "Ecosystem Resilience-Open" treatments are consistent with the RMP requirements governing logging in LSR.**

118.    The IVM-RL Program contemplates logging up to approximately 60,000 acres over the next 10-years. The BLM roughly categorizes the logging into themes which include Ecosystem Resiliency: "Open," "Intermediate," and "Closed."

119.    The "Ecosystem Resiliency-Closed" treatments will remove between 55 to 60 percent of the existing forest stand. The "intermediate" logging treatments will remove between

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—26

60 to 70 percent of the existing forest stand. The "open" logging treatments will remove between 70 and 80 percent of the existing forest stand. Additionally, the BLM contemplates creating "openings," or areas of complete tree removal, in up to 25 percent of these stands.

120.    The "Ecosystem Resiliency-Open" logging prescriptions are not designed to speed the development of spotted owl habitat, nor are they designed to address forest pathogens. Instead the "objective of these treatments is to increase resilience of forest stands to wildfire, drought, insects, by reducing stand density and ladder fuels; and increase growing space and decrease competition for large and/or legacy pine, oak, and cedar."

121.    BLM estimates that 20,000 acres of the 60,000 acres of commercial logging will be "Ecosystem Resiliency-Open" treatments, but states its decision does not have limitations on creating open forest conditions across the analysis area.

122.    The "Ecosystem Resiliency-Open" logging prescriptions will remove or downgrade existing spotted owl habitat. These logging prescriptions will preclude or delay by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment.

123.    The BLM did not model the "open" prescriptions for compliance with the 20-year standard.

124.    Because it did not model the outcomes of these logging prescriptions, the BLM failed to demonstrate that the IVM program and the associated timber sales and logging activities, including but not limited to Late Mungers, will comply with the 20-year RMP standard.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

125.    The BLM failed to demonstrate that the IVM project and the associated timber sales and logging activities, including but not limited to Late Mungers, promotes and maintains NSO habitat, including foraging habitat and habitat for prey species.

**Count 2: BLM's "Ecosystem Resilience-Intermediate" treatments are inconsistent with the RMP requirements governing logging in LSR.**

126.    BLM's modeling of its Ecosystem Resiliency-Intermediate logging prescriptions demonstrated that the proposed logging will delay the establishment of nesting and roosting habitat conditions by more than 20 years when compared to areas without treatment.

127.    The analysis within the IVM-RL EA, which the DR relies upon, shows that the IVM-RL logging treatments, including both the "open" and "intermediate" themes, will not "speed" development of nesting and roosting habitat in the LSR.

128.    The BLM failed to demonstrate that the IVM-RL Program and the associated timber sales and logging activities, including but not limited to, Late Mungers, will comply with the 20-year RMP standard.

129.    The BLM's decision to approve commercial logging treatments that are inconsistent with RMP requirements violates FLMPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
**(Violations of the National Environmental Policy Act and the Administrative Procedure Act)**

**Count 1: Failure to complete an Environmental Impact Statement and Arbitrary and Capricious Finding of No Significant Impact**

130.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

131.    NEPA requires the Defendant to prepare an EIS when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27 (1978).

132.    An EA must contain sufficient information to determine whether to prepare an EIS or issue a FONSI. The information presented in the EA must be of "high quality," and include "accurate scientific analysis." 40 C.F.R. § 1500.1(b) (1978). If the agency chooses not to prepare an EIS it must adequately explain, through a convincing statement of reasons, why potential effects are insignificant.

133.    If the proposed action may have a significant environmental effect, federal agencies must prepare an EIS. 42 U.S.C. § 4332.

134.    In determining whether a proposed action may have a "significant" environmental effect, the context and intensity of the action must be considered. 40 C.F.R. § 1508.27 (1978).

135.    In evaluating intensity, the agency must consider multiple factors, including impacts that may be both beneficial and adverse; the unique characteristics of the geographic area such as ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and whether the action threatens to violate Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b) (1978).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

136.    If the proposed action may have a "significant" environmental effect according to any of the criteria, the agency must prepare an EIS. The significance of an individual factor may result in the need to prepare an EIS. The significance of multiple factors in combination may result in the need to prepare an EIS.

