Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Alexandria Dolezal, OSB # 223924
(503) 525-2725 │ alexandria@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214

Nicholas S. Cady, OSB # 113463
(541) 434-1463 │ nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## MEDFORD DIVISION

KLAMATH-SISKIYOU WILDLANDS
CENTER, *et al.*,

                *Plaintiffs*,

    v.

UNITED STATES BUREAU OF LAND
MANAGEMENT,

      *Defendant*,

   and

AMERICAN FOREST RESOURCE
COUNCIL; ASSOCIATION OF O&C
COUNTIES,

      *Intervenor-Defendants*.

Case No. 1:23-cv-00519−CL

**Plaintiffs' Motion for Summary Judgment and Memorandum in Support**

**Oral Argument Set for April 2, 2024 at 2:00 p.m.**

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## MOTION

Plaintiffs Klamath-Siskiyou Wildlands Center, Cascadia Wildlands, Oregon Wild, and Soda Mountain Wilderness Council ("Plaintiffs") hereby submit their *Motion for Summary Judgment* pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7. Pursuant to LR 7–1, the undersigned certify that the Parties made a good faith effort to resolve the dispute but were unable to do so.

Plaintiffs respectfully ask this Court to grant narrowly tailored relief targeted at the commercial components of Defendant's Integrated Vegetation Management for Resilient Lands ("IVM-RL") Program, including those associated with the Late Mungers Project. Specifically, Plaintiffs ask this Court to enjoin implementation of the commercial logging components of the IVM-RL program, including but not limited to the Late Mungers timber sales: Penn Butte and Late Mungers. This request does not seek to enjoin the noncommercial components of the IVM-RL program or the Late Mungers Project, such as noncommercial thinning or prescribed fire.

This case involves a challenge to the final administrative actions by Defendant, Bureau of Land Management ("BLM" or "Defendant") that approved the IVM-RL Program, which authorizes commercial logging in Late Successional Reserves (LSRs). Plaintiffs' claims challenging commercial harvest in the LSRs arise under the Federal Land and Management Policy Act ("FLPMA"), 43 U.S.C. §§ 1701–1785, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq*.

In support of this *Motion*, Plaintiffs respectfully refer this Court to the following *Memorandum in Support*, the declarations of Alexi Lovechio, Evelyn Roether, Linda Pace, Spencer Lennard, and George Sexton filed *herewith*, together with the exhibits containing supporting materials attached to these filings.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... iii

TABLE OF AUTHORITIES ............................................................................................. v

GLOSSARY OF TERMS ................................................................................................. x

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................................. 2

      A.    The Northern Spotted Owl and Its Habitat ............................................. 2

      B.    Management of BLM Lands Within the Range of the NSO, Past to Present .......... 3

      C.    The IVM-RL Program ............................................................................. 5

      D.    The Late Mungers DNA and Timber Sales ............................................. 7

III.  LEGAL BACKGROUND..................................................................................... 8

      A.    Federal Land Policy and Management Act (FLPMA)............................. 8

      B.    National Environmental Policy Act (NEPA) .......................................... 9

IV.   STANDARD OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT (APA).................................................................................. 11

V.    ARGUMENT ....................................................................................................... 12

      A.    This Court Has Jurisdiction Over Plaintiffs' Claims: Plaintiffs Have Standing and This Case Is Ripe for Review ....................................... 12

      B.    BLM Failed to Demonstrate Consistency with the RMP Standards Governing Late Successional Reserve Lands in Violation of FLPMA ........................................... 13

            i.    The Southwestern Oregon Resource Management Plan ...................... 13

            ii.   Development of Nesting-Roosting Habitat and the 20-Year Standard ............... 14

            iii.  BLM Failed to Show that the Ecosystem Resilience-Open Prescription Complies with the 20-year Standard ...................................................... 18

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2725*

    iv. BLM's Promise to Analyze Future Compliance with the 20-Year Standard Was Misleading.................................................................................................... 19

C. The IVM-RL Program Violations NEPA .................................................................. 21

   i. The IVM-RL Program Necessitates an EIS ..................................................... 21

      a. Context Weighs In Favor of an EIS ......................................... 22

      b. Multiple Intensity Factors Weigh in Favor of Significance.................... 23

         1. The Effects of the IVM-RL Program Are Highly Uncertain ........ 24

         2. The IVM-RL Program's Commercial Logging Plan is Highly Controversial ................................................................ 30

         3. Beneficial vs. Adverse Effects ...................................... 36

         4. An EIS is Required Because the IVM-RL Program Threatens a Violation of FLPM ........................................................ 39

         5. BLM's Decision to Adopt the IVM-RL Decision and Apply its Interpretation of the RMP to Allow Open Treatments in LSR Sets a Problematic Precedent ........................................... 39

      c. Tiering to the 2016 RMP Does Not Avoid the Need for an EIS for the IVM-RL Program.......................................................... 41

   ii. BLM Failed to Take a Hard Look at the Effects of the IVM-RL Program and the Late Mungers Project ......................................................................... 42

      a. The lack of site-specific analysis and information fails the "hard look" test ........................................................................ 42

      b. BLM failed to take a "hard look" at the effects on moist forests ............. 45

VI. RELIEF REQUESTED.......................................................................................... .46

VII. CONCLUSION .................................................................................................. 47

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Evans*,
371 F.3d 475 (9th Cir. 2002) ................................................... 39

*Bannock Tribes of the Fort Hall Reservation v. U.S. DOI*,
No. 4:10-CV-004-BLW, 2011 U.S. Dist. LEXIS 48492 (D. Idaho May 3, 2011) .................. 41

*Bark v. U.S. Forest Serv.*,
958 F.3d 865 (9th Cir. 2020) ............................................. 22, 34, 35, 36

*Blue Mts. Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) ............................................. 21, 30, 41, 42

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ................................................... 46

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ................................................... 24

*Cascadia Wildlands v. Adcock*,
Case No. 6:22-cv-00767-AA (D. Or) ......................................... 39

*Cascadia Wildlands v. Adcock*,
Case No. 6:22-cv-1344-MK (D. Or) ......................................... 39

*Cascadia Wildlands v. BLM,*
410 F. Supp. 3d 1146 (D. Or. 2019) ..................................... passim

*Cascadia Wildlands v. U.S. Forest Serv.*,
937 F. Supp. 2d 1271 (D. Or. 2013) ......................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................... 11

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ................................................... 42

*Ctr. for Biological Diversity v. Hays*,
No. 2:15-cv-01627-TLN-CMK, 2015 U.S. Dist. LEXIS 137985 (E.D. Cal. Oct. 7, 2015) ..... 37

*Ctr. For Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ................................................... 41

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   140 S. Ct. 1890 (2020)............................................................................... 11

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004).............................................................................. 9, 21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000)........................................................................... 12, 13

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ..................................................................... 22

*Friends of Yosemite Valley v. Norton*,
   348 F.3d 789 (9th Cir. 2003) ..................................................................... 24

*Greater Hells Canyon Council v. Wilkes*,
   No. 2:22-cv-00859-HL, 2023 U.S. Dist. LEXIS 178671 (D. Or. Aug. 31, 2023) (F&R not yet
   adopted)................................................................................................ 26

*Idaho Sporting Cong. v. Thomas*,
   137 F3d 1146 (9th Cir. 1998) .................................................................... 28

*Kern v. BLM*,
   284 F.3d 1062 (9th Cir. 2002) ................................................................... 28

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*,
   21-00161-SAB, 2023 U.S. Dist. LEXIS 107552, (E.D. Wash. June 21, 2023)....................... 27

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
   373 F. Supp. 2d 1069 (E.D. Cal. 2004)....................................................... 37

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976)............................................................................... 42

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)........................................................................... 12, 13

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)............................................................................... 42

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)........................................................................... 11, 46

*N. Alaska Envtl. Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ..................................................................... 46

*N.M. ex rel. Richardson v. BLM*,
  565 F.3d 683 (10th Cir. 2009) ................................................................ 44

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) ......................................................... passim

*Nat'l Wildlife Fed. v. Appalachian Reg'l Comm'n*,
  677 F.2d 883 (D.C. Cir. 1981) ............................................................... 24

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ................................................... 17, 34, 41

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ............................................................... 46

*Native Vill. of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) ................................................................ 28

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
  18 F.3d 1468 (9th Cir. 1994) ................................................................ 11

*Ocean Advocates v. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2004) ................................................... 22, 23, 27

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) .............................................................................. 19

*Or. Nat. Desert Ass'n v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) ................................................................ 44

*Or. Natural Res. Council Fund v. Brong*,
  492 F.3d 1120 (9th Cir. 2007) ................................................... 13, 16, 17, 20

*Or. Natural Res. Council Fund v. Goodman*,
  505 F.3d 884 (9th Cir. 2007) ................................................................ 11

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  265 F.3d 1028 (9th Cir. 2001) .............................................................. 23

*Pac. Rivers v. BLM*,
  No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981 (D. Or. Oct. 12, 2018) ...................... 4

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ......................................................................... 9, 10

*Save the Yaak Comm. v. Block*,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

840 F.2d 714 (9th Cir. 1988) ............................................................................ 21

*Seattle Audubon Soc'y v. Lyons,*
871 F. Supp. 1291 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996) ............................ 3

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ........................................................................................ 13

*Utah Wilderness All. v. Norton,*
457 F. Supp. 2d 1253 (D. Utah 2006) .................................................................... 27

*Wild Va. v. Council on Envtl. Quality,*
No. 3:20-CV-00045, 2020 U.S. Dist. LEXIS 166622 (W.D. Va. Sept. 11, 2020) .................. 10

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
790 F.3d 920 (9th Cir. 2015) ............................................................................ 43

**Statutes**

16 U.S.C. § 1533(a) ...................................................................................... 3

16 U.S.C. 1531 *et seq.* ................................................................................ 40

42 U.S.C. § 4332(2) .............................................................................. 9, 11, 21

42 U.S.C. § 4342 ........................................................................................ 9

43 U.S.C. § 1701 .................................................................................... 8, 11

43 U.S.C. § 1701(a)(2) .................................................................................. 8

43 U.S.C. § 1701(a)(8) .................................................................................. 9

43 U.S.C. § 1712 .................................................................................... 9, 13

43 U.S.C. § 1732(a) ................................................................................ 9, 13

5 U.S.C. § 706(2) .............................................................................. 11, 21, 46

**Rules**

40 C.F.R. § 1500.1(b) .......................................................................... 10, 34, 41

40 C.F.R. § 1508.27 ............................................................................ 10, 22, 30

40 C.F.R § 1508.27(a) ................................................................................ 22

40 C.F.R. § 1508.27(b)(1)........................................................................................ 22, 23

40 C.F.R. § 1508.27(b)(1)........................................................................................ 36

40 C.F.R. § 1508.27(b)(10)...................................................................................... 38

40 C.F.R. § 1508.27(b)(6)........................................................................................ 39

40 C.F.R. § 1508.28................................................................................................. 24

40 C.F.R. § 1508.7................................................................................................... 10

40 C.F.R. § 1508.8................................................................................................... 10, 28

