Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Alexandria Dolezal, OSB # 223924
(503) 525-2725 │ alexandria@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214

Nicholas S. Cady, OSB # 113463
(541) 434-1463 │ nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Attorneys for KS Wild, et al. Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**MEDFORD DIVISION**

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER**, et al., <br><br> & <br><br> **APPLEGATE SISKIYOU ALLIANCE**, <br><br>    Plaintiffs, <br><br> v. <br><br> **UNITED STATES BUREAU OF LAND MANAGEMENT**, <br><br>    Defendants, <br>    & <br><br> **AMERICAN FOREST RESOURCE COUNCIL**, et al., <br><br>    Defendant-Intervenors. | Case No.: 1-23-cv-00519-CL; <br> Case No.: 1-23-cv-01163-CL <br><br><br><br> **KS WILD PLAINTIFFS' RESPONSE TO OBJECTIONS TO FINDINGS AND RECOMMENDATIONS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

LIST OF ACRONYMS ....................................................................................................... vi

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

    A. Northern Spotted Owls and their Habitat.................................................................. 3

    B. BLM-Managed Lands within the Range of the NSO.............................................. 4

    C. The IVM Program ................................................................................................... 4

LEGAL BACKGROUND AND STANDARD OF REVIEW .............................................. 6

    I.  Federal Land Policy and Management Act (FLPMA)............................................. 6

    II.   National Environmental Policy Act (NEPA) ....................................................... 6

    III.   Administrative Procedure Act (APA) and Standard of Review ......................... 7

ARGUMENT ...................................................................................................................... 8

    I.  The IVM Program fails to comply with FLPMA. .................................................. 8

    A. The 20-year standard unambiguously applies to all logging in non-nesting-roosting habitat in LSR. ................................................................................................... 9

    B. The structure, history, and purpose of the 20-year standard support its application.......13

    C. The Ecosystem Resilience-Open and Intermediate Logging Prescriptions Do Not Meet the  20-Year Standard. ................................................................................ 16

    II.   The IVM Program Fails to Comply With NEPA.......................................... 20

    A. Context ................................................................................................................ 20

    B. Intensity .............................................................................................................. 22

        1. Controversy.................................................................................................. 22

        2. Uncertainty.................................................................................................. 28

        3. Precedence .................................................................................................. 31

        4. Threatened Legal Violation ........................................................................ 34

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

**CASES**

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023) ................................................................................................. 13

*Anaheim Mem'l Hosp. v. Shalala*,
  130 F.3d 845 (9th Cir. 1997) ................................................................................................... 8

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004) ................................................................................................. 30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................................. 7

*Bark v. U.S. Forest Serv.*,
  958 F.3d 865 (9th Cir. 2020) ........................................................................................... 21, 25

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................................... 32

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ............................................................................................... 32

*Canyon v. Wilkes*,
  No. 2:22-cv-00859-HL, 2024 U.S. Dist. LEXIS 58184 (D. Or. Mar. 29, 2024) ..................... 20

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
  410 F. Supp. 3d 1146 (D. Or. 2019) ....................................................................................... 8

*Cascadia Wildlands v. U.S. U.S. Bureau of Land Mgmt.*,
  No. 6:23-cv-1358-MC, 2024 U.S. Dist. LEXIS 117974 (D. Or. June 28, 2024) .................... 33

*Cascadia Wildlands v. U.S. Forest Serv.*,
  937 F. Supp. 2d 1271 (D. Or. 2013) ...................................................................................... 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................................. 7

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ................................................................................................................. 7

*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) ................................................................................................. 30

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ................................................................................... 6

*Duncan v. Walker*,
533 U.S. 167 (2001) ................................................................................... 12

*Ecology Ctr., Inc. v. U.S. Forest Serv.*,
192 F.3d 922 (9th Cir. 1999) ..................................................................... 32

*Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ................................................................. 18, 33

*Env't Def. Ctr. v. U.S. Env't Prot. Agency*,
319 F.3d 398 (9th Cir. 2003) ....................................................................... 8

*Forest Guardians v. U.S. Forest. Serv.*,
329 F.3d (9th Cir. 2003) .............................................................................. 8

*Greater Hells Canyon Council v. Wilkes*,
No. 2:22-cv-859-HL, 2023 U.S. Dist. LEXIS 178671 (Aug. 31, 2023)................... 20

*In Def. of Animals v. U.S. Dep't of Interior*,
751 F.3d 1054 (9th Cir. 2014) ................................................................... 22

*Kisor v. Wilkie*,
588 U.S. 558 139 S. Ct. 2400 (2019) .......................................................... 13

*Klamath Siskiyou Wildlands Ctr. v. U.S. Fish & Wildlife Servs.*,
2022 U.S. Dist. LEXIS 52565 .................................................................... 13

*Klamath-Siskiyou Wildlands Ctr. v. Boody*,
468 F.3d 549 (9th Cir. 2006) ..................................................................... 20

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*,
No. 1:19-cv-01810-CL, 2021 U.S. Dist. LEXIS 223221 (D. Or. Aug. 24, 2021)................... 30

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).................................................................................... 8

*McDonnell Douglas Corp. v. Commodore Bus.*,
656 F.2d 1309 (9th Cir. 1981) ..................................................................... 7

*Metcalf v. Daley*,
214 F. 3d 1135 (9th Cir. 2000) ................................................................... 33

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ................................................................. 16, 18

*N. Spotted Owl v. Hodel*,
   716 F. Supp. 479 (W.D. Wash. 1988) .............................................................. 7

*Ohio Forestry v. Sierra Club*,
   523 U.S. 726 (1998) ..................................................................................... 32

*Or. Nat. Res. Council Fund v. Brong*,
   492 F.3d 1120 (9th Cir. 2007) ............................................................... 11, 16

*Pac. Rivers v. U.S. Bureau of Land Mgmt.*,
   No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981 (D. Or. Oct. 12, 2018) ....................... 4

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*,
   40 F.4th 930 (9th Cir. 2022) ....................................................................... 12

*Vincent v. Apfel*,
   191 F.3d 1143 (9th Cir. 1999) ..................................................................... 11

*Wildlands v. Adcock*,
   Case No. 6:22-cv-01344-MK, (D. Or. 2024) ............................................ 28, 33

**STATUTES**

28 U.S.C. § 636(b) ............................................................................................ 7
42 U.S.C. § 4332(2)(C) ..................................................................................... 6
42 U.S.C. § 4332(2)(E) ..................................................................................... 6
43 U.S.C. § 1701 ............................................................................................... 6
43 U.S.C. § 1712 ............................................................................................... 6
43 U.S.C. § 1732(a) .......................................................................................... 6
5 U.S.C. § 706 ................................................................................................... 7
5 U.S.C. § 706(2)(A), (D) .................................................................................. 7
5 USC § 553(b)(4)(A) ....................................................................................... 32

**RULES**

Fed. R. Civ. P. 56(c). ......................................................................................... 7

**REGULATIONS**

40 C.F.R § 1508.27(a) ...................................................................................... 20
40 C.F.R § 1508.27(b)(6) ........................................................................... 30, 33
40 C.F.R §1508.27(b)(5) .................................................................................. 28
40 C.F.R. § 1508.27 ...................................................................................... 6, 20
40 C.F.R. § 1508.7–.8 ........................................................................................ 7
40 C.F.R. §§ 1508.11 ......................................................................................... 6
40 C.F.R. §§ 1508.27(b)(1)-(10) ........................................................................ 7

40 C.F.R. 1502.1 ............................................................................................................... 6

40 C.F.R. § 1508.27(b)(10)............................................................................................... 34

43 C.F.R. § 1601.0-5(b) .................................................................................................... 8

43 C.F.R § 1610.5- 3(a) .................................................................................................... 6

# LIST OF ACRONYMS

APA                         Administrative Procedure Act

ASQ                         Allowable Sales Quantity

BLM                         Bureau of Land Management

DR                          Decision Record

EA                          Environmental Assessment

EIS                         Environmental Impact Statement

FEIS                        Final Environmental Impact Statement

FLPMA                       Federal Land Policy and Management Act

FONSI                       Finding of No Significant Impacts

HLB                         Harvest Land Base

LSR                         Late-Successional Reserve

NEPA                        National Environmental Policy Act

PRMP                        Proposed Resource Management Plan

RMA                         Recreation Management Area

RMP                         Resource Management Plan

ROD                         Record of Decision

## <u>INTRODUCTION</u>

Plaintiffs Klamath-Siskiyou Wildlands Center, Cascadia Wildlands, Oregon Wild, and Soda Mountain Wilderness Council ("Plaintiffs") respectfully submit the following Response to the United States Bureau of Land Management (BLM) and Intervenors' Objections, Dkt Nos. 60 and 59 respectively, to the Findings and Recommendations ("Findings"), Dkt. No. 53, issued in the above-captioned case for Plaintiffs' challenge to BLM's Integrated Vegetation Management for Resilient Lands Program (IVM Program). As Plaintiffs explain below, this Court should deny Defendant and Intervenors' Objections and adopt the Findings as written.