137.    Additionally, agencies must conduct site-specific analysis before approving a project.

138.    The IVM-RL Program is a major federal action authorized by BLM that would have a significant effect on the environment. The IVM-RL Program implicates numerous significance factors that individually and cumulatively require the preparation of an EIS.

139.    The IVM-RL Program would have significant adverse effects. The IVM-RL Program will be implemented in areas with unique characteristics, including ecologically critical areas such as LSRs, Riparian Reserves, and designated critical habitat for ESA-listed species. Southwestern Oregon is a biologically unique and significant geographic area, and is recognized for its floristic diversity, geographic complexity, highly varied climatic gradients, and prominent historic role of fire. The LSRs, designated in the 2016 RMP, have specific, ideal characteristics needed to maintain and promote NSO habitat, in addition to various standards, guidelines and environmental restrictions. Thus, LSRs have a highly important and unique role that weigh in favor of preparing an EIS.

140.    The adverse effects of commercial logging that removes existing late-successional wildlife habitat and increases fire hazard in LSRs, as authorized by the IVM-RL DR, outweigh any benefits of said logging.

141.    The IVM-RL Program is highly controversial due to its authorization of 17,000 acres of commercial logging in LSRs that will remove and/or downgrade NSO foraging habitat,

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—30

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

remove NSO designated critical habitat, prevent these LSR lands from functioning and/or developing into NSO habitat in the present, or the short or long term, prevent these LSR lands from functioning as reserves for NSOs and other species that depend on late-successional forests, and prevent these lands from promoting or contributing to the conservation and recovery of threatened and endangered species.

142.    In the IVM-RL FONSI, the BLM entirely failed to address the controversy surrounding the proposed activities and their effects on LSRs and species that depend on late-successional forests. Instead, the FONSI tiered to and relied on the RMP NEPA analysis, which, in turn, did not disclose or consider effects of the specific activities, including but not limited to the removal of up to 17,000 acres of spotted owl foraging, authorized in the IVM-RL EA and DR, either at a programmatic or site-specific level.

143.    The IVM-RL Program will result in effects that are highly uncertain or involve unique or unknown risks because the BLM failed to conduct site-specific NEPA analysis, disclose and analyze baseline conditions, or analyze the types or locations of vegetation removal activities and their respective environmental effects.

144.    The IVM-RL Program is related to other actions with cumulatively significant impacts. The IVM-RL EA fails to discuss cumulative effects of logging activities proposed for implementation on other BLM lands across the range of the 2016 RMP, including in other LSRs and on other land use allocations including but not limited to the Harvest Land Base.

145.    The IVM-RL Program will adversely affect ESA-listed and candidate species, such as the NSO, Franklin's bumblebee, coastal marten, marbled murrelet, and pacific fisher and will cause the "take" of both marbled murrelet and coastal marten.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

146.    The IVM-RL Program threatens a violation of the FLPMA, as described in this Complaint.

147.    BLM's decision to authorize and implement the IVM-RL Program without first preparing an EIS is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

### Count 2: Failure to take a "hard look" at the direct, indirect, and cumulative impacts of the IVM-RL Program and the Late Mungers Project.

148.    Plaintiffs reallege and incorporate all preceding paragraphs herein by reference.

149.    NEPA and its implementing regulations require the Bureau of Land Management to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502, 1508 (1978).

150.    The BLM is required to disclose and consider the direct, indirect, and cumulative effects of the proposed action on the environment. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c), 1508.27(b)(7) (1978).

151.    An environmental assessment must provide sufficient information, evidence and analysis, including disclosure and consideration of the environmental effects of the proposed action and alternatives, to determine whether to prepare an EIS or a FONSI.

152.    Federal agencies are required to "describe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15 (1978). These "baseline conditions" must be set forth before any project implementation occurs, otherwise the agency cannot determine what effect the project will have and, therefore, cannot comply with NEPA or ensure that the proposed action will comply with applicable substantive standards.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

153.    When analyzing cumulative effects, the BLM must analyze the effects on the environment resulting from the incremental impacts of the action, and its alternatives, when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R.§ 1508.7 (1978).