40 C.F.R. §§ 1500–1508 (2019).............................................................................. 10

40 C.F.R. §§ 1500–1508 (2021).............................................................................. 10

40 C.F.R. § 1502.14................................................................................................. 28

40 C.F.R § 1502.16.................................................................................................. 28

40 C.F.R. §§ 1502.20............................................................................................... 24

40 C.F.R. §§ 1508.27(b)(1)-(10).............................................................................. 10

43 C.F.R. § 1610.5-3(a)........................................................................................... 9, 13

43 C.F.R. §§ 1601.0-5(b)......................................................................................... 13

50 C.F.R. § 17.11(h)................................................................................................ 3

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978)...................................................................... 9
55 Fed. Reg. 26,114 (June 26, 1990)....................................................................... 3
85 Fed. Reg. 43,304 (July 16, 2020)........................................................................ 10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

**GLOSSARY**

| 2016 RMP FEIS | 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| DNA | Determination of NEPA Adequacy |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| IVM-RL Program | Integrated Vegetation Management for Resilient Lands Program |
| LSR | Late Successional Reserve |
| NEPA | National Environmental Policy Act |
| NRF | Nesting, roosting, and foraging habitat |
| Plaintiffs | Klamath-Siskiyou Wildlands, Cascadia Wildlands, Oregon Wild, Soda Creek Wilderness Council |
| RD / RDI | Relative Density / Relative Density Index |
| RMP | Resource Management Plan |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

**AR 24023: Map of IVM-RL Treatment Area**



*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

# I.     INTRODUCTION

In the northwestern United States, within the range of the threatened Northern Spotted Owl, Late Successional Reserves ("LSRs") are the keystone of public forest management — created and set aside to protect and promote owl habitat in large blocks so that logging can occur in other areas without risking the loss of the species. Now, with its IVM-RL Program, the Bureau of Land Management takes a sledgehammer to the integrity of those reserves by proposing logging treatments that will decimate currently functioning owl habitat—and, despite steep population declines, it will do so in areas occupied by reproductively successful and demographically important owls. Under the guise of managing for wildfire, the IVM-RL Program authorizes heavy logging that not only violates BLM's own land management plan and the very provisions intended to protect the reserves, but also violates NEPA.

BLM committed two errors in adopting the IVM-RL Program: 1) it failed to comply with the "20-year standard," the key provision in the applicable land management plan that ensures protection and promotion of owl habitat into the future; and 2) it failed to prepare an EIS and disclose site-specific effects of the proposed logging, including the highly controversial heavy thinning prescriptions, which are slated to take place in reserved, and in some cases, occupied, owl habitat.

Importantly, not all of the IVM-RL Program is problematic—it includes proactive and admirable strategies such as small diameter thinning and prescribed fire across many high-risk areas. For that reason, Plaintiffs bring this targeted lawsuit to halt only the heaviest cutting in LSRs, and to require BLM to adequately disclose site-specific effects of that cutting on areas set aside for habitat protection.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## II.    FACTUAL BACKGROUND

### A.  The Northern Spotted Owl and Its Habitat

The northern spotted owl ("NSO") is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. AR12550. The northern spotted owl occupies late-successional and old-growth forest habitat from southern British Columbia to central California as far south as Marin County, including the IVM-RL Program and Late Mungers Project areas. AR12550, AR00124–25.

Spotted owls rely on older, mature and complex forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. AR12380–81. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. AR12380–81; AR48486. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. AR12347. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat. AR12347.[1] Sixty percent canopy cover is the minimum canopy cover requirement for NRF habitat. AR14810, 13874, 13877, 02775.

---

[1] In addition, the NSO Critical Habitat Rule states that that "primary constituent elements" of northern spotted owl critical nesting and roosting habitat typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly. AR59317–18.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the U.S. Fish and Wildlife Service listed the northern spotted owl as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)). It has also designated critical habitat for the owl. AR59288–59481.

Despite recovery efforts, NSO populations are declining across all demographic parameters across all study areas, and the rate of decline is increasing. AR12376. The NSO populations and habitat within the IVM action area play an important role in the range-wide population dynamics of this species. AR12403–04. This is because spotted owl populations in southwest Oregon and northern California have been shown to be source populations. *Id.* The Biological Opinion for the IVM-RL program recognizes that "the proposed actions that result in positive or negative impacts to spotted owls and/or spotted owl habitat in the action area may impact the spotted owl across its range." *Id.* It also notes that the majority of the activities authorized under the IVM-RL program occur in NSO critical habitat and that those activities are likely to adversely affect both the owls and the critical habitat. AR12381, 12420, 12435, 12441.

### B.  Management of BLM Lands in the Range of the NSO, Past to Present

BLM administers 2.5 million acres of federal public lands in western Oregon. These lands are within the range of the NSO. In 1994, BLM and Forest Service adopted the Northwest Forest Plan ("NWFP"), which was designed to provide a holistic management program for all 24.5 million acres of federal forest lands throughout the NSO's range. *See Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1304–06 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996). BLM then adopted regional Resource Management Plans in 1995, which incorporated the

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

NWFP's standards and guidelines. This management, in simple terms, had two main categories:[2] reserves ("Late-Successional Reserves and Riparian Reserves") and matrix. *Id.* at 1304–05. The reserves were designed in large part to protect or accelerate older forest habitat for the NSO and other late-successional species, and the matrix was designed to provide commercial timber. *Id.*

In 2016, BLM adopted the Southwestern Oregon Record of Decision and Resource Management Plan ("2016 RMP") to remove itself from the NWFP to increase timber output. *See Pac. Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981, *14 (D. Or. Oct. 12, 2018). Like the previous plans, the 2016 RMP divided BLM lands into multiple management categories: 19 percent are designated as Harvest Land Base ("HLB"), 38 percent as LSR and 26 percent as Riparian Reserves. *Id.* at *6. The LSRs are explicitly necessary to develop large contiguous blocks of forests and were again designed to ensure the survival of federally listed species, namely the NSO and marbled murrelet, while the HLB was designed to provide a stable timber supply. AR48436–38.[3]

More specifically, the objectives for LSR include: 1) "Maintain nesting-roosting habitat for the northern spotted owl and nesting habitat for the marbled murrelet"; and 2) "Promote the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern

---

[2] Also referred to as "land use allocations."

[3] The 2016 RMP FEIS states: "Based on the results of previous analyses, large contiguous blocks of late-successional forest would not develop in the absence of a land use allocation reserving a network of large blocks of forest." AR51038. BLM's justification for the revision was to increase the size of protected reserve areas in exchange for more intensive logging in the matrix, now Harvest Land Base, to reliably produce more timber. *See* AR48417, *see also* AR48437–48441. Meanwhile, like the "matrix" land found within the NWFP, the "Harvest Land Base," is managed to "achieve continual timber production that can be sustained through balance of growth and harvest." AR48478. In other words, the RMP attempts to strike a delicate balance between habitat protection and timber yield.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

spotted owl." AR48813. The LSRs contain no timber harvest related objectives. *Id.* The specific

management direction designed to achieve the NSO habitat objectives include: 1) a requirement

that all stands that are currently northern spotted owl nesting-roosting habitat are maintained,

regardless of owl occupancy status; and 2) a requirement that silvicultural treatments do not

preclude or delay development of NSO nesting-roosting habitat in the stand and in adjacent

stands by 20 years or more compared with no treatment. *See* AR48814, 48815. While the 2016

RMP also prohibits the incidental take of NSOs, this prohibition is lifted when BLM begins its

barred owl management program. AR48773. Thus, the ultimate lynchpin of the 2016 RMP is the

protection and promotion of late-successional habitat in the reserves.

### C.  The IVM-RL Program

BLM released the IVM-RL Program for scoping in July, 2019. AR42953. From that point

forward, Plaintiffs participated in every step of the NEPA process, had multiple meetings with

BLM staff, and submitted hundreds of pages of comments on the proposal. AR42839, 42609,

41759, 41091, 33137, 33257, 20787, 19988, 19793, 03344. Plaintiffs expressed from the outset

their concerns about intensive logging in LSRs and a lack of site-specific analysis. AR42610–

613. They also requested that an EIS be prepared and that site-specific NEPA be completed.

AR41759, 42610. Despite these requests, BLM issued only an Environmental Assessment

("EA"), a Finding of No Significant Impact ("FONSI"), and did not agree to do site-specific

NEPA analysis for implementing projects. AR2596, 2955. On March 2, 2022, BLM issued the

IVM-RL Decision Record ("DR"), which authorizes: 1) up to 4,000 acres per year of commercial

logging with a ten-year maximum of 20,000 acres (17,000 acres in LSR); 2) up to 6,500 acres a

year of small-diameter thinning with a ten-year maximum of 60,000 acres; and 3) up to 7,500

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

acres of prescribed fire with a ten-year maximum of 70,000 acres. AR2940–1.[4] Under the IVM-RL DR, BLM can cut and remove mature and old-growth trees up to 36 inches in diameter and up to 173 years old. AR2944. Plaintiffs filed an administrative protest of this decision to the Interior Board of Land Appeals ("IBLA"). Decl. Sexton, ¶ 5, Ex 1. The protest was dismissed on April 25, 2022. *Id.*, Ex 2.

The alternative chosen in the Decision (Alternative C Modified) provides for multiple commercial thinning prescription options or "themes" that "provide for the greatest flexibility for treating stands and treatment areas," and the number of acres to which each "theme" will be applied is not specified. AR02944. The "prescriptive themes" include: "Near Term NSO"; "Long-Term NSO"; "Fuels Emphasis"; and "Ecosystem Resilience." AR02612, 02628. The Ecosystem Resilience theme is further divided into "Open," "Intermediate," and "Closed." AR02628–29. The different themes correspond to different relative densities of trees that will remain after logging.[5] The Decision authorizes the application of the Ecosystem Resilience-Open ("Open") prescription, the heaviest logging prescription, across all 17,000 acres in the LSR. AR2940.

---

[4] Plaintiffs have not challenged the small-diameter thinning or the prescribed fire.
[5] BLM uses Relative Density ("RD") and the Relative Density Index ("RDI") to describe the density of trees that will be left in a particular stand or unit after the logging occurs. AR02610, 02614. The 2016 RMP defines Relative Density as "A means of describing the level of competition among trees or site occupancy in a stand, relative to some theoretical maximum based on tree density, size, and species composition. Relative density percent is calculated by expressing Stand Density Index (SDI) (Reineke 1933) as a percentage of the theoretical maximum SDI, which varies by tree species and range. Curtis's relative density (Curtis 1982) is determined mathematically by dividing the stand basal area by the square root of the quadratic mean diameter." AR49054.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

The Open prescription has an RDI target of 20 percent, which will reduce the forest

canopy cover down to 30 percent or less,[6] alter the structural diversity and dead wood in the

stand and otherwise change the forest stand so it no longer provides nesting, roosting, or

foraging, or even dispersal habitat for NSOs. AR2642 (Table 15), 2779. BLM acknowledges that

Open logging units would remove existing NSO habitat from LSRs, and that logged forest stands

would not be expected to provide functioning nesting, roosting or foraging habitat for decades

into the future. AR2779, Defs Ans ¶¶ 85; *see also* AR12350, 12417. Similarly, the Intermediate

prescriptions, which have an RDI target of 30-40 percent, will reduce canopy cover below 60

percent, downgrading NSO habitat to dispersal. AR12417.