The IVM Program authorizes intensive, continuous commercial logging across hundreds of thousands of acres of Late Successional Reserve (LSR) forests across Southwestern Oregon. BLM admits this proposed logging will remove currently functioning late-successional northern spotted owl (NSO) habitat in direct violation of LSR standards under BLM's 2016 Southwestern Oregon Record of Decision and Resource Management Plan (2016 RMP). Nonetheless, the agency argues that it can remove owl habitat from these reserves if it articulates a subjective purpose for its logging that is unrelated to owl habitat development or conservation. For the IVM program, BLM's stated purpose is fire resilience.

BLM's interpretation of the RMP is unworkable and fundamentally undermines the purpose and function of LSR areas. Additionally, even when viewed in the most favorable light, BLM's arguments regarding fire are highly controversial and omit critical considerations. The agency relies on science that counsels specifically against logging as aggressively as BLM proposes and against its location within existing late-successional forests. Many of the studies in the record suggest BLM's logging will in fact increase fire risks for the surrounding communities.

Concerns that BLM's logging would exacerbate existing fire risks were raised loudly and consistently with the agency by scientists, conservationists, and the public. During this planning process, BLM had a meaningful opportunity to pursue a path that could have generated commercial timber volume, furthered owl conservation goals, and increased fire resilience across the landscape. BLM rejected this approach and instead declared it would apply its heaviest logging prescription throughout the Late Successional Reserves, reasoning that the more aggressively it logs, the better the outcomes for owls and fire. BLM's rationale is not supported by the record.

Given BLM's open violation of LSR standards and the controversy and uncertainty surrounding the proposed logging's effectiveness at fostering fire resilience, Judge Clarke correctly found that the IVM Program violated the Federal Land Policy and Management Act (FLPMA) and necessitated the preparation of an EIS pursuant to the National Environmental Policy Act (NEPA). Judge Clarke is not, however, encouraging the full vacatur of the Program because the IVM decision also includes small-diameter thinning and prescribed burning, fuels reduction projects that Plaintiffs support and specifically excluded from their challenge.

Judge Clarke has recommended the parties collaborate to reach an ultimate remedy, and those discussions have already begun. In fact, two IVM decisions authorizing small-diameter thinning and prescribed burning are moving forward elsewhere in the Medford BLM District, and a third has been recently authorized. Plaintiffs share the Court's confidence that the parties will be able come to agreement on an effective solution; however, judicial intervention remains necessary to prevent BLM from pressing ahead with the most aggressive and illegal components of this project — LSR timber sales that would result in widespread degradation, decrease fire resilience, and remove owl habitat. Judge Clarke echoed Plaintiffs' sentiment in the Findings:

"Getting this project right could benefit southwestern Oregon for years to come, while getting it wrong may have devastating consequences across the landscape for fire behavior and wildlife habitat."

## FACTUAL BACKGROUND

### A. Northern Spotted Owls and their Habitat

Northern spotted owls occupy late-successional and old-growth forest habitat within the IVM and Late Mungers Project areas. AR 12550, AR 124–25. Spotted owls rely on older, mature and complex forest habitats as they generally contain the structures and characteristics—such as layered, multi-species tree canopies dominated by large overstory trees, numerous large snags, and abundant dead wood on the ground — that are necessary for their essential biological functions of nesting, roosting, foraging, and dispersal. AR 12380–81. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat, AR 12347, and sixty percent canopy cover is the minimum required for functional NRF habitat. AR 14810, 13874, 13877, 02775.

Despite significant recovery efforts, habitat loss, competition from invasive species, and other factors have caused NSO populations to decline across all demographic parameters across all study areas with the rate of decline only increasing. AR 12376. Despite this trend, NSO populations and habitat within the IVM Program area continue to play an important role in the range-wide population dynamics of this species, because spotted owl populations in southwest Oregon and northern California have been found to be source populations. AR 12403–04. The IVM Biological Opinion highlights this fact: "the proposed actions that result in positive or negative impacts to spotted owls and/or spotted owl habitat in the action area may impact the spotted owl across its range." *Id.*

//

**B.  BLM-Managed Lands within the Range of the NSO**

The threat to NSO habitat intensified when BLM adopted the 2016 RMP, thereby

removing itself from the Northwest Forest Plan to increase timber output. *See Pac. Rivers v.*

*BLM*, No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981, *14 (D. Or. Oct. 12, 2018). The

2016 RMP allocated BLM lands into multiple management categories of which 19 percent is

Harvest Land Base ("HLB") and 38 percent Late Successional Reserves. *Id*. at *6. While HLB

was designed to provide timber, LSR was designed to protect and develop large blocks of late-

successional forests to ensure the survival of the spotted owl. AR 48436–38.

To achieve LSRs' purpose of bolstering spotted owl habitat, LSR management objectives

include: 1) "Maintain nesting-roosting habitat for the northern spotted owl and nesting habitat for

the marbled murrelet"; and 2) "Promote the development and maintenance of foraging habitat for

the northern spotted owl, including creating and maintaining habitat to increase diversity and

abundance of prey for the northern spotted owl." AR 48813. LSR contains no timber harvest

related objectives. *Id*. The RMP is predicated on the protection and promotion of late-

successional habitat within LSR.

**C.  The IVM Program**

On March 2, 2022, BLM issued the IVM Decision Record ("DR"), which authorizes: 1)

up to 4,000 acres per year of commercial logging with a ten-year maximum of 17,000 acres in

LSR; 2) up to 6,500 acres per year of small-diameter thinning with a ten-year maximum of

60,000 acres; and 3) up to 7,500 acres per year of prescribed fire with a ten-year maximum of

70,000 acres. AR 2940–1. The DR also allows for the application of the heaviest logging

prescription—Ecosystem Resilience-Open ("Open") — across all 17,000 acres in the LSR. AR

2940.

The Open prescription has a Relative Density Index (RDI)[1] target of 20 percent, which will reduce the forest canopy cover down to 30 percent, alter the structural diversity and dead wood in treated stands, and otherwise modify forest stands so they no longer provide nesting, roosting, or foraging, or even dispersal habitat for NSOs. AR 2642 (Table 15), 2779. BLM acknowledges that Open logging units would remove existing NSO habitat from LSRs, and that logged forest stands would not be expected to provide functioning nesting, roosting or foraging habitat for decades into the future. AR 2779; Defs. Ans ¶¶ 85; *see also* AR 12350, 12417. Similarly, the Intermediate prescriptions, which have a RDI target of 30-40 percent, will reduce canopy cover down to 40 percent, downgrading nesting, roosting, and foraging habitat to dispersal only. AR 12417.

The first site-specific project to implement the commercial logging portion of the IVM Program is the Late Mungers Project. This project, which is located near the town of Williams in Josephine County, involves two timber sales that call for commercial logging on 830 acres of LSR, including 461 acres of Open and 81 acres of Intermediate logging. AR 9, 11. Within the Late Mungers Project area there are eleven NSO home ranges, at least three of which have been occupied by NSO in the last five years. AR 269. BLM is proposing logging in all three of the occupied sites, including in the core area of one site. AR 269–277. Overall, the logging will remove or downgrade 360 acres of NSO foraging habitat. AR 28.

//

---

[1] BLM uses Relative Density ("RD") and the Relative Density Index ("RDI") to describe the density of trees that will be left in a particular stand or unit after the logging occurs. AR 02610, 02614. The 2016 RMP defines Relative Density as "[a] means of describing the level of competition among trees or site occupancy in a stand, relative to some theoretical maximum based on tree density, size, and species composition." AR 49054.

## LEGAL BACKGROUND AND STANDARD OF REVIEW

### I.    Federal Land Policy and Management Act (FLPMA)

Congress enacted FLPMA to "provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see* 43 U.S.C. § 1701 *et seq*. FLPMA requires BLM to develop land use plans, called resource management plans ("RMPs"), that govern the use of land that BLM manages. 43 U.S.C. § 1712. These RMPs require BLM to manage lands in compliance with the plan and ensure that all site-specific projects conform to the plans' standards. 43 U.S.C. § 1732(a); 43 C.F.R § 1610.5- 3(a).