154.    To take the required "hard look" the agency may not rely on incorrect or incomplete assumptions or data. The information must be accurate and of high quality.

155.    BLM must take a "hard look" before project approval, not later after the project has already been approved, and not before the site-specific details are known. 40 C.F.R. § 1500.1 (b)-(c) (1978). This requires utilizing accurate scientific analysis and disclosing that information and analysis, and its limitations, to the public.

156.    Defendant had sufficient information at the time of the IVM-RL NEPA process to conduct site-specific analysis of the logging activities that were authorized by the IVM-RL DR and their reasonably foreseeable effects.

157.    Defendant failed to take the requisite "hard look" at the direct, indirect, and cumulative impacts likely to result from the implementation of the IVM-RL Decision Record selecting Alternative C modified, by inappropriately relying on nonspecific analysis from the 2016 RMP, failing to establish baseline conditions, relying on unsupported assumptions, disregarding pertinent RMP standards and impacts to resources altogether and/or deferring site-specific analysis until an unspecified, non-mandatory, non-NEPA process with limited public disclosure and involvement.

158.    The Defendant failed to conduct a NEPA analysis and failed to disclose and analyze direct, indirect, and cumulative environmental effects from the Late Mungers project

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—33

159.    The Defendant also failed to take the requisite hard look at the Project's impacts to NSO nesting and roosting habitat in the long term. In particular, the BLM's modeling predicted more than a 20-year delay of nesting and roosting habitat due to the proposed logging of existing late-successional forests within the reserves.

160.    The Defendant failed to conduct a NEPA analysis, and failed to take the requisite hard look at the direct, indirect, and cumulative effects of implementation of the IVM-RL Program Decision Record as required by NEPA, which is arbitrary, capricious, and not in accordance with the APA. 5 U.S.C. § 706(2)(A).

161.    The Defendant's conclusion in the Decision Record for the Late Mungers DNA that no further analysis was necessary is arbitrary, capricious, and not in accordance with the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following narrowly tailored relief:

A.    Declare the Integrated Vegetation Management for Resilient Lands Environmental Assessment and associated Decision Record and Finding of No Significant Impact and the Late Mungers DNA violate FLMPA and its implementing regulations because they are inconsistent with the applicable RMP;

B.    Declare that the BLM violated NEPA and its implementing regulations by authorizing the Integrated Vegetation Management for Resilient Lands Environmental Assessment and associated Decision Record and Finding of No Significant Impact and the Late Mungers DNA without satisfying its legal obligations to take a hard look at the impacts of the Late Mungers Project.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—34

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

C.      Declare that the issuance of the Integrated Vegetation Management for Resilient Lands Environmental Assessment and associated Decision Record and Finding of No Significant Impact and the Late Mungers DNA are arbitrary, capricious, and abuse of agency discretion, and contrary to law, in violation of Section 706(2)(A) of the APA;

D.      Partially vacate the commercial logging portions of the Integrated Vegetation Management for Resilient Lands Environmental Assessment and associated Decision Record and Finding of No Significant Impact, and the Late Mungers DNA, and remand the Integrated Vegetation Management for Resilient Lands Environmental Assessment and associated Decision Record and Finding of No Significant Impact to the BLM until such time as the BLM demonstrates to this Court that it has adequately complied with the law;

E.      Enjoin the BLM and its contractors, assigns, etc. from implementation of commercial timber sales that stem from the Integrated Vegetation Management for Resilient Lands Environmental Assessment and associated Decision Record, Finding of No Significant Impact, including but not limited to the two Late Mungers timber sales;

F.      Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act and/or other applicable statutes; and

G.      Grant Plaintiffs such additional relief as this Court deems just and proper.

DATED this 10th day of April 2023.

Respectfully submitted,

s/ Meriel L. Darzen
Meriel L. Darzen, OSB # 113645
(503) 525-2725 | meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214

Additional counsel on following page.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—35

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Nicholas S. Cady, OSB # 113463
541-434-1463 │nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440


Kelsey Furman, OSB # 214184
kelsey@kswild.org
Klamath-Siskiyou Wildlands Center
562 A St.
Ashland, Oregon 97520

*Attorneys for all Plaintiffs*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—36

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*