The IVM-RL EA did not disclose any site-specific effects of the proposed logging on the

action area. AR2601. Instead, BLM stated that it will implement the IVM-RL through a series of

future site-specific projects that could take place over ten years or more. *Id*. ("[w]hen designing

subsequent site-specific projects, BLM would evaluate each project to determine if the project is

adequately analyzed by the EA and the [2016 RMP] and whether the project conforms to this

programmatic Decision for this EA."); AR2939. For each subsequent site-specific project, the

public involvement process "will be subject to Authorized Officer discretion and based on

project specific circumstances[.]" AR2602.

### D. The Late Mungers DNA and Timber Sales

The first site-specific project to implement the commercial logging portion of the IVM-

RL DR is the Late Mungers Project.[7] This project, which is located near the town of Williams in

---

[6] This is a "treatment unit average," meaning considerable portions of these units will have all trees removed.

[7] BLM has issued two other DNAs that implement the IVM-RL Program but do not involve commercial logging. *See* Integrated Vegetation Management for Resilient Lands,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Josephine County, involves two timber sales that will result in commercial logging on 830 acres within LSRs, including 461 acres of Open and 81 acres of Intermediate logging. AR9, 11. Within the Late Mungers Project area there are eleven NSO home ranges,[8] all of which are within the LSR land use allocation. At least three of these home ranges have been occupied by NSOs within the last five years. AR00269. Through the Late Mungers Project, habitat will log NSO within all three of the occupied sites, including within the core area of one of the occupied sites. AR00269–277. Overall, the logging will remove or downgrade 360 acres of NSO foraging habitat. AR00028.[9]

BLM did not develop or produce any site-specific NEPA analysis for the Late Mungers Project; instead, it issued a Determination of NEPA Adequacy ("DNA") relying on the IVM-RL NEPA. AR 9. Plaintiffs and their members will be harmed by the implementation of the Late Mungers project. *See, e.g.*, Decl. Lennard, ¶ 14, Decl. Pace, ¶ 13.

### III.   LEGAL BACKGROUND

#### A.  Federal Land Policy and Management Act (FLPMA)

Congress enacted FLPMA to "provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see* 43 U.S.C. § 1701 *et seq*. FLPMA ensures

---

https://eplanning.blm.gov/eplanning-ui/project/123406/510, last accessed Nov. 13, 2023 (Table Rocks and Derby Chain DNAs).

[8] The U.S. Fish and Wildlife Service describes a spotted owl's "home range" as the "'area traversed by the individual [spotted owl] in its normal activities of food gathering, mating, and caring for young.' Within home ranges, areas receiving concentrated use, typically surrounding the nest site and favored foraging areas, are called core areas." AR12514 (internal citations omitted). The Service further defines the "provincial home range" of an owl or pair as "a 1.2–1.5 mi (1.9–2.4 km) radius circle centered on a nest site or activity center." AR12582.

[9] The Late Mungers DNA Table 16 shows commercial logging as downgrading Foraging habitat, but given that there will be at least 251 acres of foraging that will be treated with the Open prescription and that prescription results in removal, *see* AR2779, it follows that those acres in Late Mungers will be removed.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

that the present and future use of public lands be "projected through a land use planning process[.]" 43 U.S.C. § 1701(a)(2). In FLPMA, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values[.]" 43 U.S.C. § 1701(a)(8).

FLPMA requires BLM to develop land use plans, called resource management plans ("RMPs"), that govern the use of land that BLM manages. 43 U.S.C. § 1712. Once an RMP has been developed, BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

### B.  National Environmental Policy Act (NEPA)

NEPA ensures that an agency carefully consider detailed information concerning significant environmental impacts, and guarantees that the relevant information will be made available to the public so that it may play a role in both the decision-making process and the implementation of the decision. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). To achieve these twin aims, NEPA and its implementing regulations set forth "action-forcing" procedures designed to (1) ensure that the agency took the requisite "hard look" at the environmental consequences of the proposed action, and (2) foster meaningful public participation. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349–51 (1989).

NEPA requires all federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement ("EIS"), the detailed

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

statement must describe, *inter alia*, the adverse environmental impact of the proposed action and alternatives to it. *Id.*; *see id.* § 4332(2)(E); 40 C.F.R. §§ 1508.11, 1502.1 (1978).[10]

In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. § 1508.27. In evaluating intensity, federal agencies must consider ten non-exclusive "intensity" factors, including, *inter alia*, impacts that may be both beneficial and adverse; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1)-(10).

To support an agency determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.7–.8. The information released must be of high quality and sufficient to allow the public to

---

[10] The Council of Environmental Quality ("CEQ") promulgated regulations implementing NEPA in 1978. *See* 42 U.S.C. § 4342 (establishing CEQ); 43 Fed. Reg. 55,978 (Nov. 29, 1978). The 1978 regulations, with two minor amendments, were in place through 2019. *See* 40 C.F.R. §§ 1500–1508 (2019); *Wild Va. v. Council on Envtl. Quality*, No. 3:20-CV-00045, 2020 U.S. Dist. LEXIS 166622, at *4–5 (W.D. Va. Sept. 11, 2020). CEQ modified the NEPA regulations by final rule on July 16, 2020. 85 Fed. Reg. 43,304 (July 16, 2020), codified at 40 C.F.R. §§ 1500–1508 (2021)). BLM began IVM-RL on July 2, 2019, using the 1978 CEQ NEPA regulations (as amended). AR2958. All citations in this brief are to the 1978 CEQ regulations.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

question the agency rationale and understand the agency's decision-making process. 40 C.F.R.

§ 1500.1(b); s*ee Robertson*, 490 U.S. at 349.

### IV.    STANDARD OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT (APA)

The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve

claims brought pursuant to the Administrative Procedure Act ("APA"). *See Nw. Motorcycle*

*Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Plaintiffs' FLPMA and

NEPA claims are reviewed pursuant to the APA, 5 U.S.C. § 706(2). *Or. Natural Res. Council*

*Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007). "The APA sets forth the procedures by

which federal agencies are accountable to the public and their actions subject to review by the

courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020)

(citation omitted). Under the APA, agencies must engage in "reasoned decisionmaking." *Id.*

Agency actions must be "set aside" if they are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," or adopted "without observance of

procedure required by law." 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary and capricious

where the agency "relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, [or] offered an explanation for its decision

that runs counter to the evidence before the agency[.]" *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Under this standard of review, a court is not

permitted to substitute its judgment for that of the agency, but must assess whether the decision

was "based on a consideration of the relevant factors and whether there has been a clear error of

judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## V.    ARGUMENT

**A.  This Court Has Jurisdiction Over Plaintiffs' Claims: Plaintiffs Have Standing and This Case Is Ripe for Review.**

As set forth in the declarations filed herewith, Plaintiffs are non-profit organizations whose members, supporters, and staff use and enjoy the public lands managed by the Medford District BLM, and whose interests are harmed by the approval of the IVM-RL Program but would be redressed by a favorable decision. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (citations omitted). The injury here is "imminent".[11] The BLM is actively planning and authorizing projects implementing the IVM-RL Program, and has already used the DNA process to authorize the Late Mungers Project. *See* Complaint, ECF1, ¶¶ 1–2. Within the project area, Plaintiffs' members use and enjoy the public lands for a variety of personal and professional recreational, scientific, and spiritual purposes and have firm plans to return.

Evelyn Roether is a recreationist, environmental educator, and landowner and worries about the negative impact the timber sales authorized pursuant to the IVM-RL Program will have on aesthetic, economic, social, and ecological values within the project area and surrounding region. Roether Decl. ¶¶ 1–4, 9, 11–14. Linda Pace, an avid hiker and grandmother, is troubled by the loss of access to old-growth forests for herself and future generations. Pace Decl. ¶¶ 9–12, 15. Spencer Lennard, a professional conservationist, is concerned about disturbances to wildlife, recreation, and his own professional research. Lennard Decl. ¶¶ 2–4, 9–10, 14. Alexi Lovechio

---

[11] An "injury in fact" must be "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

worries about the impact the Program will have on her work and the survival and recovery of the northern spotted owl. Lovechio Decl. ¶¶ 2, 8. George Sexton is particularly concerned about the far-reaching effects of losing late-successional forest stands. Sexton Decl. 12–18 ¶¶.

Because Plaintiffs' members' interests would be irreparably damaged by implementation of the IVM-RL Program, including but not limited to the Late Mungers Project, and the remedy requested will redress the injury, Plaintiffs have standing.[12] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560‑63, 572–73 n.7 (1992).

### B. BLM Failed to Demonstrate Consistency with the RMP Standards Governing Late Successional Reserve Lands in Violation of FLPMA.

In adopting the IVM-RL Program and specifically the Open and Intermediate prescriptions, BLM impermissibly ran afoul of a critical standard in the applicable 2016 RMP— the standard that ensures that LSRs will be able to provide functional and high-quality NSO habitat and avoid causing jeopardy to a seriously threatened and declining species.

### i. The Southwestern Oregon Resource Management Plan

FLPMA requires BLM to prepare RMPs for the various districts under its control. 43 U.S.C. § 1712. BLM must ensure that site-specific management actions are consistent with and conform to the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b), 1610.5-3(a); *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). As such, the IVM-RL Program and any associated timber sales, including Late Mungers, must comply with the RMP

---

[12] Because Plaintiffs' members have standing, Plaintiffs themselves have organizational standing to bring the case. *See Friends of the Earth*, 528 U.S. at 181.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

and the substantive management direction therein. *See* AR48411; AR00002–04; *see* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

The 2016 RMP contains both management "objectives" and "directions." AR48746. Management objectives are "[d]escriptions of desired outcomes for BLM-administered lands and resources in an RMP." *Id*. Management objectives are resource conditions that BLM desires or envisions would eventually result from proper implementation of the plan. AR49050. Management directions, on the other hand, are defined explicitly as "[r]ules" to achieve these objectives, and are binding. AR49050. Management directions "identify where future actions may or may not be allowed and what restrictions or requirements may be placed on those future actions to achieve the objectives set for BLM-administered lands and resources." *Id.*

### ii. Development of Nesting-Roosting Habitat and the 20-Year Standard

Late Successional Reserves are to be managed for two main objectives: to *maintain* and *promote* spotted owl habitat. To maintain habitat, the RMP management direction states that "[i]n stands that are currently northern spotted owl nesting-roosting habitat, maintain nesting-roosting habitat function, regardless of northern spotted owl occupancy." AR48814. To promote habitat, the RMP prohibits actions that would delay the development of owl nesting-roosting habitat by more than 20 years. AR48815. This standard (hereinafter, the "20-year standard") states:

> "In stands that are not northern spotted owl nesting-roosting habitat, apply silvicultural treatments to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term. Limit such silvicultural treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment. Allow silvicultural treatments that do not meet the above criteria if needed to treat infestations or reduce the spread of forest pathogens."

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*Id*. In other words, while BLM can log and temporarily degrade owl habitat, within the reserves, **logging cannot delay the development of nesting-roosting habitat by more than 20 years when compared to how the stand would develop without treatment.** BLM has failed to demonstrate that two of its IVM-RL logging prescriptions comply with this standard.