### II.    National Environmental Policy Act (NEPA)

NEPA ensures that an agency carefully consider detailed information about significant environmental impacts, and it guarantees the relevant information will be available to the public to enable participation in the agency decision-making process and action implementation. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). NEPA requires all federal agencies to prepare an Environmental Impact Statement, a "detailed statement" that describes adverse environmental impacts and alternative actions for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C), 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1508.11, 40 C.F.R. 1502.1.

In conducting the required evaluation of the context and intensity of the proposed action, 40 C.F.R. § 1508.27, federal agencies must consider ten non-exclusive "intensity" factors, including, *inter alia*, impacts that may be both beneficial and adverse; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; the

degree to which the action may adversely affect an endangered or threatened species or any of its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1)-(10). To support an agency determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.7–.8.

### III.    Administrative Procedure Act (APA) and Standard of Review

Courts review *de novo* a Magistrate Judge's Findings and Recommendations. 28 U.S.C. § 636(b); *McDonnell Douglas Corp. v. Commodore Bus.*, 656 F.2d 1309, 1313 (9th Cir. 1981). Federal Rule of Civil Procedure 56 allows entry of summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court encourages district courts to utilize summary judgment in appropriate cases. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).

Judicial review of agency actions involving FLPMA and NEPA are governed by the Administrative Procedure Act (APA). 5 U.S.C. § 706. Pursuant to the APA, courts shall hold "unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as those actions taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The "arbitrary and capricious" standard of review does not shield agency action from a "thorough, probing, in-depth review" of challenged actions. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). "Courts must not 'rubber stamp the agency decision as correct.' Rather, the reviewing court . . . must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'"

*N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988) (internal citations omitted).

On review, agencies must articulate a rational connection between the facts found and the conclusions made. *See Env't Def. Ctr. v. U.S. Env't Prot. Agency*, 319 F.3d 398, 428 n.46 (9th Cir. 2003). The reviewing court must determine whether the agency's decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Forest Guardians v. U.S. Forest. Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003). Finally, courts may only uphold an agency's decision based on the reasoning found in the challenged decision itself; courts may not substitute reasons for an agency action that are not found in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

## ARGUMENT

### I.    The IVM Program fails to comply with FLPMA.

To comply with FLPMA, BLM must ensure that site-specific actions conform to the governing Resource Management Plan — here, the 2016 RMP. *Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146, 1153 (D. Or. 2019) (citing 43 U.S.C. § 1732(a)); 43 C.F.R. § 1601.0-5(b) (defining "conformance" as "specifically provided for in the plan" or "clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment."). The IVM Program targets Late Successional Reserves, and the 2016 RMP "explicitly provides that LSRs are to be managed for two objectives: maintaining and promoting [northern spotted owl] habitat." Dkt. No. 53 at 17 (citing AR 48486). "Because the goal of LSRs is to provide for large amounts of spotted owl nesting/roosting habitat across a large landscape, stand management of these lands is designed to be consistent with the production of older, larger trees

and natural processes." AR 49937 (RMP Biological Opinion); *see also* AR 49936 ("A primary objective of the LSRs in both the moist and dry forest is to provide large blocks of spotted owl and murrelet habitat.").

To further these objectives, in stands currently functioning as NSO nesting-roosting habitat, the 2016 RMP requires that habitat "be maintained regardless of owl occupancy." *Id*. Meanwhile, in stands that are not NSO nesting and roosting habitat, the BLM must comply with the following standard:

> [A]pply silvicultural treatments to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term. Limit such silvicultural treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment. Allow silvicultural treatments that do not meet the above criteria if needed to treat infestations or reduce the spread of forest pathogens.

AR 48488 (hereinafter, the "20-year standard"). This is the only LSR management direction that instructs BLM to apply "silvicultural treatments," because the reserve land allocation is designed to rely primarily on "natural processes." AR 49937.

The parties agree that this management direction is binding. BLM and Intervenors claim, however, that this standard does not apply to the "Open" and "Intermediate" logging prescriptions because such logging purportedly has a different goal. Dkt. No. 27 at 28. BLM's attempt to exempt its logging from the 20-year standard is contrary to the plain language, history, structure, and purpose of the 2016 RMP. BLM's argument is unfounded; the 20-year standard plainly applies; and the logging prescriptions that violate that standard must be set aside.

**A. The 20-year standard unambiguously applies to all logging in non-nesting-roosting habitat in LSR.**

The plain language of the 20-year standard requires that in non-nesting-roosting stands, the agency must apply treatments that either: 1) "speed the development of nesting-roosting habitat," or 2) "improve the quality of existing nesting-roosting habitat in the stand or in the adjacent stand in the long term." AR 48488. To accomplish this, BLM must "limit such treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment." *Id*. Forest pathogen treatments are thus the only exception to the 20-year standard. *Id*. The 20-year standard is thus the only LSR management direction that corresponds to the management objective to "promote the development of nesting-roosting habitat for the northern spotted owl." *See* AR 48486. The RMP proceeds to explain that BLM should use "integrated vegetation management in designing and implementing" these "treatments," which can be designed for any number of reasons, including reducing stand susceptibility to fire risks. AR 48488.

The IVM Program authorizes BLM to implement its most aggressive logging treatment across 17,000 acres of LSR that BLM has concluded are non-nesting-roosting NSO habitat. Dkt. No. 53 at 13 (citing AR 2940). This logging:

> "allow[s] a reduction in the relative density of forest stands down to 20 percent and the creation of openings, or "clearcuts," of up to 4 acres across 25 percent of the forest stand within the LSR. AR 2612, 2703-05. Generally, this will remove a substantial amount of the forest stand's basal area, remove larger diameter trees that comprise the canopy, and reduce overall canopy cover. AR 2642.

Dkt. No. 53 at 18 n. 8. While the IVM decision would allow the heaviest logging to be implemented across all project acres, it also contemplates the implementation of its second heaviest prescription, Ecosystem Resilience-Intermediate logging treatment, that would reduce the relative density of forest stands down to 30 percent and would downgrade spotted owl

nesting, roosting, and foraging habitat, but maintain 40 percent canopy cover. Dkt. No. 53 at 18 n.9 (citing AR 2659, 2780). BLM and Intervenors claim that the 20-year standard does not apply to its proposed "Open" and "Intermediate" logging prescriptions because such logging is aimed not at NSO habitat development but instead at ecosystem resilience. Dkt. No. 27 at 28.

This contradicts the plain language of the RMP, which requires adherence to the 20-year standard whenever silvicultural treatments are proposed in non-nesting and roosting habitat, AR 48484, as is the case here. The 20-year standard's lone exception for forest pathogen treatments is undisputedly inapplicable. *Id*. As Judge Clarke states in the Findings, the RMP "language provides no indication that the applicability of the 20-year standard should be limited to only logging treatments with the stated intent of developing habitat." Dkt. No. 53 at 19. Defendant and Intervenors' interpretation is simply not grounded in the plain language, and therefore this Court should not afford the agency any deference. *Vincent v. Apfel*, 191 F.3d 1143, 1148 (9th Cir. 1999) (holding that there is no justification for adding limiting language to a clear and unambiguous statute or regulation.); *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (holding no deference because "an agency's interpretation does not control, where . . . it is plainly inconsistent with the regulation at issue.").