Spotted owls rely on older, structurally complex forest habitats that provide key features for nesting and roosting. AR02775, 12513. NSOs also need foraging habitat, which is similar to nesting-roosting but is often single storied, lacking in decadent features, and may have lower basal area. AR14641. Sixty percent canopy cover is the minimum canopy cover requirement for nesting-roosting and foraging habitat. AR14810, 2658. Maintaining and developing forest stands with canopy cover of sixty percent or greater is a crucial component of protecting habitat (including critical habitat) for NSOs and supporting their survival. AR48486–87. Other targeted components of nesting-roosting habitat are: basal area 180-240 feet$^2$, mean diameter of trees $\geq$ 21", quadratic mean diameter $\geq$ 15", at least 12 trees per acre over 20" in diameter, and a high basal area of trees over 26" in diameter. AR2658; *see also* AR2775 (setting out metrics for nesting-roosting and foraging).

To test whether certain logging prescriptions would meet the 20-year standard, BLM selected three sample stands and looked at these stand metrics. The stands were picked because "habitat field evaluation and stand plot data were available" for them. AR2656. Then:

> Stand-level inventory plot data for these three selected stands were processed and modeled in ORGANON, a tree growth and yield simulator. Growth for each representative stand was modeled through time under a no treatment scenario and three treatment scenarios based on the proposed action: RD targets[13] of 30 percent, 40 percent, and 45 percent (Long-Term Spotted Owl Theme, Ecosystem Resilience-Intermediate Theme, Alternatives A and B thinning prescriptions, Ecosystem Resilience-Intermediate Theme, and Ecosystem Resilience-Closed Theme, and the Spotted Owl Near-Term Theme).

---

[13] *Supra* note 5.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

The metrics for nesting-roosting habitat (see Appendix 6 for definitions) were used to determine when these stands reached nesting-roosting conditions when modeled into the future because **this specific management direction is about achieving nesting-roosting habitat (USDI BLM 2016b, p. 72).** The treated stands were then modeled for additional 20 years of growth to determine if there was a delay beyond 20 additional years in the treated stands.

*Id.* (emphasis added). Three problems emerged from this approach. First, BLM did not model or demonstrate compliance for the RD target of 20 percent, which corresponds to the Open treatments. *Id.* Second, BLM's modeling of the lighter Intermediate logging prescriptions demonstrate that they violate the 20-year standard and fail to achieve multiple key habitat metrics for decades into the future. And third, BLM claims later site-specific analysis will ensure compliance, but records from the subsequent Late Mungers timber sale reveal this promise to be empty.

### iii. BLM Failed to Show that the Ecosystem Resilience-Open Prescription Complies with the 2016 RMP

The Ecosystem Resilience-Open ("Open") logging treatment will decrease the relative density of forest stands down to 20 percent and create openings (often defined as "clearcuts") of up to 4 acres across 25 percent of the forest stand within the LSR. AR2612. Generally, this will remove a substantial amount of the forest stand's basal area, remove larger diameter trees that comprise the canopy, and reduce overall canopy cover such that it will take well over 50 years to recover. AR2642, 2659 (showing stands with RDI of 30 percent taking over 50 years to reach nesting-roosting parameters). These actions negatively affect the stand metrics that define owl habitat.

Failure to demonstrate compliance with an RMP standard is a FLPMA violation. *Brong*, 492 F.3d at 1124–26. Here, BLM did not even attempt to show that the Open prescription complies with the 20-year standard. AR2656 ("The Ecosystem-Open and Fuels Emphasis themes

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

were not modeled to determine if they would delay development of spotted owl nesting-roosting habitat by 20 years because these treatments are not designed to speed the development of spotted owl nesting-roosting habitat."); *see also* AR2663 (falsely stating Alternative C would only thin to 30-45 percent RD). This is a violation in and of itself. Further, given that the less aggressive Intermediate logging prescription also violates the 20-year standard as elaborated upon below, the Open prescription likely violates the standard because it will remove more canopy, basal area, and density. AR02618, 12417.

BLM attempts to explain this violation away by claiming that these prescriptions have different objectives. AR12417. But under the 2016 RMP, in *all stands* in LSRs that are not currently NSO nesting-roosting habitat, the agency must apply silvicultural treatments in such a way that they "speed the development" of nesting-roosting habitat or "improve the quality" of nesting-roosting habitat in the stand in the long term, *and* such treatments must not "preclude or delay" nesting-roosting habitat development by "20 years or more" in the stand, as compared to development without logging. AR48815.[14] This is the heart of the LSR management direction, and the only exception—related to infestations and pathogens—is not relevant here.[15] Any other

---

[14] BLM would be free to apply these exact prescriptions in the Harvest Land Base, *see* AR48811, but is likely choosing not to because BLM could implement even heavier logging prescriptions in that land use allocation that would generate more timber volume. AR48809.

[15] The only exception to the 20-year standard is to allow silvicultural treatments that do not meet the standard when necessary to address "infestations" and "forest pathogens." AR48815. "Pathogen" is not defined in the RMP, but when discussed in the RMP's FEIS, it refers to organisms that cause disease, like Swiss needle cast, sudden oak death, Port-Orford-cedar root disease, other root diseases such as Armillaria and Heterobasidion. AR51267. Most of these pathogens are subject to state and federal quarantine regulations and treatment involves "cutting, piling, and applying herbicides to host species within 300 feet of infected trees." AR51523. This is generally followed by successive years of surveys and retreatment if necessary. *Id.* The IVM-RL Program is not designed to address pathogens, its prescriptions do not involve pathogen treatment, and the EA contains no information concerning the presence of any pathogens. *See* AR2596–937. The only reference in the EA to pathogens is to the general

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2725

interpretation of these RMP standards is not entitled to deference because their language is plain and unambiguous. *See Brong*, 492 F.3d at 1127. BLM's failure to demonstrate consistency with the RMP is a violation of FLPMA. *Id.* at 1124–26; *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005) (while the analysis need not be perfect, the court "must still be able reasonably to ascertain from the record" that the agency is in compliance with the plan standard).

### iv.    BLM's Modeling of the Intermediate Ecosystem Resilience Logging Prescription Demonstrated a Violation of the 20-year Standard.

BLM also failed to show that the Intermediate prescription (30 percent RDI) can meet the 20-year standard; in fact, its modeling showed the opposite result. AR2659. The Intermediate prescription will also downgrade and remove spotted owl habitat metrics, AR2780, but unlike the Open prescription, BLM actually modeled the Intermediate treatments on three "sample" stands for compliance with the 20-year standard. The outcome of even this self-selected and non-representative limited sample demonstrated that the Intermediate prescription will delay the establishment of nesting-roosting habitat conditions by more than 20 years when compared to no treatment. AR2659–60 (Table 22 demonstrating that for each sample stand "no treatment" provided sufficient canopy cover and basal area to serve as nesting and roosting habitat in 30 years, while the 30 percent RDI treated stands did not meet those minimum habitat thresholds in 50 years, and were further behind than no treatment). BLM's own modeling demonstrates that the proposed logging prescriptions would preclude or delay the development of nesting-roosting habitat by more than 20 years. *Id.*

---

assumption that in dry forests, "management would emphasize increasing fire resistance and resilience, which would often also increase resistance to drought, insects, and pathogens." AR02615. But plainly the logging is not "needed to treat infestations or reduce the spread of forest pathogens" such that the exception to LSR standards applies. AR48815.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

In sum, these two prescriptions would take Late Successional Reserve forests that *currently function* as spotted owl foraging habitat, and set them back by more than half a century. These prescriptions fail to comply with the RMP's standards governing logging in LSRs and therefore violate FLPMA.

> **v.    BLM's Promise to Analyze Future Compliance with the 20-Year Standard Was Misleading**

In addition to the problems with modeling described above, BLM also admits the effects of the IVM-RL Program's proposed logging treatments "really depend[] on the site-specific starting elements of a stand," further calling into question the value of the modeling. BLM states it will conduct site-specific analysis later to ensure the 20-year standard is not being violated. AR2663 ("[I]ndividual projects would adjust prescriptions as needed (within the RD range in the appropriate treatment theme location) to reach the desired outcome and not delay the development of nesting-roosting by 20 years when compared with not treating the stand.").  But compliance must be demonstrated now, not deferred. *See, e.g.*, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30 (1998) (holding that the duty to demonstrate Forest Plan consistency applies at the time of the decision, not at a speculative future date). And further, for its first commercial logging project, Late Mungers, BLM did not follow through on this promise.

The Late Mungers timber sale, proposes Open—the heaviest logging prescription—for the majority of acres that will be commercially logged. AR21 (Table 12). The Late Mungers DNA has a 20-year standard compliance section that states that "[t]he BLM selected a total of 91 acres for modeling because they represented the same type of non-nesting-roosting stands modeled in the IVM-RL EA that have the ability to maintain or develop into nesting-roosting habitat." AR29. The DNA then points to "Appendix 3 for a summary table of modeling outputs from the Late Mungers units," AR29, but Appendix 3 appears to be data from a single timber

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

sale unit with a logging prescription of 35 percent RDI and no subsequent analysis of its compliance with the 20-year standard. AR77. Members of the public specifically complained about this, and BLM's response to comments stated it would publish the data in the administrative record.[16] AR115. Plaintiffs were unable to find any data or analysis in the administrative record that analyzed the application of the Open prescription to the 20-year standard. In any case, BLM's selection of a handful of timber sale units that "represented the same type of non-nesting-roosting stands modeled in the IVM-RL EA" is insufficient because these timber sale units are spread across a diverse landscape. *See* AR37–63. Ultimately, the conclusions in the DNA are unsupported by any data or analysis. AR29 (claiming modeling results are consistent with IVM-RL EA but failing to include them). Given that the IVM-RL EA modeling that *is* included indicates that the 20-year standard will be violated by the Ecosystem Resilience prescriptions, the application of those logging prescriptions to more than 500 acres within the LSRs in the Late Mungers project is a violation of FLPMA. AR25; *Brong*, 492 F.3d at 1130–32 (finding a FLPMA violation where BLM failed to demonstrate or rationally explain compliance with RMP standard).

These violations are not de minimis or insignificant on the landscape. The IVM-RL DR approved up to 20,000 acres of commercial logging, including 17,000 acres in the LSR. AR2939–40. Crucially, there are no acreage limits for implementation of the specific "prescriptive themes" adopted in the IVM-RL DR, *id.*; AR02618–19, meaning BLM could apply the Open or Intermediate prescription to all 17,000 acres of LSR and still be in compliance with

---

[16] This position by BLM problematically ensures that members of the public could not access this data unless they sued the agency.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

the IVM-RL DR.[17] In sum, BLM's decision to approve commercial logging treatments that are inconsistent with RMP requirements meant to protect NSOs on up to 17,000 acres of LSR—the specific lands set aside to ensure NSO survival—violates FLPMA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

### C. The IVM-RL Program Violates NEPA

There are two problems with the NEPA analysis undertaken by BLM for the IVM-RL program: 1) the level of NEPA completed was insufficient because the IVM-RL Program may result in significant effects to the environment, requiring an EIS; and 2) BLM relied upon an improper "programmatic" procedure that inadequately assessed and failed to take a "hard look" at critical site-specific effects of the Program. The two problems are interrelated but will be discussed separately below. This Court should find that an EIS is required, *and* that BLM must utilize a legal NEPA process in assessing and taking the requisite "hard look" at site-specific impacts of the Program.