Both BLM and Intervenor argue that the Court "erred by explicitly added [sic] the word 'all' into the first sentence so that the standard would restrict treatment 'in all treatment stands.'" Dkt. No. 60 at 22 (citing Dkt. No. 53 at 19); Dkt. No. 59 at 19. This argument misconstrues the Court's Findings. The Findings correctly cite the RMP language regarding where the 20-year standard applies: "In stands that are not northern spotted owl nesting-roosting habitat." Dkt. No. 53 at 17; *see also* Dkt. No. 60 at 28 ("The first sentence focuses on *where* silvicultural treatments apply. That sentence says it applies '*[i]n stands* that are not northern spotted owl nesting-

roosting habitat.' AR 48815 (emphasis added).").  This provision contains no limiting language, and thus Judge Clarke properly explains that the proper "interpretation" is that the standard applies to "all treatment stands that are not northern spotted owl nesting-roosting habitat" given "the plain language leading up to the standard." Dkt. No. 53 at 19. There is no error here.[2]

The RMP states that BLM can propose logging in both the LSR and HLB for many of the same reasons (*compare* AR 48480-2 *with* AR 484888); thus, the critical difference between LSR and HLB is the management direction requiring any logging in LSR to speed the development of owl habitat. In other words, this is the "LSR standard."[3] If BLM is allowed to circumvent this direction, it eliminates the core RMP requirement distinguishing management in LSR from that in HLB, which is why Judge Clarke appropriately found that to do so would "render the direction superfluous." Dkt. No. 53 at 19; *see Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv*., 40 F.4th 930, 936 (9th Cir. 2022) (citations omitted) (courts should avoid statutory interpretations that render any language superfluous). In interpreting regulations, the court has a duty, where possible, "to give effect" to all operative portions of the enacted language—its "every clause and word." *Duncan v. Walker*, 533 U.S. 167, 174 (2001).  Thus, BLM "is clearly permitted — at times even obligated — to conduct distinct fire management treatments in LSRs, even if they downgrade or remove habitat, *so long as those treatments are limited to actions that do not preclude or delay future habitat development by 20 years or more*." *Id*. (emphasis added).

---

[2] Judge Clarke's quotation that includes the "all treatment stands" language is uncited and within a paragraph discussing the proper "interpretation" of the RMP language. Dkt. No. 53 at 19. It is clearly not an error. Thus, BLM's argument that the Judge's Findings are based on a misquote are without merit. *See* Dkt. No. 60 at 29 fn.5.

[3] BLM's 2016 RMP continues to rely upon LSR designations, and while it eliminated the Northwest Forest Plan's prohibition on logging LSR stands over 80 years in age, it replaced that direction with the "speed and improve" language at issue.

In sum, the 20-year standard is unambiguous and directly controls BLM logging treatments in LSR. The Court appropriately found "that the 20-year standard clearly applies to any proposed actions in the LSRs, irrespective of BLM's stated purpose." Dkt. No. 53 at 21.

**B.  The structure, history, and purpose of the 20-year standard support its application.**

LSR is specifically designated and managed "to provide for large amounts of spotted owl nesting-roosting habitat across a large landscape, and stand management of these lands is designed to be consistent with the production of older, larger trees and natural processes," AR 49937. In the Court's words, LSR is "endowed with the purpose of habitat protection." Dkt. No. 53 at 20.

BLM uses this designation to increase the scale and intensity of logging in other land use allocations, such as HLB (the allocation focused primarily on timber production), while still complying with its NSO obligations under the Endangered Species Act (ESA). AR 48436-38, 51038; *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 802 (D.C. Cir. 2023) (late-successional reserves were created to preserve critical habitat for the northern spotted owl and other endangered and threatened species). Courts have recognized that in creating the 2016 RMP and allocating land to LSR and HLB, "BLM balanced its obligation to protect and support the recovery of the spotted owl under the ESA with its obligation to manage the lands for timber production." *Klamath Siskiyou Wildlands Ctr. v. U.S. Fish & Wildlife Servs*., 2022 U.S. Dist. LEXIS 52565, *3. The 20-year standard must therefore be read with that purpose in mind. AR 48486; *Kisor v. Wilkie*, 588 U.S. 558, 573-574 139 S. Ct. 2400 (2019).

While the BLM's RMP Final Environmental Impact Statement (FEIS) and associated Biological Opinion (BiOp) anticipated the application of fire resiliency treatments in LSR, both documents assumed that these treatments would "retain greater amounts of older forest on the

landscape," and the treatments thus "were expected to result in a net habitat improvement for the spotted owl." AR 49938; *see also* AR 52022 (LSRs will contribute "to the development and spacing of the large habitat blocks needed for northern spotted owl conservation."). The IVM Program does the opposite. It declares that large swaths of LSR are "not suitable for eventual habitat development," and therefore can be aggressively logged, with prescriptions specifically designed to log and remove late-successional forests. *See* Dkt. No. 53 at 13 (citing AR 2940); *see also* Dkt. No. 53 at 17-18 (describing how the goals of BLM's Open and Intermediate logging schemes are "inapposite" to the characteristics of nesting and roosting habitat and "could result in the long-term destruction of habitat").

BLM's attempt to further subdivide LSR into areas it can sacrifice (i.e. low habitat suitability areas) and those it cannot, undermines the core spotted owl assumptions in the RMP FEIS and BiOp which are predicated on the quantity and distribution of LSR areas. *See* AR 52026 (LSR units are shaped to contribute to large blocks of habitat, each capable of supporting at least 20 spotted owl nesting pairs, or a network of small blocks of habitat no less than 7 miles apart); AR 49937 ("stand management of these lands is designed to be consistent with the production of older, larger trees and natural processes.").

BLM and Intervenors also argue that LSR dry sub-allocation management directions permit BLM to aggressively degrade and remove owl habitat. This argument directly conflicts with the RMP, which specifies that the LSR management directions apply to all LSR areas, including the mapped sub-allocations:

> Harvest Land Base and Late-Successional Reserve have specific, mapped sub-allocations (Map 2), some of which have differing management objectives or management direction. For these sub-allocations, the management objectives and management direction of the broader allocation apply, as well as the management objectives or management direction specific to that sub-allocation.

AR 48463. The Court specifically addressed this in its Findings. *See* Dkt. No. 53 at 9 ("LSRs are further broken down into "Dry" and "Moist" forest types. Dry LSRs are governed by the same management objectives and directions that apply to all LSRs generally, with an additional overlay of objectives and directions specifically applicable to Dry-forest types. AR 48490-91.").

Finally, arguments by BLM and Intervenors are premised on the false assumption that the 20-year standard would render it impossible for BLM to conduct dry-forest resilience treatments as directed by the dry forest management directions. *See* Dkt. No. 60 at 24 ("it would be impossible for BLM to implement the separate applicable management direction to conduct commercial thinning to reduce the density of larger stands down to an RDI of 20 to 45 percent on a minimum of 17,000 acres of dry forest per decade. AR 48488, 48490."). The Court found this argument unpersuasive because the RMP allows the "20-year standard to apply harmoniously with the other management directions." Dkt. No. 53 at 19. BLM's assumption is undermined by the record in several ways.

Specifically, the 20-year standard would not prevent the application of any of the small-diameter thinning or prescribed fire that is proposed throughout the IVM Program. AR 3159-60. Second, the Near-Term Spotted Owl, Ecosystem Resilience-Closed, and Fuels Emphasis commercial logging prescriptions were all modeled for compliance with the 20-year standard and d0 not violate the 20-year standard. These commercial thinning treatments simply entail logging less heavily than the IVM Program Intermediate and Open prescriptions. AR 2986-88. In fact, the record demonstrates that BLM's lighter commercial thinning prescriptions would achieve "high" fire resistance, AR 2628, would meet the 20-year owl standard, AR 2660, and require less maintenance. AR 2632.

Further, BLM modeled the application of these heavy logging treatments in existing foraging stands, the data metrics of which indicated they were currently suitable nesting and roosting habitat. AR 2659-60. BLM admits in its Environmental Assessment (EA) that if this logging was planned instead in young plantations, the 20-year standard would be met: "young stands that typically represent capable habitat would be early enough in the stand development, that treatments would not result in a potential 20-year set back would not occur. Treatments in young stands would still retain an adequate amount of existing trees and structure." AR 2791. Thus, it is entirely possible for BLM to commercially log, apply the heaviest prescription contemplated by the RMP, and comply with the 20-year standard; BLM simply cannot do all three simultaneously in currently functioning owl habitat.

### C. The Ecosystem Resilience-Open and Intermediate Logging Prescriptions Do Not Meet the 20-Year Standard.

The IVM-RL Program's Open and Intermediate prescription themes would delay the development of NSO habitat by more than 20 years, violating the 2016 RMP. BLM did not model compliance of the Open logging prescriptions with the 20-year standard, AR 2656, but it was plainly reasonable for the Court to conclude that the prescription would violate the standard. As the Court explained: "[g]iven that the Open prescription allows openings of up to 4 acres and massive canopy reduction, it is likely that had BLM actually modeled the Open prescription, the modeling would have demonstrated a violation of the 20-year standard, emphasizing even further the propriety of obligating BLM to demonstrate compliance."[4] Dkt. No. 53 at 21. In any case,

---

[4] Relative density index "roughly equates to the level of intensity for commercial thinning." Dkt. No. 53 at 13. The Open logging prescription would log down to 20 percent RDI, and the Intermediate prescription would log down to 30 percent RDI. *Id.* at 18. Since the modeling indicated the Intermediate logging prescription fell short of the nesting and roosting standard as elaborated upon below, this further supports Judge Clarke's finding that had BLM modeled the

BLM's failure to model the Open prescription is a failure to demonstrate compliance with a mandatory RMP standard. *Brong*, 492 F.3d at 1124-26; *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953-963 (9th Cir. 2005) (while the analysis need not be perfect, a court "must still be able reasonably to ascertain from the record" that the agency complies with the plan standard).