### i. The IVM-RL Program Necessitates an EIS.

NEPA requires agencies "to the fullest extent possible" to prepare an EIS for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS requirement is the heart of NEPA. *Pub. Citizen*, 541 U.S. at 757. When an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Comm. v. Block*, 840

---

[17] Notably, all 20,000 of the proposed acres of commercial logging could be "Open" treatments, as BLM states that the treatment plan does not have limitations on creating open forest conditions, and a total of 31,000 acres of the Treatment Area are eligible to receive the "Open" prescription. AR02618–19, 02629.

F.2d 714, 717 (9th Cir. 1988) (citing references omitted); *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). An agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion and will be set aside if it is "arbitrary and capricious." *Kern v. BLM*, 284 F.3d 1062, 1070 (9th Cir. 2002) (citing *Marsh v. ONRC,* 490 U.S. 360, 376–77 (1989)).

CEQ regulations set forth the criteria agencies must consider when determining whether an action will significantly affect the environment and consequently requires a full EIS. 40 C.F.R. § 1508.27. The two-part inquiry into the "significance" of the impacts of a federal action requires an agency to consider "both context and intensity." *Id.* Context refers to the setting and circumstances of the proposed action, including "society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity "refers to the severity of impact" and requires analysis of ten specific factors. *Id.* § 1508.27(b). Meeting just one of these "intensity factors" may be sufficient to require preparation of an EIS. *Ocean Advocates v. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004); *see Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001). Here, the IVM-RL Program requires completion of an EIS because its environmental effects "may" be significant, in both their context and intensity.

### a. Context Weighs in Favor of an EIS

"Context simply delimits the scope of the agency's action, including the interests affected." *Babbitt*, 241 F.3d at 731. In the case of a site-specific action, the contextual analysis of significance "usually depend[s] upon the effects in the locale rather than in the world as a whole." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020). If an agency chooses to use a "larger analysis area," even when the proposed action involves a site-specific location, it

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

should be prepared for the environmental impacts that present themselves to be diluted down and imprecise, *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014), which is what they are here.

The geographical context here is the 875,290-acre IVM-RL Planning Area. AR2599, 2957, 24023 (map). BLM's analysis of potential environmental impacts occurs at this vast scale and omits any information or data regarding site-specific impacts of its LSR logging program. In using a larger analysis area and doing a programmatic analysis, BLM diluted the effects of the action. *See, e.g.*, AR2653 (fractions of NSO habitat removed as compared to large treatment area). This dilution combined with the lack of site-specific analysis, and the fact that this project targets LSRs—lands set aside for habitat protection[18]—with widespread logging that will remove late-successional NSO habitat for the long-term weighs in favor of an EIS. *See Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1157 (D. Or. 2019) ("An agency cannot minimize an activity's environmental impact by adopting a broad scale analysis and marginalizing the activity's site-specific impact."); *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1036 (9th Cir. 2001).

### b.    Multiple Intensity Factors Weigh in Favor of Significance

The intensity analysis "relates to the degree to which the agency action affects the locale and interests identified in the context part of the inquiry." *Babbitt*, 241 F.3d at 731. To determine the severity of the impacts (the intensity), the agency must consider ten non-exhaustive factors. *See id.*; 40 C.F.R. §1508.27 (b)(1)–(10); *see also Cascadia Wildlands v. U.S. Forest Serv*., 937 F. Supp. 2d 1271, 1283–84 (D. Or. 2013) (holding that when considered individually, certain

---

[18] "LSRs lie at the heart of the NFP's ecosystem-based conservation strategy for the northern spotted owl and other endangered species." *Bron*g at 1126. This principle is carried forward into the 2016 RMP.

significance factors might not have triggered the need for an EIS, but "when considered

collectively, they do."). The Ninth Circuit has held that presence of even one intensity factor may

necessitate preparation of an EIS. *Ocean Advocates*, 402 F.3d at 865.

### 1.     The Effects of the IVM-RL Program Are Highly Uncertain

By producing a vague, generalized EA and conducting no further NEPA, BLM

acknowledged and embraced a high level of uncertainty regarding short-term and long-term

environmental effects of the IVM-RL Program. Procedurally, BLM frames the IVM-RL EA as

"programmatic," *see*, *e.g.*, the footer of the EA, but in fact, this is not "Programmatic NEPA"

because no site-specific NEPA analysis will ever occur. Instead, BLM adopted a "program" with

maximum flexibility that, by design, results in highly unknown and uncertain effects thus

requiring an EIS.

When evaluating the adequacy of an EIS or an EA, courts have long recognized a

distinction between programmatic and site-specific environmental analyses. *See, e.g.*, *Nat'l*

*Wildlife Fed. v. Appalachian Reg'l Comm'n,* 677 F.2d 883, 888 (D.C. Cir. 1981) ("Whereas the

programmatic EIS looks ahead and assimilates 'broad issues' relevant to one program design, the

site-specific EIS addresses more particularized considerations arising once the overall program

reaches the 'second tier,' or implementation stage of its development."); *see also Friends of*

*Yosemite Valley v. Norton*, 348 F.3d 789, 800–01 (9th Cir. 2003) (recognizing that "NEPA

requires a full evaluation of site-specific impacts only when a 'critical decision' has been made

to act on site development—*i.e.*, when 'the agency proposes to make an irreversible and

irretrievable commitment of the availability of resources to a project at a particular site.'")

(*quoting California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)) (emphasis deleted)); 40 C.F.R.

§§ 1502.20, 1508.28 (allowing "tiering"). As the Ninth Circuit explained, the key inquiry is not

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

"whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur." *Block*, 690 F.2d at 761.

The problem here is that BLM resources have been committed, but there is never going to be any site-specific NEPA, and the IVM-RL EA is intentionally vague in its disclosure of effects. As such, because of the flexible, largely undefined nature of the program, which will nonetheless affect thousands of acres, and because DNAs are not NEPA documents, the IVM-RL Program required an EIS to cure the uncertainty and adequately disclose site-specific effects.

Here, the "programmatic EA" explains that "[t]reatments proposed in this EA could occur anywhere within the 'Treatment Area,'" which encompasses 684,000 acres.[19] AR2600. It goes on to explain:

> "when designing subsequent site-specific projects, BLM would evaluate each project to determine if the project is adequately analyzed by this EA and the 2016 PRMP/FEIS, and whether the project conforms to any programmatic decision for this EA. BLM would document whether this EA provides adequate analysis for the project in a Determination of NEPA Adequacy (DNA) worksheet. To implement projects that are not adequately analyzed by this EA, BLM would prepare additional [NEPA] review (e.g. a separate EA)."

AR2600.[20] However, BLM has subsequently issued three DNAs (including the Late Mungers Project), but has completed no further site-specific NEPA, as discussed *infra* Section V.C.ii.

A critical example of the uncertainty about effects from the IVM-RL Program is the lack of information in the EA about the potential site-specific effects of 17,000 acres of LSR logging, all of which could potentially remove or downgrade existing NSO habitat, or prevent it from functioning as nesting-roosting habitat for the long-term. For instance, there is no discussion of effects on occupied NSO territories (apart from a bare assertion that NSOs will not be "taken")

---

[19] The "Treatment Area" is slightly smaller than the overall Planning Area because it excludes some areas that have different designations or land use allocations. AR2957.

[20] Notably, the level of public involvement for each subsequent project is subject to manager discretion. AR2602.

or NSO critical habitat across the treatment area. And such effects will never be considered. *See, e.g.*, AR12403 (BiOp noting "locations of projects are unknown in relationship to spotted owl sites at this time"), 12470 (referring to later site-specific analysis for effects to ensure compliance with NSO Recovery actions); AR2600. This uncertainty was intentionally built-in to provide BLM timber planners maximum flexibility when logging LSRs. AR02944 (the chosen alternative "would provide for the greatest flexibility for treating stands and treatment areas due to the number of acres available for treatment and the flexibility in treatment prescriptions allowed."). But as Magistrate Judge Hallman recently noted, "[a]llowing for the widest range of possible outcomes breeds uncertainty." *Greater Hells Canyon Council v. Wilkes*, No. 2:22-cv-00859-HL, 2023 U.S. Dist. LEXIS 178671, at *32, *42 (D. Or. Aug. 31, 2023) (F&R not yet adopted) (finding an EIS was required where there was substantial uncertainty about how an intentionally flexible forest plan amendment would be implemented).

The IVM-RL EA's analysis does little, if anything, to resolve or minimize the uncertainty. With respect to modeling effects to NSO habitat, BLM states that "because treatment locations are unknown, three stands categorized as either foraging or dispersal-only habitat were selected across the Medford district for analytical purposes to represent examples of dry forest stands that would receive treatment under each alternative." AR2656. This means BLM modeled only three stands across the 684,000 acres, and only modeled "dry forest stands" even though there are approximately 40,000 acres of moist forest stands across the project area. AR2615 (6% of 684,000 acres). Ultimately, the agency does not really know what the effects or outcomes of the LSR logging prescriptions will be. The EA says:

> **The analysis relied on only three examples of representative stands and the ability of a stand to develop into nesting-roosting habitat really depends on the site-specific starting elements of a stand.** Additionally, individual projects would adjust

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

> prescriptions as needed (within the RD range in the appropriate treatment theme location) to reach the desired outcome and not delay the development of nesting-roosting by 20 years when compared with not treating the stand.

AR2663 (emphasis added); *see also* AR2642 (effects on NSO critical habitat unknown and deferred to later analysis). This paragraph reveals how little the agency truly knows about what will ultimately occur when the IVM-RL Program logging is implemented and whether NSO habitat will get better or worse as a result. At bottom, the treatments will indisputably have negative effects on NSOs and their habitat in the short term, and there is substantial uncertainty about the effects of the IVM-RL Program's logging prescriptions on spotted owl LSR habitat long term. AR14727 (finding the majority of the proposed actions may affect and are likely to adversely affect NSOs). This factor weighs strongly in favor of an EIS. *See, e.g.*, *Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 21-00161-SAB, 2023 U.S. Dist. LEXIS 107552, *11 (E.D. Wash. June 21, 2023) (finding the project significant because its context "create[d] uncertain risks to old-growth forests and the wildlife dependent on them."); *Ocean Advocates*, 402 F.3d at 870 (holding the agency should conduct an EIS to clear up speculation regarding impacts on oil tanker traffic in the EA).

The subsequent non-NEPA DNA process used by BLM to implement IVM-RL does not obviate the need for an EIS for the IVM-RL Program. DNAs are "an administrative convenience created by BLM," and are not defined or referred to in NEPA or its implementing regulations. *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006). A DNA is not a NEPA document and cannot substitute NEPA analysis. *Id.* at 1261–62, 1264. The Late Mungers Project, for which BLM issued a DNA, is a relatively large logging project: over 7000 acres, with 830 acres of commercial logging, and impacts eleven to NSO activity centers including at

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

least three occupied nests. AR9, 124. Courts have required an EIS for less.[21] But instead of

disclosing these significant effects, BLM completed *no* NEPA for Late Mungers. BLM's

purposeful evasion of its obligation to conduct site-specific analysis of environmental impacts

within an actual NEPA document violates the basic requirements of the statute. *See, e.g.*, 40

C.F.R. §§ 1502.14, 1502.16, 1508.8; *Kern v. BLM*, 284 F.3d 1062, 1072–73 (9th Cir. 2002)

(finding site-specific analysis of an action must occur in a NEPA document).