As the Court detailed in its Findings, BLM did model compliance of the Intermediate logging prescription with the 20-year standard. Dkt. No. 53 at 21-22 (citing AR 2656). The "sheer results of the modeling exhibited that the treated stands could not return to the minimum threshold levels for canopy cover and basal area that is required for functional habitat even after 50 years." Dkt. No. 53 at 22; AR 2659-60. Specifically, BLM's modeling showed that before treatment, both samples Stand A and Stand B provided sufficient canopy cover, basal area, number of large diameter trees per acre, and basal area of large diameter trees to serve as nesting-roosting habitat; Stands A and B also served as habitat at 30 years with "no treatment." *Id*. Conversely, stands logged with the Intermediate prescription still did not meet the minimum habitat thresholds for canopy cover and basal area even after 50 years; such stands were delayed more than "no treatment" stands in nearly all four metrics. *Id*. (Table 22 showing that only the basal area of trees ≥ 26" DBH in sample Stand A was higher with treatment than without).

Thus, BLM's own modeling failed to demonstrate that the Intermediate prescription will "speed the development . . . or improve the quality" of spotted owl nesting-roosting habitat in the long term. AR 48488. Such treatment would instead "preclude or delay" the development of nesting-roosting habitat by more than 20 years in violation of the 2016 RMP. *Id*. To address this

---

Open prescription, it would have found the 20-year standard would not be met. BLM does not argue that the Open logging prescription would meet the 20-year standard.

failure, BLM attempts to add to the model outputs "at least 10-20 percent additive canopy cover" and "at least 10 square feet of additive basal area, which would contribute to attaining nesting roosting standards for canopy cover and basal area." AR 2659; Dkt. No. 53 at 22 (citing AR 2791). The added values represent the artificial or natural "growth of 75 trees per acre (seedlings) grown 50 years" throughout all logged units. AR 3377.

This approach is arbitrary because BLM's fire resilience determinations hinge entirely on removing this regrowth through "require[d] maintenance every 10 to 30 years to maintain low-moderate load surface fuel profiles." AR 2631. "Maintenance" involves prescribed burning and "remov[ing] regrowth" to maintain open conditions and lower fuel loading. AR 2631. BLM explains that "[w]ithout frequent maintenance disturbance, understory fuels would re-grow (including natural or artificial regeneration)," and "maintenance of high to moderate stand-level fire resistance in the frequent-fire adapted dry forest, hinges on frequent low-moderate intensity disturbance" to remove these fuels. AR 2633. The required level and frequency of maintenance increases with the severity of the logging prescription because more "open conditions" and higher levels of canopy removal will lead to "more rapid live fuel loading," which would decrease fire resilience. AR 2631.

Thus, the purported fire resilience of the areas logged with BLM's heavier "ecosystem resilience prescriptions" depend entirely on perpetual and regular removal of natural or artificial regrowth, AR 2631-3, yet the compliance of these heavier logging prescriptions with the 20-year standard for owls depends entirely on the preservation of the selfsame natural or artificial regrowth.[5] AR 3377. An agency cannot rely upon contradictory or unsupported assumptions.

---

[5] Again, even with the additive canopy cover and basal area, the heaviest "ecosystem open" prescriptions still do not meet the 20-year standard, BLM does not dispute this. *See* AR 2791.

*Native Ecosystems Council*, 418 F.3d at 964, and the Court appropriately found that BLM's reliance on these contradictory assumptions was impermissible. Dkt. No. 53 at 22-23 (citing *Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022)).

 BLM's Objection does not address these contradictory assumptions, but Intervenors' Objection does. Dkt. No. 59 at 25. Intervenor argues that "'maintenance' includes a variety of treatments like low intensity prescribed underburning, handpile burning, and thinning. AR_02631," and the "magistrate judge's conclusion incorrectly presumes, without support, that the removal of regrowth through thinning activities is per se required within the 10–30-year period." Dkt. No. 59 at 25 (citing AR 0231). This is nonsensical and inaccurate.

 The Court explained that "those heavier prescriptions, which aim to create open conditions and low fuel loading for fire resilience, depend entirely on the removal of natural or artificial regrowth. See AR 2631." Dkt. No. 53 at 22-23. The Court did not specify the regrowth would be removed by thinning, and it is unclear why this would matter. BLM states in the EA that "Maintenance treatments would be needed every 20-30 years after 'initial entry' treatments, in order to maintain moderate resistance to stand-replacement fire, averaging 1.5 maintenance entries over 50 years (Table 11)." AR 2632. Given that the only justification for this LSR logging is fire resilience which depends on maintenance, BLM is simultaneously relying on the removal of regrowth to maintain fire resilience and the presence of this regrowth to meet the RMP's owl standards. Either may be possible, but it cannot be two mutually exclusive options at once.

 Judge Clarke found that because "nesting-roosting habitat requires forest qualities and characteristics that are inapposite to the characteristic goals of the Open and Intermediate prescription themes, authorizing those prescriptions in LSRs could result in long-term

destruction of habitat." Dkt. No. 53 at 17-18. As Judge Clarke notes, "BLM's argument, at its core, is that because its actions are not intended to aid the development of habitat, its actions do not need to comply with the standard that requires BLM's actions aid the development of habitat," which he identifies as "circular reasoning." Dkt. No. 53 at 19.

Legally and pragmatically, BLM's interpretation is unreasonable. The agency's analysis hinges on internally inconsistent and contradictory assumptions and reads the purpose of LSR standards out of existence to expand logging in protected reserves. This is irreconcilable with the RMP's objectives and management directions. Accordingly, Judge Clarke properly found that "BLM's interpretation [of the 20-year standard] is plainly inconsistent with the 2016 RMP" and that the agency's proposed logging described in the IVM Program thus violated FLPMA. Dkt. No. 53 at 18.

## II. The IVM Program Fails to Comply With NEPA.

An EIS is required where a project raises substantial questions as to whether it may have a significant impact on the environment. *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006) (citing *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 114 (9th Cir. 1998)). To determine if there may be a significant impact, an agency must consider the context of the project and any intensity factors present. 40 C.F.R § 1508.27. Because BLM failed to complete an EIS given the factors present, the IVM Program violates NEPA.

### A. Context

"Context provides an overall scope to judge the significance of a project in light of the intensity factors," and "the larger the scope and setting of a project, and the greater the context, the less intense the project must be to be significant." *Greater Hells Canyon Council v. Wilkes*,

No. 2:22-cv-859-HL, 2023 U.S. Dist. LEXIS 178671 (Aug. 31, 2023) *25-26 (internal citations omitted);[6] *see* 40 C.F.R § 1508.27(a).

As Judge Clarke explained, "[h]ere, the context is southwest Oregon. The IVM Program's Planning Area encompasses 875,290 acres throughout the Medford District, of which 684,185 acres comprise the eligible Treatment Area." Dkt. No. 53 at 26; *see* AR 2603. The Court went on to explain:

> Within this massive area exists varied forest types that serve multiple distinctly important purposes, not the least of which include habitat for endangered, threatened, and rare species. The Program will occur over 10 years, without any secured sunset date, and it will authorize commercial logging and fire resiliency treatments. Wildfire prevention is an acutely important interest for this area's affected residents and neighbors, who have consistently demonstrated their dedication to effective land planning solutions by actively participating in BLM's process and voicing concerns.