Critically, BLM *could* have disclosed site-specific impacts—including those from the

Late Mungers Project—in the IVM-RL NEPA analysis, but it arbitrarily chose not to.  This is

also contrary to NEPA. "If it is reasonably possible to analyze the environmental consequences"

of a particular type of action at a particular stage, "the agency is required to perform that

analysis." *Kern*, 284 F.3d at 1072 (requiring analysis of foreseeable impacts to particular species

at the resource management plan stage, notwithstanding that those impacts could be analyzed

more precisely at a later site-specific project stage); *see also Idaho Sporting Cong. v. Thomas*,

137 F3d 1146, 1150–51 (9th Cir. 1998) (requiring an EIS where the agency failed to conduct

adequate site-specific water quality analysis during NEPA process, despite earlier analysis). The

record demonstrates that the BLM was planning the Late Mungers timber sale long before it

completed the IVM-RL NEPA process, yet disclosed none of the site-specific information about

Late Mungers in the IVM-RL EA. *See, e.g.*, AR39643, 39980, 10996, 31284 (Late Mungers

analysis pre-dates the IVM-RL decision by several years). This information was critical to

ascertaining what the true effects of the IVM-RL program would be as implemented. *See Native*

---

[21] *See, e.g.*, *Or. Wild v. BLM*, No. 6:14-cv-0110-AA, 2015 U.S. Dist. LEXIS 32584, at
\*27–31 (D. Or. Mar. 14, 2015) (requiring an EIS where logging project would remove 153 acres
of suitable Northern spotted owl habitat).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*Vill. Of Point Hope v. Jewell,* 740 F.3d 489, 497 (9th Cir. 2014) (quoting *Kern*) ("Regardless of whether a programmatic or site-specific plan is at issue, NEPA requires that an EIS analyze environmental consequences of a proposed plan as soon as it is 'reasonably possible' to do so."); *Kern,* 284 F.3d at 1072 ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done.").

For example, of the 800 acres of commercial logging in the Late Mungers Project, over half of those acres will receive the Open prescription, removing a substantial amount of currently functional foraging habitat and NSO designated critical habitat *in occupied NSO territories* for the long term. AR274. This type of site-specific information was relevant and should have been disclosed in the IVM-RL NEPA analysis, along with this same information for the remaining areas that will be treated pursuant to the IVM-RL Program, to properly account for cumulative effects.[22]

In sum, BLM built substantial uncertainty into the IVM-RL Program's public-facing disclosure of effects, even though it already knew where and how it would be implementing the Program and could analyze effects. Instead of its "faux-programmatic" NEPA approach, if BLM wanted to rely on a programmatic analysis and avoid any further NEPA obligations, a complete EIS with disclosure of known and foreseeable site-specific effects was warranted. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732 (9th Cir. 2001) (citations omitted) (The very

---

[22] In response to comments about failure to analyze site-specific effects, BLM explained: "Maps 3, 4, 5, 6 and 7 displayed potential commercial and non-commercial treatment areas and commercial prescription themes by action alternative." AR02536. These maps show with relative specificity where the treatments might be located on the landscape, which means BLM could have analyzed the site-specific effects, but chose not to.

purpose of an EIS is to "obviate the need for speculation," and "[p]reparation of an EIS is mandated where uncertainty may be resolved by further collection of data[.]")

### 2. The IVM-RL Program's Commercial Logging Plan Is Highly Controversial

Late Successional Reserves are to be managed by BLM to maintain or promote the development of spotted owl habitat. AR48813. The majority of the IVM-RL Program's commercial logging will occur in LSRs. AR2612. While commercial logging is permitted within these reserves for certain purposes, BLM's proposed Open logging is admittedly not intended to promote owl habitat. AR2656. BLM will "remove," not just degrade, existing, functional owl habitat through its Open logging prescription. AR2642; 2940 (Decision Record allowing logging down to 20 percent RD across all project acres). In an attempt to justify its plan, BLM asserts a need to reduce fire. AR2605. But not just any fire, an oddly specific type: "atypical large-scale crown fire." AR2619. BLM reasons that logging will help prevent a high intensity surface fire from evolving into a stand-replacing crown fire, which might have negative impacts on owls. *Id.* But this position is substantially in dispute and highly controversial, and an EIS is required. 40 C.F.R. § 1508.27(b)(4); *Blue Mts. Biodiversity Project*, 161 F.3d at 1212 (citations omitted) (requiring an EIS due to controversy where there is "a substantial dispute [about] the size, nature, or effect of the major Federal action"); *Babbitt*, 241 F.3d at 736 (citations omitted) ("A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions.").

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Here, as discussed below, Plaintiffs and others raised specific evidence that BLM's chosen logging prescription will exacerbate fire issues, not make them better.[23] *See, e.g.*, AR19991; AR1966–76; AR31785–92. Thus, the burden is then shifted to the agency to "come forward with a well-reasoned explanation demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences." *Babbitt*, 241 F.3d at 736 (interna citations omitted).

The Open commercial logging prescription is a regeneration-type prescription, creating open conditions through the thinned portion of the stand with canopy cover averaging to 30 percent, and converting a quarter of logged areas into group selection openings intentionally designed to create new young plantations. AR2736.[24] Additionally, 25 percent of the stand will be converted into gaps or group openings (areas of complete tree removal or clearcut areas). AR2612. BLM will replant trees in these openings and potentially inside the thinned units. These "gaps" or regeneration-type components of the Open and Intermediate treatments (which may result in up to 25 percent of the unit being clearcut) are highly controversial from both a fire risk and owl habitat standpoint. Plaintiffs and others contended that this logging prescription will

---

[23] As an initial point, it is important to distinguish the different types of "fuel reduction treatments" that are analyzed in the literature and proposed by BLM here. The non-commercial hazardous fuel reduction and prescribed fire components are supported by Plaintiffs, and their effects are not in dispute. AR2620–21. These activities were intentionally excluded from the scope of Plaintiffs' complaint. To further regional fire containment efforts, BLM has located these activities strategically along "Potential Wildfire Operational Delineations" or "PODs," which are lines along landscape features agencies will use to contain fires in the future. AR2694. The maps from the Late Mungers DNA readily demonstrate how the proposed "small diameter thinning and prescribed fire maintenance" activities are strategically located along these defense lines and the nearby communities at risk. *See, e.g.*, AR39, 43, 44.

[24] The EA states: "Uneven-aged management systems must consider regeneration or else the system cannot be sustained over time (O'Hara, 2014, pp. 84–97). Turning over portions of stands through group selection would allow for a vigorous, young cohort to establish, while thinning other portions would allow for enhanced growth of residual trees." AR2736.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

increase fire risk and severity and provided a substantial body of scientific literature and prior examples of BLM NEPA analysis that concluded as much. *See, e.g.*, AR1966–76; 31785–92. These comments focused on the "group selection openings." AR1966 (commenters flagging replanting and plantation creation in group openings); AR1967 ("[P]lantation stands sustain statistically higher severity fire effects. (Odion et al. 2004, Zald. 2018)."); AR1970 ("[M]ore open conditions and more intensive forest management led to accelerated levels of fire severity (Lesmeister. 2019, Zald. 2018)."); AR1972–3.[25]

BLM acknowledged these comments but points to its analysis of fire in the EA and denies there is any controversy. AR2449. This position is contradicted by the record. For example, BLM never addresses the group selection openings in isolation, but cites studies to argue that its thinning will generally have beneficial fire impacts. AR2620–1. These studies either do not pertain to gap creation or explicitly find these openings have opposite negative impacts. For example, BLM cites Bigelow and North (2011) to conclude that its thinning will not increase wind speed and fuel moisture and the associated fire risks that correspond to those two

---

[25] *See also* AR31785–92 (Compilation of previous BLM analysis of timber sales with similar logging prescriptions admitting these logged areas will "exhibit higher flame lengths, rates of spread, and fire intensity. Fires started within these stands could be difficult to initially attack and control. For 5 to 20 years following planting, the overall fire hazard would increase in these stands."); AR1970–1 ("On the 2002 Biscuit Fire that burned near our study area, Thompson and Spies (2009) . . . found that forests with small-stature vegetation and areas of open tree canopies and dense shrubs experienced the highest levels of tree crown damage, while older, closed-canopy forests with high levels of large conifer cover were associated with the lowest levels of tree crown damage. The moisture content of air and soil in a forest affects the amount of fuel moisture, and thus the probability of ignition and burning temperature (Heyerdahl et al. 2001)."); AR1972 ("[M]ore herb and shrub fuels usually imply more open conditions which are associated with lower relative humidity and higher wind speeds. Dead fuels may be drier and the rate of spread may be higher because of the altered microclimate from more closed canopy forest with less understory" (citing Agee 1996)); AR1972 (Wilson et al 2007 found an increase in shrub density at 16 and 30 years following thinning; Campell 2008 finding the same); AR1973 (Weatherspoon and Skinner 1995 found higher levels of fire severity on open sites when compared to closed, canopy forest).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

variables. AR2847. But that study analyzed gap creation and concludes that these openings "greatly increased wind speeds and higher surface temperatures mean[ing] that they are at risk for more severe fire behavior. This should be of particular concern when group selection openings are embedded within fuels-reduction thinned stands that form part of a network for rapid access by fire-fighting personnel (Moghaddas et al., 2010)." AR60619. The authors specifically counsel against opening creation in thinning units, the exact approach being implemented by BLM here.

The metastudy by Martinson and Omi (2013) that BLM uses to justify its logging treatments analyzed a number of different fuel reduction treatments, but none of them involved gap or opening creation. AR59092. Further, the Prichard studies BLM continually relied upon to justify its logging did not include gap creation, and the authors explicitly counsel against creating openings in southwestern Oregon. AR62043.[26] BLM never addresses repeated criticisms of its proposal to create gaps in up to 25 percent of its logged areas, and instead repeatedly responds with broad claims that thinning generally will have beneficial fire effects. AR82. The studies BLM cites in fact establish that gap creation logging has *negative effects* on fire behavior.

BLM also attempts to dodge this issue by assuming that "[c]ommercial thinning and group selection openings actions would not shift mature and structurally-complex forest structural stages because proposed actions would not harvest the entire stand." AR2622. The RMP's fire analysis is based upon assigning areas each a structural stage with corresponding

---

[26] Prichard (2010) says: "the efficacy and longevity of treatments could be reduced compared with the dry forests of our study area. For example, in a landscape analysis of fire severity in the 2002 Biscuit fire in southwestern Oregon, Thompson and Spies (2009) reported that shrub cover was one of the most important predictors of fire severity. Plantations and other clearings involved in the Biscuit fire experienced the highest incidence of fire severity and were associated with a flammable shrub stratum."AR62043.

levels of fire-resistance: "vegetation structural stage is an important component affecting resistance to stand replacing fire, and assigned forest structural stages to a relative ranking of resistance to stand-replacing fire." AR2620 (RMP citations omitted). The function of BLM's assumption here is that for purposes of its fire analysis, all commercially logged areas will maintain their existing higher-level fire resistance rating (the existing level of fire resistance associated with mature forests)[27] regardless of the logging. BLM's assumption eliminates consideration of the fact that on the ground 25 percent of these areas will be areas of total tree removal, followed by replanting, which will amount to structural changes across thousands of acres. AR3377; AR48488–9. These will be open early successional areas, "areas with less than 30 percent canopy cover," and this "structural stage is typically comprised of highly flammable vegetation (Agee 1993)." AR52428. When combined with open conditions that can increase surface wind speeds and flames lengths, fire risks actually increase. AR52429; AR2630; AR557, 590; AR61364. This means that in the next 10 years, BLM may convert 4,250 acres, AR2940 (25% of 17,000 acres), across the landscape into a structural stage with high fire hazard. *See* AR2618 ("Alternative C does not have limitations on creating open forest conditions."). BLM acknowledges that these group selection openings are intended to be "regeneration" harvests to establish a new, "young cohort." AR2736; *see also* AR3379 (the group openings will resemble "plantations"). These are structural forest changes, which means BLM's assumption that this extensive logging will not shift structural stages is incorrect and violates NEPA. *See Native*

---

[27] Mature forests have relatively higher fire-resistance ratings because they have larger numbers of bigger trees with thicker bark that improve fire resistance and increase the likelihood of low to moderate severity burning. "[T]hese structural types can create influential microclimates and shelter surface winds, harboring conditions that are more likely to result in lowered fire severity (Odion et al. 2004), particularly in topographic locations with low fire probability." AR52430.

*Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) ("To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data[.]"); 40 C.F.R. § 1500.1(b). Essentially, BLM is selectively presenting only the potential positive impacts of its logging program without analyzing or acknowledging the downsides. This approach hides the substantial dispute over effects. *Bark,* 958 F.3d at 871(Ordering EIS because "[t]he effects analysis did not engage with the considerable contrary scientific and expert opinion; it instead drew general conclusions[.]").

The body of research presented by Plaintiffs in comments was the basis for the Ninth Circuit's recent ruling in *Bark v. U.S. Forest Service* that overturned an agency decision to conduct "fuel reduction" via heavy commercial thinning of mature forests on the east side of Mt. Hood National Forest because the Forest Service's claim that such logging would have beneficial fire impacts was contradicted by a "substantial body of research." 958 F.3d at 870–71; *see also* AR13421 ("[R]ecent research indicates that forests with less environmental protection and more tree removal tend to burn more severely."). As in *Bark*, BLM has failed to meaningfully engage with this body of research. 958 F.3d at 871. Notably, Plaintiffs pointed out that even if these logging treatments would be effective, the odds of fire actually intersecting the logged area in the relevant time window following the logging is extremely low. AR2621 ("there is a presumed low instance of wildfires intersecting fuel treatments"); AR66477 (Rhodes and Baker (2008) finding in Ponderosa Pine forests there was a 2-4% chance of treated areas being affected by high-severity fire). The Rhodes and Baker study assumed these treatments would be effective for 20 years, AR66479, but if reduced to 11 years, the time when fuels returned to pre-treatment levels, "the probability that higher-severity fire affects treatments [reduces] by ~45%" on top of that already low percentage. AR66479. This is especially apparent when comparing the strategic

locations of the small diameter thinning and burning activities approved in the IVM-RL DR, to the isolated commercial logging units that would readily be burned through and around in the instance of a fire. *See*, *e.g.*, AR37, 39, 41, 42; AR59110.

In sum, the IVM-RL's Ecosystem Resilience prescriptions, which will remove existing owl habitat and have substantial negative effects on owls,[28] is a high-risk-low-yield approach that is highly controversial and has uncertain effects. BLM's failure to recognize and adequately analyze the negative fire consequences of the proposed logging prescriptions (including the gap creation) violates NEPA, and the discrepancy between scientific evidence presented by Plaintiffs in their comments and the agency's assertions represents a significant scientific controversy warranting an EIS. *Bark*, 958 F.3d at 871; *see Or. Wild v. BLM*, 2015 U.S. Dist. LEXIS 32584 at *23 (D. Or. Mar. 14, 2015) (BLM failed to meet its burden of showing in FONSI that there was no legitimate controversy where scientific reports and comments showed otherwise).

### 3.      Beneficial vs. Adverse Effects

Another key intensity factor weighing in favor of an EIS is found in 40 C.F.R. § 1508.27(b)(1)—"[i]mpacts that may be both beneficial and adverse." The regulation states "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." *Id.* This factor is at the crux of why the IVM-RL Program requires an EIS: the agency is ostensibly trying to find a balance between protecting and promoting spotted owl habitat, as required by the RMP, and making the forest and surrounding areas more resilient from wildfire. Ultimately, the path the agency chose *does* result in significant effects to NSO habitat,

---

[28] The Biological Opinion noted that in the gap areas, "where nesting/roosting and foraging habitat is fragmented, the effects to spotted owls may be disproportionately greater than the acreage of removal would indicate (e.g., a relatively small amount of removal may fragment a large patch of habitat)." AR12419.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

including occupied habitat within the LSRs, and will prevent thousands of acres of currently

suitable NSO habitat within the LRSs from functioning as NSO habitat for many decades, even

though it admits that is the primary purpose of those lands.[29] *See supra* Section V.B. This

significant effect, even when contrasted against alleged beneficial effects from the IVM-RL

Program, requires an EIS. *See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F.

Supp. 2d 1069, 1086 (E.D. Cal. 2004) ("Neither the net long-term benefits of the program, nor

the risk associated with not implementing the project, relieve the Forest Service of its duty to

conduct an EIS when the project will have significant environmental impacts.");[30] *see also Ctr.*

*for Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 U.S. Dist. LEXIS

137985, at *28 (E.D. Cal. Oct. 7, 2015) (stating that in making its determination of significance

the Forest Service did not *improperly* "rely on the Project's benefits to discount its negative

effects").

More specifically, the EA states that 7,995 acres of nesting, roosting and foraging habitat

were lost to fires within the analysis area. AR02648. Comparatively, the IVM-RL Program will

remove at least 2,600 acres and downgrade at least 3,900 acres of foraging habitat across all land

use allocations. AR02650, Table 19. These removed and downgraded acres will be cumulative

with 74,000 acres of NRF habitat projected for removal in the HLB land use allocation over the

next 50 years, or approximately 14,800 acres per decade. AR02647, Table 18. Thus, even

assuming the implementation of IVM-RL will decrease fire hazard on some existing NRF habitat

---

[29] These effects on NSOs and their habitat also weigh in favor of the need for an EIS. *See* 40 C.F.R. § 1508.27(b)(9).

[30] Notably, in *Klamath-Siskiyou Wildlands*, the agency attempted to rely on protection of the reserve system (LSRs) to justify harm to NSO habitat in that project, which was outside of LSRs. *Id.* at 1083. Conversely, here the harm is happening *inside* the LSRs, making it arguably even worse.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

(which, as discussed below, is disputed), cumulatively the IVM-RL Program and logging in HLB will remove *twice* as much foraging habitat as fire. BLM never grapples with this balance of effects.

Further, as discussed above, the likelihood that the logging treatments will help in the context of fire is suspect. BLM admits that "during extreme fire weather events and plume-dominated fire behavior, even fuel profiles and vegetation structure representative of historic fire regimes may have a reduced likelihood of altering fire behavior (Lydersen et al. 2014), and treated areas may become less effective at altering fire behavior (Ewell et al. 2015), resulting in large areas of high severity." AR51299; AR2621. These extreme weather events are projected to increase dramatically, AR51299, thus increasing the likelihood these logging treatments will be ineffective. Studies in the record which have analyzed this projected increase in high-severity fire have concluded that negative impacts from logging owl habitat strongly outweigh the negative impacts anticipated from fires. AR57661–2 ("Even an immediate doubling of fire rates due to climate change or other factors would result in far less habitat affected by high-severity fire than thinning. In addition, much of the high-severity fire might occur regardless of thinning, especially if the efficacy of thinning in reducing high-severity fire is reduced as fire becomes more controlled by climate and weather (Cruz and Alexander 2010)."). This body of research casts doubt on whether the IVM-RL Program, which will remove substantial amounts of functional NSO habitat, will actually further fire related goals. This difficult balance between beneficial and adverse effects requires an EIS.

**4.      An EIS is required because the IVM-RL Program threatens a violation of FLPMA.**

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

An EIS is also required because the IVM-RL Program "threatens a violation of Federal, State, or local law." 40 C.F.R. § 1508.27(b)(10). As discussed above, *supra* Section V.B., the IVM-RL Program violates FLPMA because it fails to comply with the 2016 RMP's 20-year standard for NSO nesting-roosting habitat.

### 5.     BLM's Decision to Adopt the IVM-RL Decision and Apply its Interpretation of the RMP to Allow Open Treatments in LSR Sets a Problematic Precedent

The IVM-RL logging program in the LSR has the potential to set a long-term precedent that effectively undercuts the ability of the 2016 RMP to protect and promote NSO habitat. By interpreting the RMP to allow logging that removes existing NSO habitat to a point that it will not return for decades into the future, in violation of the 20-year standard, BLM not only authorizes this logging on 17,000 acres of LSR within the IVM-RL Program area but also opens the door for this same interpretation to occur on the other approximately 364,000 acres of LSR acres that are subject to the same provisions of the 2016 RMP.[31] The RMP will be implemented on 2.5 million acres over the next 50 years. NSOs are in severe decline across their range. AR12376, 02867. Plaintiffs brought this case because of this specific issue and the possibility of a precedent being set that could have severe negative effects on LSRs for decades into the future. This precedent-setting action requires an EIS. *See* 40 C.F.R. § 1508.27(b)(6); *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2002) (holding that an EIS should have been prepared given the substantial uncertainty, controversy, and possible precedential effect of the action).

---

[31] There are at least two other pending cases that implicate both BLM's use of DNAs to implement programmatic logging programs, and BLM's application of the 20-year standard to logging in LSRs, respectively. *See, e.g.*, *Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-1344-MK (D. Or); *Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-00767-AA (D. Or).

**c. Tiering to the 2016 RMP Does Not Avoid the Need for an EIS for the IVM-RL Program.**

The IVM-RL FONSI states that an EIS is not required because the effects of the program "do not exceed the effects analyzed in the [2016 RMP FEIS], to which the EA is tiered, or otherwise would not have a significant effect on the quality of the human environment." AR02956; *see also* AR2824, 2826, 2829, 2833, 2834, 2837 (EA deferring analysis on various issues including stream, invasive species and carbon to RMP FEIS). Such an assertion by BLM misconstrues when an agency may lawfully tier to and rest on an earlier analysis to satisfy its NEPA obligations.

BLM produced a four-volume final EIS for the 2016 RMP ("2016 RMP FEIS") that analyzed the impacts of and considered alternatives to the Southwestern Oregon RMPs. AR51034–53135. This "programmatic" FEIS thus broadly analyzed management direction for BLM-administered lands across 2.5 million acres of western Oregon. AR51072. The 2016 RMP FEIS described and analyzed the planning area and the anticipated impacts with a high level of generality and was intended to provide a *30,000-foot view* of BLM's overall management objectives, not a detailed discussion of specific areas or activities. *See* AR51083 (The FEIS is a "framework" to support subsequent "project-level NEPA analysis for management actions implementing the RMP."); AR48746 ("BLM will carry out additional decision-making, including NEPA compliance, Endangered Species Act (ESA; 16 U.S.C. 1531 *et seq.*) consultation, and other consultation, as appropriate, before authorizing any future actions and implementation decisions that result in on-the-ground activities.").