*Id.* at 27. The area to be logged is massive, and the IVM Program authorizes its most intensive logging prescription across all acres indefinitely into the future. AR 2940, 2601, fn. 6. Plaintiffs and interested community members consistently raised concerns, based on numerous and consistent scientific studies that rely on both modeling and actual data derived from recent fires in the region. These studies suggest BLM's plan to heavily thin existing mature forests to increase fire resilience will actually make fire issues worse.[7]

---

[6] *Canyon v. Wilkes*, No. 2:22-cv-00859-HL, 2024 U.S. Dist. LEXIS 58184 (D. Or. Mar. 29, 2024) (Findings and Recommendations adopted in full by Judge Aiken)

[7] The debate over whether to commercially thin *existing mature forest* in the name of moderating fire was the exact issue before the court in *Bark v. U.S. Forest Serv*., and the Ninth Circuit found that the agency "reiterated its conclusions about vegetation management but did not engage with the substantial body of research," that demonstrated that logging mature forests and trees is bad for moderating fire. 958 F.3d 865, 869 (9th Cir. 2020). The literature in the record here also condemns the logging of mature forests and trees. *See* AR 68615 (Agee and Skinner 2005 ("Where large trees are not present, and a thinning prescription is considered, the largest of the small trees should be reserved."); AR 43141 (Lesmeister et al 2019 (in the Klamath-Siskiyou region "succession likely decreases risk of high-severity fire"); *see* AR 13421 (Hanson 2021) ("highest levels of high-severity fire were in the categories with commercial logging (post-fire logging, private commercial timberlands, and commercial thinning), while the three categories

BLM fails to address or engage with these studies, the region's history, or the public's legitimate concerns about the impacts and efficacy of heavy logging in "southwestern Oregon, a region uniquely and extraordinarily vulnerable to severe wildfire." Dkt. No. 53 at 2 (*citing* AR 48418). As this Court has previously explained, a dispute over the efficacy of logging in reserves is a factor that weighs in favor of significance. *Cascadia Wildlands v. U.S. Forest Serv.,* 937 F. Supp. 2d 1271, 1283-84 (D. Or. 2013).

## B.  Intensity

Here, the Court properly found that an EIS was required because at least[8] "four factors sufficiently demonstrate that the IVM Program's impact on southwest Oregon would be significantly severe: the degree of controversy generated, the degree of uncertainty manifested, the likelihood of problematic precedent, and the threat of violating federal law." Dkt. No. 53 at 27-28.

### 1.  Controversy

"A project is 'highly controversial' if "evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1069 (9th Cir. 2014) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)). If "evidence from numerous experts" undermines the

---

with lower levels of high-severity fire were in forests with no recent forest management or wildfire, less intensive noncommercial management, and unmanaged forests with re-burning of mixed-severity wildfire, respectively.").

[8] The Court declined to address other significance factors raised in the briefing including "the inarguably unique characteristics of the geographic area and the degree of possible adverse effect to endangered or threatened species," and the Court declined to reach numerous hard look arguments pertaining to a lack of site-specific analysis and deficient fire analysis because its Findings identified deficiencies sufficient to support the ruling. Dkt. No. at 53 at 26-27.

agency's conclusions, it "then becomes the agency's burden to put forth a well-reasoned

explanation demonstrating why the dispute does not suffice to create a public controversy." Dkt.

No. 53 at 28 (citing *Bark,* 958 F.3d at 870).

> Judge Clarke correctly found that Plaintiffs raised the controversy factor:
>
> AS and KS Plaintiffs presented substantial evidence that BLM's chosen logging prescriptions would not have the intended effect and would instead exacerbate fire issues. For example, some studies found that treatments like Open and Intermediate, which create open conditions through thinned portions of forests stands and rely on regeneration, not only remove the habitat and connectivity that is required for NSO survival, but those treatments have also been found to create highly flammable young stocks interspersed throughout the thinned units. Another study found that the regrowth and replanting required in younger plantation stands will eliminate the effort to mimic past fire regimes, and the gap openings will increase fire hazard in these stands. Other research concurred that open conditions and more intensive forest management can lead to accelerated levels of fire severity in this region specifically, and that thinning and group selection openings may indirectly increase surface wind gusts and temperatures, increasing severity of surface fire behavior.

Dkt. No. 53 at 28-29; *see* Dkt. No. 21 at 42-46 (citing excerpts from Prichard (2010);

Weatherspoon and Skinner (1995); Agee (1996); Thompson and Spies (2009); Bigelow and

North (2011)); *see* Dkt. No. 27 at 73 ("such openings can increase wind speed, decrease fine fuel

moisture (drying out of dead sticks and debris), and increase surface vegetation if no

maintenance treatments are implemented, which could contribute to the risk of a stand-replacing

crown fire"); *see also* AR 3379 (BLM admitting its openings will resemble "plantations"); *see*

AR 60619; Dkt. No. 27 at 75 (admitting that plantations experience "higher severity fire") (citing

AR 52429).

All these negative fire impacts associated with BLM's logging are disclosed in the EA

and discussed at length in the studies relied upon by BLM in the EA;[9] BLM's fire analysis,

---

[9] Gaps and openings "should be of particular concern when group selection openings are embedded within fuels-reduction thinned stands that form part of a network for rapid access by fire-fighting personnel (Moghaddas et al., 2010)." AR 60619; *see also* Dkt. No. 21 at 43-45

however, does not factor in any of these negative consequences nor does the agency's ultimate

decision. BLM's fire analysis only consists of the modeled risk of "crown fire," with BLM

concluding the more canopy it removed (i.e. the heavier it logged), the less the risk of crown

fire.[10] *See* AR 2628 (Table 10).

Deficiencies with this model abound. The model's conclusion — that the more canopy

removed, the better the fire outcome — directly conflicts with literature that has analyzed actual

fire outcomes in the Klamath-Siskiyou region. AR 43141 (Lesmeister study evaluating the

Douglas Complex and Big Windy Fires in 2013); *see also* AR13421 (Hanson study evaluating

the outcome of the Creek Fire in 2020). The agency's conclusion also conflicts with the admitted

reality that regeneration harvest, which involves high levels of canopy removal, ultimately

increases fire risk. Dkt. No. 21 at 43 ("For 5 to 20 years following planting, the overall fire

hazard would increase in these stands" citing AR 1966–76; 31785–92); *see also* Dkt. No. 27 at

75 (admitting that plantations experience "higher severity fire") (citing AR 52429)).

In any case, BLM's crown fire analysis does not incorporate the admitted negative

potential fire effects into its analysis. For example, Plaintiffs' proposed Alternative B retains

_____

(citing excerpts from Prichard (2010); Weatherspoon and Skinner (1995); Agee (1996);
Thompson and Spies (2009); Bigelow and North (2011)); *see* Dkt. No. 27 at 73 ("such openings
can increase wind speed, decrease fine fuel moisture (drying out of dead sticks and debris), and
increase surface vegetation if no maintenance treatments are implemented, which could
contribute to the risk of a stand-replacing crown fire").

[10] BLM claims in its factual background section that "fires that spread along the forest floor
(surface fires) are generally low to moderate in their severity," Dkt. No. 60 at 12 (citing AR
2998-3000). This is false, and the record citation BLM provides contains no support for this
assertion. Contrary to BLM's representation, surface fires can range in intensity, and surface fire
variables directly affect a host of corresponding fire severity factors. *See* AR 3142 ("Rates of
spread and flame lengths are key components affecting fire size and resistance to control.
Surface fire behavior has a direct effect on fire severity, mortality, suppression tactics, and the
initiation of crown fire, lower surface fuel loading produces lower flame lengths."). BLM's
failure to analyze surface fire and its singular focus on crown fire is emblematic of BLM's
attempt in the IVM EA to its limit its "findings to only the positive outcomes." Dkt. No. 53 at 29.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO FINDINGS AND                    24
RECOMMENDATIONS

more mature trees than Alternative C and does not include gap creation. AR 2610. These suggestions were made in part to mitigate the fire consequences of the proposed commercial thinning. AR 33119; *see* AR 68615 (Agee and Skinner 2005). BLM lists the presence of "large trees" as a critical variable in the "wildland fuel profile," but BLM's fire analysis does not incorporate any differences between the Alternatives despite different diameter limits and the requirements in Alternative B to retain more larger trees. AR 2610; AR 2628 ("thinned stands with remaining large trees have been shown to have less severe fire effects when intersected by wildfires (USDI BLM 2016a, p. 228; Martinson and Omi 2013, Lydersen et al. 2014)"); *see* AR 2628 (Fire resilience Table 10 showing no inputs for large tree retention or gaps or differences between application of the two Alternatives). Despite including these differing alternatives, BLM does not analyze the difference in fire impacts. *See* AR2 628 (Table 10) (the fire consequences of the different Alternatives are identical); *see also* AR 2791 (no difference in modeling of different RDI prescriptions); *see also* Dkt. No. 21 at 43-45 (explaining how through assumptions BLM avoids factoring in the negative fire consequences of its proposed logging).