BLM's attempts to "tier" to the 2016 RMP FEIS's NEPA analysis in lieu of taking a site-specific look at environment impacts have already have been rejected by this Court. *See generally Cascadia Wildlands v. BLM,* 410 F. Supp. 3d 1146 (D. Or. 2019) ("*Cascadia I*"); *Blue*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) ("Nothing …

suggests that the existence of a programmatic EIS for a [regionwide management] plan obviates

the need for any future project-specific EIS, without regard to the nature or magnitude of a

project."). While tiering in certain contexts is certainly permissible, *see, e.g.*, 40 C.F.R. §

1502.20 (encouraging agencies to tier their analyses to eliminate repetitive discussions of the

same issues and to focus on the actual issues ripe for decision at each level of environmental

review), courts "may reject such environmental review where none of the documents address

significant issues." *Cascadia I* at 1157–59.

        Here, BLM's repeated efforts to tier to the RMP to avoid conducting site specific analysis

presents the exact problem as in *Cascadia I*. And as discussed above, this problem is exacerbated

by BLM's attempt to tier both "upward" to the 2016 RMP and "downward" to non-NEPA

compliant DNAs. *See supra* Section V.B.iv. The result is a procedural failure with massive gaps

in site-specific analysis of key effects and issues. An EIS that disclosed and considered site-

specific data and effects on NSO habitat and fire effects, among other issues, was required and

BLM's failure to undertake such detailed, thorough analysis was unlawful.

        In sum, at least five of the intensity factors weigh in favor of an EIS, which is particularly

necessary here where BLM is undertaking a major logging program in a designated reserve

intended to protect habitat, and no site-specific NEPA will be completed later. *Shoshone-*

*Bannock Tribes of the Fort Hall Reservation v. United States DOI*, No. 4:10-CV-004-BLW,

2011 U.S. Dist. LEXIS 48492, at *29 (D. Idaho May 3, 2011) ("Any one of these factors could

compel a finding that the impact is severe and that an EIS is required, and the presence of

multiple factors all pointing in the same direction mandates that result.")

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

ii.    **BLM Failed to the Take a Hard Look at the Effects of the IVM-RL Program and the Late Mungers Project**

a.    **The lack of site-specific analysis and information fails the "hard look" test.**

As this Court has explained, a "'hard look' requires a consideration of 'all foreseeable direct and indirect impacts' and a full assessment of the cumulative impacts of the proposed action." *Cascadia I* at 1156 (quoting *Ctr. For Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012)). "To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data[.]" *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. § 1500.1(b)) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). Nor is it sufficient to make speculative, conclusory statements about the impact of an action. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001). The "hard look" applies in the context of EA. *Cascadia I* at 410; *Blackwood*, 161 F. Supp. 3d at 1156 (citing *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988)); *Kleppe v. Sierra Club*, 427 U.S. 390, at 409–410, n. 21 (1976).1211. Thus, even if an EIS is not required, the IVM-RL EA fails the "hard look" test because it failed to adequately disclose and consider site-specific impacts of the program, including for example the cumulative effects on occupied NSO territories and the long-term loss of existing NSO habitat in those territories as evidenced by failure to comply with the 20-year standard. *See Blackwood* at 1216 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'"). In this

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

case, the agency readily had the ability to undertake such analysis during the IVM-RL NEPA
process but failed to do so.

    This Court has refused to accept this type of improper analysis for other similar (but
smaller) BLM logging projects. In *Cascadia I,* Plaintiffs challenged BLM's Thurston Hills
logging project. 410 F. Supp. 3d at 1152. In that case, BLM relied on the RMP's fire hazard
analysis across a large planning area and concluded that it did not need to analyze the issue in
detail at the project level. *Id.* at 1157–59. The Court held that this approach did not constitute the
hard look required under NEPA because BLM "did not analyze site-specific geographic
conditions or effects on the immediate area." *Id.* at 1158; *see WildEarth Guardians v. Mont.
Snowmobile Ass'n*, 790 F.3d 920, 926–27 (9th Cir. 2015) (finding generalized map without
species specific information violated hard look).

    Here, BLM's analysis of effects on NSOs and their habitat suffers the same defect. BLM
claims it will locate logging projects based on site-specific factors including "moist and dry
forest types, abiotic factors (such slope and aspect), current NSO habitat conditions, and the
potential for developing into nesting-roosting habitat in the future." AR2610, AR2704–5,
AR2810. But the EA contains no baseline information on these variables nor any site-specific
data. Instead, it includes only a very general map depicting the almost 700,000-acre treatment
area from which it is impossible to determine effects on existing and occupied owl home ranges,
particular demographic units, or designated critical habitat. AR24030, 14779.

    In *Mont. Snowmobile Ass'n*, the Ninth Circuit found that this type of generality does not
comply with NEPA. In response to a similarly general map, the court said:

> "This paltry information does not allow the public to determine where the range for
> moose is located, whether the areas open to snowmobile use will affect that range, or
> whether the Forest Service considered alternatives that would avoid adverse impacts on
> moose and other big game wildlife. **In other words, the EIS does not provide the**

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2725*

> **information necessary to determine how specific land should be allocated to protect particular habitat important to the moose and other big game wildlife."**

790 F.3d at 927 (emphasis added). Here, BLM's failure to disclose these types of effects, such as the effect of removing existing functional foraging habitat in occupied NSO home ranges and how this might cumulatively impact demographics or critical habitat, combined with the failure to model Open treatments for compliance with the 20-year standard, falls short of a "hard look." Given the undisputed adverse impacts to NSOs and the precarious state of NSO populations, this Court should similarly reject BLM's incomplete approach here.

To the extent BLM argues such analysis will be done at the DNA stage, it is important to reiterate that a DNA is not a NEPA document, and regardless, a review of the Late Mungers DNA issued by BLM to implement the IVM-RL Program reveals that the site-specific implementation of IVM-RL discloses no further information and has more significant effects than what was disclosed during the NEPA process. The Late Mungers DNA repeats language from the IVM-RL EA that "[t]he prescriptions are tailored to each site's condition (elevation, aspect, soil condition, and stand health) and tiered to the prescription themes in the IVM-RL EA (BLM 2022a) Table 4 below." AR12. But BLM does not disclose any of the logging units' elevations, aspects, soil conditions, age, or species composition anywhere in the DNA materials, even though Plaintiffs and others submitted their own data on this information to BLM, nor does it provide analysis demonstrating compliance with the 20-year standard, *see supra* Section V.B.iv. *See* AR9–36, 2066–2077.

BLM's lack of site-specific analysis and obfuscation about future (but already planned) projects in the IVM-RL EA "deprived the public of meaningful participation," just as it did in *Cascadia I* and resulted in an incomplete disclosure of effects in violation of NEPA. 410 F. Supp. 3d at 1158; *see Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016) (internal

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

citation and quotations omitted) (NEPA analysis must "succinctly describe the environment of
the area(s) to be affected by the alternatives under consideration, and insure that environmental
information is available to public officials and citizens before decisions are made and before
actions are taken."); *see also N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir.
2009) (internal citation and quotations omitted) (The important question the court must answer is
whether "all reasonably foreseeable impacts" were assessed "at the earliest practicable point . . .
before an irretrievable commitment of resources [was] made.").

### b. BLM failed to take a "hard look" at effects on fire in moist forests.

BLM admits that its fire analysis does not include moist forests. AR2621 ("As in the
PRMP/FEIS, this issue applies to dry forest (i.e. does not include Moist forest)"). But the IVM-
RL Program includes moist forest logging. AR2826. Alternative B, considered by BLM, omitted
logging in moist forests, but the agency never compares the differences the implementation of
the logging prescriptions would have on moist versus dry forests. AR2610.

Moist forests compromise approximately 6 percent of the IVM-RL Program area to be
logged. AR2615 ("Within the Treatment Area, only 6 percent of forest types are considered
moist forest, which is scattered and intermixed with dry forest throughout the Treatment Area.").
BLM developed Alternative B in response to comments generated by Plaintiffs. AR2610.
Plaintiffs requested this alternative because moist forests in this region are unique and provide
"relatively cooler and moister climatic conditions that may act as micro-refugia for many plants,
invertebrates, salamanders, mollusks, bryophytes, and lichens considered at risk to climate
change in this region (Olson et al. 2012)." AR41801. Moist forests also respond very differently
to commercial thinning treatments, and federal management regimes, like the NWFP, have long

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

reflected scientific understandings that commercial logging in mature moist forests to accelerate late-successional habitat is unwarranted and unsupportable. AR41807.

Despite the fact that canopy openings in moist forests can have drastic fire impacts, *see Cascadia I,* 410 F. Supp. 3d at 1158, BLM assumes that "[c]hanges in forest conditions in the moist forests would not alter resiliency at the landscape scale." AR2615. While the conclusion that logging in moist forests might not alter resilience at the "landscape" scale, it will certainly have negative fire implications at the site-level and could compromise the safety of forest conditions in specific areas near at-risk communities. By failing to analyze and by downplaying this negative impact, which runs directly counter to the project's purpose and need, BLM failed to take a "hard look" at this issue despite the fact that this distinction is highlighted in the alternatives analyzed. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (citations omitted) ("The agency's obligation is to articulate a 'rational connection between the facts found and the choice made.'"); *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (citing *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1241 (9th Cir. 2005)) ("a 'hard look' should involve a discussion of adverse impacts that does not improperly minimize negative side effects").

## VI.    RELIEF REQUESTED

Vacatur is the presumptive remedy under the APA for violations of FLPMA and NEPA. *See* 5 U.S.C. § 706(2) (providing that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"). It is the agency's burden to demonstrate that vacatur should not result. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Plaintiffs here seek a tailored remedy commensurate with the narrow scope

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

of this lawsuit. Given that this remedy may depend on this Court's rulings on several of

Plaintiffs' claims, Plaintiffs request the opportunity to provide further briefing on remedy

depending on this Court's decision on the merits.

## VII.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully asks this Court to grant the Motion

for Summary Judgment and order further briefing on remedy.

Respectfully submitted this 21st Day of November, 2023.

/s/_____
Meriel L. Darzen (OSB # 113645)
Alexandria Dolezal (OSB # 223924)
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
503-525-2725
Email: meriel@crag.org

/s/_____
Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Email: nick@cascwild.org

*Counsel for Plaintiffs*

## TABLE OF RECORD CITATIONS

| AR/ | Date | Author/Title |
|---|---|---|
| 48736 | 8/5/2016 | BLM/Southwestern Oregon Record of Decision Resource Management Plan (2016 RMP) |
| 2938 | 3/2/2022 | BLM/IVM Decision Record |
| 2955 | 3/2/2022 | BLM/IVM Finding of No Significant Impacts (FONSI) |
| 2596 | 3/2/2022 | BLM/IVM Final Environmental Assessment |
| 13860 | 9/25/2021 | Southwest Oregon Dry Forest Resilient Lands Biological Assessment - Amended |
| 12333 | 12/20/2021 | USFWS/Final IVM Biological Opinion |
| 9 | 2/9/2023 | BLM/DNA Worksheet for Late Mungers Vegetation Management Project |
| 49380 | 2016 | USFWS/Biological Opinion On the Bureau of Land Management's Approval of the Proposed Resource Management Plan for Western Oregon |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*