By focusing only on crown fire risk and incorporating a series of flawed assumptions into its analysis, "BLM effectively reduces its findings to only the positive outcomes, while discounting the coinciding negative possibility that treatments would exacerbate forest fires." Dkt. No. 53 at 29. BLM's Open logging prescription is a regeneration-type prescription, creating open conditions through the thinned portion of the stand and converting a quarter of logged areas into group selection openings intentionally designed to create new young plantations. AR 2736, AR 3379-40. In doing so, BLM creates and exacerbates the precise problem it claims IVM is intended to solve. As the Court in *Bark* observed, "[t]his dispute is of substantial consequence

because" "fire management is a crucial issue that has wide-ranging ecological impacts and affects human life." *Bark*, 958 F.3d at 871.

BLM's objection generally argues that forest thinning in other contexts can be beneficial and can reduce fire intensity, and these approaches have been upheld by courts. Dkt. No. 60 at 45. This is true, but the severity of the thinning prescription and the existing condition of the area to be logged matter.[11] The Zald 2018 study discussed in BLM and Intervenor's Objections discusses fire hazards posed by "plantations" "dominated by young trees" "arranged in a relatively spatially homogenous fuel structure," and concludes these areas would benefit from thinning, but distinguishes these areas from "older forests" that "tend to have greater variability in both tree size and spatial pattern vs. plantations (Naficy et al. 2010), arising from variable natural regeneration (Donato et al. 2011), post-disturbance biological legacies (Seidl et al. 2014), and developmental processes in later stages of stand development (Franklin et al. 2002)." AR 46001. The IVM Program would permit BLM to log existing late-successional forests (which already have high levels of fire resilience) so heavily that they cease to function as owl habitat and require replanting. *See* AR 2623, 3379 ("group selection openings in LSR-dry would be stocked to at least 75 trees per acre" and resemble "plantations"). This approach runs directly counter to the Zald study.

BLM argues it "even adopted several of [the Zald study's] proposed features in the IVM Program," including "commercial thinning (including in even-aged stands) combined with prescribed fire." Dkt. No. 60 at 43. This response is emblematic of BLM's flawed approach. It

---

[11] *See* Dkt. No. 42 at 38-39 (Discussing the widely diverse areas BLM is targeting for logging, including forests that burned as recently as 2018, AR 1997-9, forests that had recently been commercially thinned, AR 2001, moist forests typed as dry, AR 2004, 2016 and late-successional forests with large, mature trees. AR 2003-4)

picks and chooses elements from various studies, primarily the commercial logging components, while ignoring other critical components, such as the recommendation to protect existing late-successional forests for fire resilience.

BLM also argues in its objection that it dismissed the Hanson 2021 study, which concluded that the "highest levels of high-severity fire were in the categories with commercial logging (post-fire logging, private commercial timberlands, and commercial thinning), while the three categories with lower levels of high-severity fire were in forests with no recent forest management or wildfire, less intensive noncommercial management, and unmanaged forests with re-burning of mixed-severity wildfire, respectively," AR 13421, because the study "did not adequately account for other factors affecting fire severity, such as 'ecoregion, elevation, and temperature.'" Dkt. No. 60 at 43-44. Ironically, BLM's own fire modeling suffers from the same faults, relying upon average or mean values or estimates instead of actual stand data while failing to include data on ecoregion, elevation, and temperature. *See* AR 2628-9. The lack of site-specific data to inform the agency's fire modeling resulted in the unsupported conclusion that forest canopy removal would produce better fire outcomes, which conflicts with the conclusions of studies in the record. AR 2628-9 (Table 10); *see, e.g.,* AR 1970 ("[M]ore open conditions and more intensive forest management led to accelerated levels of fire severity").

In short, BLM is attempting to use studies that support the thinning of dry,[12] young plantations to justify logging existing late-successional forests (dry or moist) to the extent that

---

[12] Moist forests compromise approximately 6 percent of the IVM Program area or 41,0000 acres. AR 2615. There is no scientific or ecological justification to commercially thin existing mature or late-successional moist forests. *See* Dkt. No. 21 at 56-57. Despite the fact that creating canopy openings in moist forests can have drastic fire impacts, *see Cascadia I,* 410 F. Supp. 3d at 1158, BLM assumes that "[c]hanges in forest conditions in the moist forests would not alter resiliency at the landscape scale." AR 2615. While the conclusion that logging in moist forests might not

replanting 75 trees per acre is required. This approach is not just "highly controversial," it is grossly negligent because the replanted areas will resemble plantations and drastically and undisputedly exacerbate fire hazard across thousands of acres in "a region uniquely and extraordinarily vulnerable to severe wildfire." Dkt. No. 21 at 43 ("For 5 to 20 years following planting, the overall fire hazard would increase in these stands" (*citing* AR1966–76; 31785–92)); *see also* Dkt. No. 27 at 75 (admitting that plantations experience "higher severity fire") (citing AR52429); Dkt. No 53 at 2 ("Of the fifty communities in Oregon identified as 'the highest cumulative wildfire risk,' nearly half are located in southwestern Oregon. AR 2602).

### 2. Uncertainty

The Court correctly found that the IVM EA involved "an inherently high degree of uncertainty" by using a non-site-specific, programmatic framework. Dkt. No. 53 at 30. A project is highly uncertain when the environmental effects are unknown, or the project involves unique unknown risks. 40 C.F.R §1508.27(b)(5). The IVM is one of the initial examples of BLM's plan to authorize logging with non-site-specific landscape EAs that will subsequently be tiered to by Determinations of NEPA Adequacy ("DNAs"). Through this process, BLM selects all (or nearly all) acreage in a given land use allocation across a district and decides to log every acre, preemptively determining that logging all of this acreage would not result in significant impacts because it falls under the scope of the 2016 RMP. *See* AR 2958. Given that this process precludes site-specific review of environmental impacts, the BLM simply tiers to the analysis that accompanied the 2016 RMP in an attempt to satisfy NEPA's hard look requirement. This process and this preliminary finding of no significant impact (FONSI) results in several NEPA

---

alter resilience at the "landscape" scale, it could compromise the safety of forest conditions at the local scale, near at-risk communities.

violations, but without question, involves inherent uncertainty because actual environmental impacts are unknown.

In another recent BLM case, Plaintiffs challenged this same process for NEPA compliance directly. *Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK, (D. Or. 2024) ("*Siuslaw HLB*").[13] There, BLM similarly attempted to rely upon a landscape-scale EA that largely did not contain site-specific analysis and attempted to tier to the 2016 RMP FEIS. *Id.* at *5-6. The court in *Siuslaw HLB* found that BLM's attempt to tier to the 2016 RMP FEIS "was insufficient because neither the 2016 RMP FEIS nor the Siuslaw Plan EA contained adequately site-specific information or analysis" for several different resources. The Court ultimately found this approach required an EIS because "the lack of information about several site-specific impacts of the Siuslaw Plan and the ability of those impacts to be mitigated render such effects highly uncertain." *Id.* at *27; *see also id.* at *14, 20–21.

The findings from *Siuslaw HLB* align with the case here because BLM again "adopted an intentionally non-specific approach in the [IVM] EA to allow the plans to proceed flexibly under a 'programmatic' framework." Dkt. No. 53 at 30. This approach similarly fails because "BLM tiers to a global EIS that omits any site-specific analysis and explicitly pushes review to later implementation-level projects." Dkt. No. 53 at 31. Consistent with the *Siuslaw HLB*, Judge Clarke found BLM's approach that relies on a non-site-specific EA and tiering to the RMP FEIS ensures "site-specific analysis is never completed, it breeds problems for public participation, transparency, and establishing any sort of concrete certainty as to impacts." Dkt. No. 53 at 31. Judge Clarke appropriately determined that BLM's approach to tiering creates high uncertainty, contributing to the requirement to prepare an EIS.

---

[13] Findings and Recommendations currently awaiting Judge McShane's adoption.

Also, BLM further argues that the "Magistrate Judge's reasoning incorrectly assumed that BLM had relied on DNAs to fill gaps in its earlier NEPA analysis," and argues that the EA reasonably forecasted site-specific impacts. Dkt. No. 60 at 48. The Court specifically found based on clear record admissions by BLM that "[t]he EA did not disclose any site-specific effects of the proposed logging. AR 2601." Dkt. No. 53 at 11. Thus, by necessity, BLM is relying on subsequent DNAs to fill gaps in its NEPA analysis.[14]

Also, BLM argues that the "magistrate judge found that it was 'unclear which elements of the Program may continue beyond the 10-year time frame.' Dkt. No. 53 at 31. The record shows that the answer is none." Dkt. No. 60 at 41, 48. In fact, the record directly contradicts BLM's claim. AR 2601, n.6 ("the EA does not have a specific 'sunset date' after which BLM will no longer use it.").

Finally, BLM argues that Judge Clarke's finding that the IVM Program involved uncertainty fails "because the same Magistrate Judge previously upheld a FONSI for an analytically indistinguishable programmatic project – the North Landscape Project." Dkt No. 60 at 47. This argument fails because the IVM Program and the North Landscape Project are readily distinguishable. While the North Project did involve multiple timber sales, it was "a site-specific management approach" that included a "full and fair discussion of the significant environmental impacts," and was quite small in comparison to the vast, diverse area and hundreds of thousands of acres of commercial logging contemplated by IVM. *See* Dkt. No. 42 at 40; *compare Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, No. 1:19-cv-01810-CL, 2021 U.S. Dist. LEXIS 223221, at *3, 5 (D. Or. Aug. 24, 2021) (The North Project involved logging on up to

---

[14] Also, as Plaintiffs argued and BLM did not refute, BLM's subsequent DNA for the Late Mungers Project did not contain the site-specific analysis that was promised in the IVM EA. *See* Dkt. No. 21 at 30-31.

9,073 acres with an average of around 500 acres per year) *with* AR 2940-41 (IVM DR authorizes up to 4,000 acres of commercial logging per year in LSRs, across roughly 300,000 acres).

While there is a "quotient of uncertainty" with NEPA, *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009), the Court rightly characterized BLM's approach here as "an intentionally non-specific approach." Dkt. No. 53 at 30, *see* AR 2956 ("the EA does not analyze specific, discretely identified, site-specific projects"). This approach weighs heavily in favor of an EIS as "the impacts contemplated here" are "highly uncertain." *Id.*

### 3. Precedential Impact

The Court correctly found that the IVM Program establishes a precedent for future actions that may cumulatively have a significant negative impact on the environment. Dkt. No. 53 at 31 (citing *Anderson v. Evans,* 371 F.3d 475,493 (9th Cir. 2004)); 40 C.F.R § 1508.27(b)(6)). The IVM Program is BLM's first reliance on its "interpretation" of the 20-year standard, the application of which will have sweeping impacts on the management of LSR. Dkt. No. 53 at 31-32. Judge Clarke appropriately found that BLM's interpretation "would severely undercut the ability of the RMP to protect and promote habitat decades into the future." *Id.* at 32.

"If approval of a single action will establish a precedent for other actions which may cumulatively have a negative impact on the environment, an EIS may be required." Dkt. No. 53 at 31 (*citing Anderson,* 371 F.3d at 493 (9th Cir. 2004); 40 CFR § 1508.27(b)(6)). BLM failed to consider how not applying the 20-year standard would influence fundamental assumptions in the RMP FEIS and Biological Opinion. AR 49938; *see also* AR 52022. The IVM Program would mark a fundamental change for LSR management across 1.2 million acres in Oregon. Dkt. No. 53 at 2.

BLM does not acknowledge this reality, instead arguing that the agency's interpretation of the 20-year standard was "a separate process through the Oregon State Office, not by the BLM Medford District while preparing the IVM Program," implying that BLM had no obligation to analyze or address this change in the IVM NEPA documents. Dkt. No. 60 at 50-51. BLM's assertion that the interpretation of the 20-year standard was a separate process is undermined by the record. *See* AR 30740 (March 2020 emails among the Medford District's IVM team discuss the 20-year standard and claim that "our treatments in non-Nesting Roosting habitat in the LSR should not set back the development of Nesting Roosting habitat by 20 years. This has been an issue we have been discussing on the district for the past couple of years and our plan is to roll our interpretation into this EA analysis and have the State Office comment on it during their review of the EA."); AR 22624 (interpretation of the 20-year standard released by Oregon State Office in August 2020). Clearly, the Medford District had been trying to develop a way to avoid complying with the 20-year standard in coordination with the State Office to justify logging LSR in this District. Thus, Judge Clarke's statement is not factually erroneous as claimed.

Further, it is unclear why this matters. BLM's internal interpretation of the 20-year standard never went through NEPA, and it is not a final agency action that Plaintiffs could challenge. *See* 5 USC § 553(b)(4)(A) (providing that interpretive rules are exempt from notice and comment requirements under the APA); *see also Bennett v. Spear*, 520 U.S. 154, 177 (1997) (holding that rules are not challengeable until legal consequences flow from the rules). Plaintiffs would have to wait for the BLM to issue a decision relying on their interpretation of the standard to challenge it, which is exactly what Plaintiffs did here. *See, e.g., Ohio Forestry v. Sierra Club*, 523 U.S. 726 (1998) (challenging forest planning and policy is only ripe when harm is imminent

and certain); *Ecology Ctr., Inc. v. U.S. Forest Serv*., 192 F.3d 922, 925 (9th Cir. 1999) (holding that plaintiffs "cannot demand general judicial review" of programs and non–legislative rules not covered by the APA, including interpretive rules; rather, courts may "intervene in the administration of the laws only when, and to the extent that, a 'final agency action' has an actual or immediate threatened effect").

Additionally, regarding tiering, Judge Clarke determined that BLM's attempted "use of tiering effectively allows the agency to avoid completing any site-specific analysis under the guise of passing it off as already considered," and that the Court "declines to validate BLM's practices as generally acceptable NEPA procedure." Dkt. No. 53 at 32. BLM's approach to tiering here violates NEPA because it is using tiering to "maneuver around its obligation, hanging each subsequent decision where no specific issues have been addressed." *Id.* (citing *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir. 1998) ("Nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific EIS, without regard to the nature or magnitude of a project.")).

BLM argues that "there is nothing that prevents BLM from conducting additional analyses for future implementation projects," Dkt. No. 60 at 50, but BLM here has conclusively found that there will not be a significant impact. AR 2856. This finding is final and will not be revisited. *See Env't Def. Ctr.*, 36 F.4th at 868. The purpose of an EA is to determine whether there is a possibility of significant impacts; given that BLM has already made this final decision, there is no reason the BLM would publish an EA again. *See Metcalf v. Daley,* 214 F. 3d 1135, 1143 (9th Cir. 2000) ("The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a [Finding of No Significant

Impact].") (citing 40 C.F.R. § 1508.9). Therefore, the IVM EA and Finding of No Significant Impact are directly precedential across 300,000 acres and serve as an endorsement and example of BLM's use of tiering to avoid analyzing site-specific effects for future projects. Accordingly, BLM's use of tiering "may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6). Moreover, every BLM district in Oregon has proposed landscape-level EAs that heavily rely on tiering to replace site-specific analysis.[15]

Finally, both BLM and Intervenors argue that the precedence factor is "insufficient on its own to demonstrate a significant environmental impact" unless the approval of the project is *binding* on future decisions." Dkt. No. 59 at 38; *see also* Dkt. No. 60 at 49-50. But Judge Clarke relied on the project's precedential effect in combination with three other intensity factors that the Court found sufficiently demonstrate that the IVM Program's impact on southwest Oregon would be significantly severe." *See* Dkt. No. 53 at 28. Thus, Judge Clarke did not exclusively rely on the project's precedential effect to determine an EIS was required. *Id.*

### 4. Threatened Legal Violation

As previously discussed in Section I, the IVM Program does not comply with the 20-year NSO standard from the 2016 RMP, and this threatened violation of federal law imposed for the protection of the environment requires an EIS. 40 C.F.R. § 1508.27(b)(10).

//

---

[15] *See e.g. Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK, (D. Or. 2024) (challenging the "Siuslaw HLB Landscape Plan" authorized by BLM in the Northwest District); *Cascadia v. Adcock*, Case No. 6:22-cv-00767-AA (active challenge of the "N126 LSR Landscape Plan" authorized by BLM in the Northwest District); *Cascadia Wildlands v. United States BLM*, No. 6:23-cv-1358-MC, 2024 U.S. Dist. LEXIS 117974 (D. Or. June 28, 2024) (challenging the "Big Weekly Elk Forest Management Project" authorized by BLM in the Coos Bay District).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to adopt in full Judge

Clarke's Findings and Recommendations and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted this 19th day of July, 2024.


/s/ Meriel Darzen
Meriel L. Darzen (OSB # 113645)
Alexandria Dolezal (OSB # 223924)
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
503-525-2725 | Email: meriel@crag.org

/s/ Nicholas Cady
Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463 | Email: nick@cascwild.org

*Counsel for Plaintiffs*