ADAM R. F. GUSTAFSON
Acting Assistant Attorney General

ALEXIS G. ROMERO
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-5885
alexis.romero@usdoj.gov

*Counsel for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, *et al.*, <br><br> APPLEGATE SISKIYOU ALLIANCE, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendant, <br><br> AMERICAN FOREST RESOURCE COUNSEL; ASSOCIATION FOR O&C COUNTIES <br><br> Intervenor-Defendants. | Case No.: 1-23-cv-00519-CL (Lead Case) <br> Case No.: 1-23-cv-01163-CL (Trailing Case) <br><br> Honorable M.J. Mark D. Clarke <br><br> **FEDERAL DEFENDANT'S REMEDY BRIEF** |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD................................................................................................. 4

ARGUMENT ............................................................................................................. 5

    I.      The Court May Partially Vacate the Ecosystem Resilience-Intermediate and Ecosystem Resilience-Open Treatments in the IVM Decision Record and Late Mungers Decision Record ........................................................... 6

    II.     The Court Should Remand the IVM FONSI, IVM EA, and Late Mungers DNA for further analysis, but without Vacatur ...................................... 9

          A.     There Is No Legal Basis for Vacating An EA ......................................... 10

          B.     Any NEPA Errors Were Not Serious, Particularly in Light of Recent Legislative, Regulatory, and Judicial Changes and Clarifications to NEPA ....................................................................................................... 12

          C.     Vacatur of the Remaining IVM Program Documents Would Have Significant Disruptive Consequences ...................................................... 15

    III.    The Court Should Not Impose Additional Instructions or Restrictions on BLM's Activities After Remand.......................................................... 20

CONCLUSION.......................................................................................................... 22

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. For the Wild Rockies v. Pena*,
  865 F.3d 1211 (9th Cir. 2017) ............................................................................... 19

*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................ 5

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................. 10

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) .............................................................................. 5, 7

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ................................................................................. 11

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) .................................................................................. 4

*Los Padres ForestWatch v. Forest Serv.*,
  25 F.4th 649 (9th Cir. 2022) ................................................................................. 20

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .......................................................................................... 21, 22

*Nat'l Fam. Farm Coal. v. EPA*,
  966 F.3d 893 (9th Cir. 2020) .............................................................................. 5, 12

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) .............................................................................. 19

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
  136 F.4th 816 (9th Cir. 2025) ............................................................................ 12, 21

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................................ 6, 11

*Pacific Rivers v. BLM*,
  815 Fed. Appx. 107 (9th Cir. 2020) ....................................................................... 20

*San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*,
  449 F.3d 1016 (9th Cir. 2006) ................................................................................ 21

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) .............................................................................................. 20

*Seven Cnty. Infrastructure Coalition v. Eagle County*,
  2025 WL 1520964 (U.S. May 29, 2025) ......................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ........................................................... 21

**Statutes**

42 U.S.C. § 4336(b)(1) ................................................................................................................. 14

42 U.S.C. § 4336(b)(2) ................................................................................................................. 13

42 U.S.C. § 4336a ......................................................................................................................... 13

42 U.S.C. § 4336a(e) ..................................................................................................................... 13

42 U.S.C. § 4336b ......................................................................................................................... 13

42 U.S.C. § 4336e(5) ..................................................................................................................... 13

43 U.S.C. § 1712(a) ......................................................................................................................... 6

43 U.S.C. § 4336(b) ...................................................................................................................... 14

5 U.S.C. § 706 .................................................................................................................................. 4

5 U.S.C. § 706(2)(A) ..................................................................................................................... 10

**Regulations**

43 C.F.R. § 1601.0-5(b) .................................................................................................................. 6

43 C.F.R. § 1601.0-5(c) .................................................................................................................. 6

43 C.F.R. § 1601.0-5(n) .................................................................................................................. 6

43 C.F.R. § 1610.5-6 ..................................................................................................................... 20

90 Fed. Reg. 10,610 (Feb. 25, 2025) ........................................................................................... 13

**INDEX OF EXHIBITS**

| Exhibit 1 | Declaration of Elizabeth Burghard, BLM Medford District Manager |
|---|---|
| Exhibit 2 | Declaration of Mark Bey, Lomakatsi Restoration Project |
| Exhibit 3 | Declaration of Jaime Stephens, Klamath Bird Observatory |
| Exhibit 4 | Agate Oak Project DNA |

# INTRODUCTION

BLM prepared a program-level Environmental Assessment ("EA") and a corresponding Finding of No Significant Impacts ("FONSI") in support of the Integrated Vegetation Management ("IVM") Program, which is described in the corresponding Decision Record. BLM then began Program implementation with a pair of non-commercial implementation projects followed by the Late Mungers Decision Record, which contemplated 89 percent non-commercial and 11 percent commercial treatment for certain areas near Grants Pass. In support of the Late Mungers decision, BLM prepared a Determination of National Environmental Policy Act ("NEPA") Adequacy ("DNA") documenting the decision's compliance with NEPA.

The Parties have agreed for years that the remedy issues in this case were nuanced and will require careful parsing of these documents. This is particularly true considering the Plaintiffs' distinct requests for relief and the Court's mixed merits ruling at summary judgment.

For the reasons below, BLM agrees that certain portions of the IVM Program could be vacated per the Court's merits decision. Specifically, under the Court's interpretation of the RMP, BLM acknowledges the Court's equitable authority to vacate those portions of the IVM Decision Record authorizing the Ecosystem Resilience – Open and Ecosystem Resilience – Intermediate Commercial treatments, or those portions of the Late Mungers Decision Record authorizing the Ecosystem Resilience – Open and Ecosystem Resilience – Intermediate Commercial treatments within the Late Mungers project area.

The remaining portions of both Decision Records should be remanded *without* vacatur.

As to NEPA, the errors identified in the Court's ruling were not so serious as to support vacatur of the IVM EA and FONSI or the Late Mungers DNA. All three branches of government have either clarified or amended NEPA since the Court's merits decision, including

FEDERAL DEFENDANT'S REMEDY BRIEF
        *Klamath-Siskiyou Wildlands, et al. v. BLM*, Case No. 1-23-cv-00519-CL

clarifications with respect to the NEPA principles that applied at the time BLM prepared the IVM Program. Given these developments, BLM's responsibilities on remand will be to assess these changes to NEPA, and the Court should not prejudge that inquiry by vacating the IVM Program. Moreover, nearly three-quarters of the IVM Program was either upheld in BLM's favor, not challenged by Plaintiffs, or went appropriately unaddressed in the Court's decision. There is, therefore, no legal basis for vacating the entire IVM Program, let alone the underlying environmental reports.

Finally, an overbroad vacatur of the IVM Program would lead to disruptive consequences. Nearly ten years after BLM adopted the 2016 Southwestern Oregon Resource Management Plan ("RMP"), which mandated that the Medford District conduct both commercial and non-commercial restoration treatments within the Late Successional Reserve ("LSR"), BLM has implemented less than a quarter of that much-needed forest health and ecosystem restoration. Vacatur would create an additional multi-year delay of important fire and disturbance treatments, including non-commercial work that is ongoing with local conservation partners. The Court should avoid these harmful disruptions by remanding the remaining portions of the IVM Program without vacatur.[1]

## BACKGROUND

Plaintiff KS Wild et al. filed an action challenging the Integrated Vegetation Management for Resilient Lands ("IVM") Program in April 2023, alleging violations of the

---

[1] In discussing the Court's equitable authority to vacate or not parts of the IVM Program, BLM preserves its ability to consider appeal on all issues.

Federal Land Policy and Management Act ("FLPMA") and NEPA.  Compl., ECF No. 1.[2]
Under FLPMA, the Complaint alleged that the IVM Program's Ecosystem Resilience – Open
and Ecosystem Resilience – Intermediate commercial treatments were inconsistent with the 2016
RMP.  ECF No. 1 ¶¶ 118-129.  Under NEPA, KS Wild alleged the BLM was required to prepare
an Environmental Impact Statement ("EIS"), and that BLM had failed to take a "hard look" at
certain environmental impacts.  ECF No. 1 ¶¶ 130-161.  Among other remedies, KS Wild's
request for relief sought partial vacatur of the commercial components of the IVM Program.
ECF No. 1, Request for Relief D.

Plaintiff ASA filed a separate action in August 2023, also alleging violations of FLPMA
and NEPA.  Under FLPMA, ASA alleged that BLM had failed to ensure compliance with the
2016 RMP's recreational management direction.  Compl. ¶¶ 124-133 (Claim III), 1:23-cv-ECF
No. 1, ECF No. 1 ("ASA Compl.")  Under NEPA, ASA also alleged that BLM was required to
prepare an EIS and take a "hard look" at various environmental impacts.  *Id.* ¶¶ 98-123.  Unlike
KS Wild, ASA's request for relief sought vacatur of the entire project.  *Id.* at 29, Request for
Relief E.

The cases were consolidated, ECF No. 22, the American Forestry Resource Council and
Association of O&C Counties intervened on behalf of BLM, ECF No. 15, and the Parties briefed
summary judgment.  Given that the Plaintiffs sought distinct remedies, all Parties agreed that
summary judgment would be limited to merits, with further remedy briefing as needed.  *See* ECF
No. 53, at 34.

---

[2] Unless otherwise stated, all citations to ECF documents will be to the KS Wild case, 1-23-cv-
00519-CL, which the Court has designated as the lead case.  ECF No. 22.

After briefing and oral argument on the merits, Magistrate Judge Clarke issued a Findings & Recommendation ("F&R") finding that KS Wild and ASA raised substantial questions as to whether the IVM Program will have a significant environmental impact under NEPA, agreeing with KS Wild's FLPMA claim, and disagreeing with ASA's FLPMA claim.  ECF No. 53.  The F&R did not reach Plaintiffs' additional NEPA claims that BLM had failed to take a "hard look" at various environmental impacts in its EA for the IVM Program.  ECF No. 69.

The Parties engaged in a brief period of good faith, confidential discussions regarding remedy, including in a mediation conference before Magistrate Judge You.  ECF No. 74.   After the conference, the Parties proposed, and the Court entered, a briefing schedule to assess the appropriate remedy.  ECF No. 77.

## LEGAL STANDARD

"[C]ourts . . .  must keep in mind that review of an agency's [NEPA document] is not the same thing as review of the agency's final decision concerning the project."  *Seven Cnty. Infrastructure Coalition v. Eagle County*, 2025 WL 1520964, at *9 (U.S. May 29, 2025).  The Supreme Court has recently explained that "[e]ven if a[] [NEPA document] falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the [relevant NEPA document]."  *Id.* at *9.  This vacatur principle stems from the rule of prejudicial error in the Administrative Procedure Act (APA).  *Id.* (citing 5 U.S.C. § 706).

Even when there is reason to believe more NEPA analysis might have led the agency to a different decision, a court must still consider whether the challenged project "can be left in place while the agency follows the necessary procedures."  *Idaho Farm Bureau Fed'n v. Babbitt*, 58

F.3d 1392, 1405 (9th Cir. 1995).  In this context, courts must consider "[1] how serious the agency's errors are 'and [2] the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Courts also look to "whether the agency would likely be able to offer better reasoning and adopt the same rule on remand."  *Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 929 (9th Cir. 2020) (citation omitted).

## ARGUMENT

The Court must carefully consider the distinction between the NEPA documents prepared and the final decisions embodied in the IVM Decision Record and Late Mungers Decision Record.  Under the Court's interpretation of the RMP, BLM acknowledges the Court's equitable authority to vacate the Ecosystem Resilience – Open and Ecosystem Resilience – Intermediate treatments authorized in the Decision Records for the IVM Program and the Late Mungers project, in light of the Court's conclusions respecting substantive compliance with FLPMA.  *See* M.J. Clarke's Findings & Recommendation (F&R) ECF No. 53 at 19; Order Adopting F&R, ECF No. 69.  But vacatur should not extend to the other portions of the IVM Program, which the Court either upheld or declined to address. Vacatur also should not extend to the underlying NEPA documents themselves.  These NEPA documents contain useful analysis that could help inform the BLM's actions on remand, together with this Court's opinion and the significant amendments and clarifications made to NEPA since BLM began the planning process for this Program six years ago.

I.     **The Court May Partially Vacate the Ecosystem Resilience-Intermediate and Ecosystem Resilience-Open Treatments in the IVM Decision Record and Late Mungers Decision Record**

Under FLPMA, BLM must prepare land use plans, which the agency refers to as resource management plans. 43 U.S.C. § 1712(a); 43 C.F.R. 1601.0-5(n); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Subsequent implementation actions must conform to the land use plans. 43 C.F.R. § 1601.0-5(b). The legal question relevant to vacatur, therefore, is whether BLM made a decision that "adhere[ed] to the terms, conditions, and decisions of officially approved and adopted resource related plans." 43 C.F.R. § 1601.0-5(c).

The Court found that BLM's decision to authorize certain commercial treatments did not conform to management direction in the applicable land use plan, as required by BLM's regulations implementing FLPMA. *See* ECF No. 53 at 17-23. Interpreting the 2016 RMP, the Court first explained that "BLM is clearly permitted—at times even obligated—to conduct distinct fire management treatments in LSRs." *Id.* Furthermore, "BLM is even permitted to commercially log in LSRs, provided it complies with the 20-year standard and the other directives contained in the 2016 RMP." *Id.* at 19-20. But the Court concluded that BLM failed to comply with FLPMA "with respect to whether the implementation of the Open and Intermediate themes will comply with the 20-year standard." *Id.* at 23. The referenced Open and Intermediate silvicultural prescriptions appear highlighted under the Preferred Alternative (Alternative C) in Table 11 of the IVM EA, AR 2633, which is reproduced here.[3]

---

[3] In the Table from the EA reproduced, Alternative A refers to an action alternative based on Plaintiff ASA's proposal at the public comment stage, AR 39187, Alternative B refers to Plaintiff KS Wild's proposal at the public comment stage, AR 2610, 33264-72, and Alternative C is the alternative that BLM selected, with minor modifications not relevant here. AR 2939; *see also* Burghard Decl. ¶ 15.

| Action Alternative | Estimated Canopy Cover (%) | Maintenance Frequency (Average Number of Entries Over 50 Years) | Percentage of IVM Eligible Treatment Acreage | Acres (approximate) |
|---|---|---|---|---|
| **Common to all** | | | | |
| Young Moderate - Density Stands | N/A | 20-30 years (1.5) | 19% | 130,000 |
| **Alternative A (Implementation Acres: 17,000 Commercial Actions and 17,000 Prescribed Fire)** | | | | |
| Strategic Areas & 1/4 mile of CAR (0.35-0.4) | 40-50 | 10-20 years (2) | 2% | 13K |
| Surface and Ladder Fuels | N/A | 10-20 years (3) | 16% | 107K |
| **Alternative B (Implementation Acres: 20,000 Commercial Actions and 30,000 Prescribed Fire)** | | | | |
| Maintain NSO Dispersal-Only Habitat (0.35-0.45) | 40-50 | 20-30 years (1.5) | 3% | 17K |
| Maintain Spotted Owl Nesting-Roosting and Foraging Habitat (0.45) | >60 | | 2 | 10K |
| Jeffery Pine and Oak - Open (0.2-0.35) | 30-40 | 10-20 years (4) | 0.05% | 367 |
| Surface and Ladder Fuels | N/A | 10-20 years (3) | 75% | 513K |
| **Alternative C (Implementation Acres: 20,000 Commercial Actions and 70,000 Prescribed Fire)** | | | | |
| Near-Term Spotted Owl (0.45) | >60 | 20-30 years (1.5) | 2% | 12K |
| Ecosystem Resilience - CLOSED (0.4-0.45) | 50-60 | | 0.2% | 1K |
| Long-Term NSO (≥0.3) | >40 | | 5% | 32K |
| Ecosystem Resilience - INTERMEDIATE (0.3-0.4) | 40-50 | | 7% | 49K |
| Fuels Emphasis (1/4 mile of CAR) (0.35-0.4) | 40-50 | 10-20 years (2) | 1% | 6K |
| Ecosystem Resilience - OPEN (0.2-0.3) | 30-40 | 10-20 years (4) | 5% | 32K |
| Surface and Ladder Fuels | N/A | 10-20 years (3) | 73% | 500K |

AR 2633 (Table 11)

Under the Court's interpretation of the RMP, BLM acknowledges the Court's equitable authority to partially vacate the Decision Record, specifically, authorization of the Ecosystem Resilience – Open and – Intermediate treatments, under the two pronged legal standard articulated in *California Communities Against Toxics*, 688 F.3d at 992. AR 2944.

BLM also concedes that under the Court's interpretation of the RMP, the Ecosystem Resilience – Intermediate and Ecosystem Resilience – Open treatments in the Late Mungers project cannot be implemented, and therefore the Late Mungers Decision Record could be subject to partial vacatur as to those particular treatments. AR 2-3, 11 (authorizing 830 acres of commercial restoration thinning treatments, consisting of several different IVM silvicultural

prescriptive themes, including 542 acres of combined Open and Intermediate treatments, as well as 7,523 acres of small-diameter thinning and prescribed fire).

In contrast, the Court should not vacate the remaining parts of the IVM and Late Mungers Decision Records. Beyond the Ecosystem Resilience – Intermediate and Ecosystem Resilience – Open treatments, vacating any other commercial or non-commercial portion of the restoration treatments authorized in the IVM Decision Record or Late Mungers Decision Record would be inappropriate and disruptive for several reasons.

First, the Court did not identify serious errors related to the IVM Program besides how BLM interpreted the above discussed 2016 RMP management direction. That the Court's FLPMA ruling did not opine on commercial treatments other than Ecosystem Resilience – Open and – Intermediate made sense; KS Wild Plaintiff specifically limited its claims here to "Ecosystem Resilience-Open," KS Wild Compl., ¶¶ 118-125 (FLPMA Count 1), and "Ecosystem Resilience-Intermediate" *Id.* ¶¶ 126-129 (FLPMA Count 2). And the Court rejected ASA Plaintiffs' broader FLPMA arguments about commercial treatments. ECF No. 53 at 25. There is, therefore, no basis for vacating other IVM Program components, and the Court should reject any request from Plaintiffs to expand the scope of its merits ruling to other commercial or non-commercial treatments.

Second, for the reasons explained in more detail below, vacating the remaining commercial or non-commercial components of the IVM Program would lead to disruptive consequences for BLM and the broader Rogue Valley community. Vacatur would mean that much-needed forest health and ecosystem restoration treatments, which have already been delayed for years, would go unimplemented even longer, perpetuating an elevated risk of

wildfires, insect infestations, and other disturbances.  *See* Burghard Declaration, ¶¶ 3-10, 12-14, 21-27, 29, 32-33; Stephens Decl. ¶¶ 3-4.  *See infra* Section II.B.

## II.    The Court Should Remand the IVM FONSI, IVM EA, and Late Mungers DNA for further analysis, but without Vacatur

As *Seven County* made clear, vacatur is not the presumptive remedy for NEPA violations, and the Court should not partially or fully vacate BLM's environmental documents – the EA, FONSI, and project-specific DNA.[4]   On the merits, the Court found that BLM's analysis and conclusions were inconsistent with the pre-2019 CEQ regulations applicable at the time BLM initiated the IVM NEPA process.  ECF No. 53 at 26.  The proper inquiry for vacatur is whether the agency can cure any defects on remand.  This question is complicated by the fact that the legal landscape will be substantially different on remand given Congressional, executive, and judicial modifications to NEPA.  Rather than determining at this stage whether any errors were serious, the Court should allow the agency to carefully consider these NEPA changes on remand.  As to disruptive consequences, vacatur would also set BLM and its many implementation partners back years in essential forest health and ecosystem restoration efforts in the Rogue Valley.  Independently or taken together, the legal developments and disruptive consequences strongly weigh against vacatur of any NEPA or NEPA-compliance document prepared for the IVM Program.

---

[4] The Government preserves for appeal all issues, including whether vacatur is the "presumptive" remedy in the Ninth Circuit following NEPA, FLPMA, or APA violations after the Supreme Court's decision in *Seven County*.  At any rate, there is no authority requiring a court to vacate after an APA violation.

**A.  There Is No Legal Basis for Vacating An EA**

The IVM EA should be remanded without vacatur because courts may not vacate

environmental assessments.  For similar reasons, the Court should decline to vacate the IVM

FONSI or Late Mungers DNA because doing so would run counter to the Supreme Court's

recent decision in *Seven County* and bedrock administrative law principles.

The APA allows the Court to set aside only final "agency action, findings, and

conclusions."  5 U.S.C. § 706(2)(A).  In contrast, the IVM EA, like all NEPA documents, is "in

essence, a report."  *Seven County*, 2025 WL 1520964, at *3.  Review of the agency's

environmental report "is not the same thing as review of the agency's final decision concerning

the project."  *Id.*, at *9.  In other words, an EA is not agency action – much less *final* agency

action.  This is because an EA is not "the consummation of the agency's decisionmaking

process," *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).  Instead, the EA

plays an intermediate role as one of many documents that inform the agency's ultimate decision.

The fact that an EA is not an appropriate target for vacatur is made clear by how

decisionmakers rely on EAs.  Agency officials often issue decision records that differ from the

EA, where the ultimate decision can be more protective of the environment than an alternative as

articulated in the EA.  For example, Alternative C in the IVM EA analyzed the possibility of

building permanent roads as part of IVM implementation projects, but the decisionmaker went a

step further in choosing to authorize only temporary roads.  AR 2938.  This illustrates how the

EA is not a decision of any kind—final or otherwise—and thus not an appropriate target for the

Court's vacatur authority under the APA.  *See Seven County*, 2025 WL 1520964, at *9.

Vacatur of an EA is also inappropriate even after a Court finds a FLPMA violation.

FLPMA is subject to the same APA standard of review as NEPA, meaning the finality

requirement is the same.  ECF No. 53 at 3 (this case is reviewed under the APA).  More broadly,

FLPMA requires an agency to demonstrate compliance with a land use plan, but FLPMA does

not specify the method for complying with said plan or that an environmental report under

NEPA is the only way to document land use plan compliance.  While FLPMA "is mandatory as

to the object to be achieved, [] it leaves BLM a great deal of discretion in deciding how to

achieve" compliance with plans like the RMP.  *Norton*, 542 U.S. at 66.  While it is not

uncommon for BLM to show FLPMA compliance within the agency's NEPA documents, BLM

could also demonstrate compliance through separate documents, such as incorporating

enforceable northern spotted owl (NSO) protective measures into project-specific decision

documents or even the contracts with third parties for implementing those decisions.  *See*

Burghard Decl. ¶ 30.  Vacating a NEPA document on the grounds that the Court found a

FLPMA violation would thus muddy the doctrinal distinctions between the two statutes and be

inappropriate several times over.

The IVM FONSI should likewise be remanded without vacatur.  It is true that in some

cases courts have found that a FONSI is a final "finding" that can be vacated.  *Env't Def. Ctr. v.*

*Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022).[5]  However, no Ninth Circuit

authority *mandates* vacatur of a FONSI following a court's conclusion of legal error, and given

the developments to CEQ's NEPA regulations discussed above, BLM's errors were not so

serious as to warrant vacatur.

---

[5] Defendants preserve for appeal the question of whether an EA combined with a FONSI
constitutes a final agency action following the Supreme Court's opinion in *Seven County*.  2025
WL 1520964, at *9.

FEDERAL DEFENDANT'S REMEDY BRIEF
              *Klamath-Siskiyou Wildlands, et al. v. BLM*, Case No. 1-23-cv-00519-CL

Finally, the Late Mungers DNA should be remanded without vacatur. Since the merits decision, this Court in a different BLM forestry case has explained that "DNAs are recognized procedural tools to document that the effects of particular BLM projects are covered by existing NEPA documentation." N126 SJ Order at 7 n.3, Cascadia Wildlands v. Adcock, 6:22-cv-00767-AA (D. Or. March 31, 2025), ECF No. 50. More specifically, "BLM may prepare an EA for a program of work, then issue a decision on the overall approach to that program, and then issue a DNA and decision for a specific action to implement that approach." *Id.* The Court's recognition of DNAs, including the ways in which they may be utilized alongside EAs, suggests that any legal errors in BLM's EA-DNA process here can be remedied with a closer look on remand.

### B. Any NEPA Errors Were Not Serious, Particularly in Light of Recent Legislative, Regulatory, and Judicial Changes and Clarifications to NEPA

In addressing remedy, BLM does not challenge the Court's conclusion's applying the pre-2019 CEQ regulations to review the IVM Program. But all three branches of government recently addressed NEPA, and this changed legal landscape is relevant to assessing the seriousness of the errors identified by the Court. Specifically, on remand, BLM will have to consider these changes in assessing the proper scope of NEPA analysis and management actions for the Late Successional Reserve land use allocation going forward.

When assessing the seriousness of legal error, courts ask whether the agency could issue a similar decision on remand after additional analysis or explanation. *Nat'l Fam. Farm Coal.*, 966 F.3d at 929; *see also Seven County*, 2025 WL 1520964, at *20. But the Court need not take on the difficult task of deciding whether a new decision would comply with NEPA as affected by the trifecta of developments outlined below. Remanding each NEPA or NEPA compliance

document *without* vacatur will allow BLM to address those questions after additional environmental review, rather than have the Court predict what BLM's analysis might reveal about the significance of environmental effects. *See North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 831 (9th Cir. 2025) ("While a full EIS may be necessary in light of the … Project's cumulative effects, we leave that decision to the [agency] to consider in the first instance on remand.") (internal citations omitted).

Since BLM completed the NEPA process for the IVM Program, Congress amended NEPA in the BUILDER Act. *See* 42 U.S.C. § 4336a. The BUILDER Act clarified that agencies may prepare a "programmatic environment document" which is then relied on by subsequent documents for future actions. 42 U.S.C. § 4336b. *See also* 42 U.S.C. § 4336e(5) (defining "'environmental document' [as] an environmental impact statement, an environmental assessment, or a finding of no significant impact."). The Act also clarified the distinction between an EIS and an EA, explaining that an EA is permitted for any "agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown[.] . . . " 42 U.S.C. 4336(b)(2). Finally, the Act set page limits for an EIS (150 pages) and EA (75 pages), excluding appendices. 42 U.S.C. § 4336a(e). Only actions "of extraordinary complexity" can go up to 300 pages in an EIS. *Id.* For reference, the EA prepared here for the IVM Program contains 85 pages of environmental analysis and an additional 253 pages of technical references and appendices. AR 2938-2954.

Following the congressional amendment to NEPA, the Executive Branch rescinded the CEQ regulations. *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025). This rescission applied to the CEQ regulation addressing the "context" and "intensity" factors the Court analyzed here in evaluating BLM's

Finding of No Significant Impact. ECF No. 53, at 26. This regulation will not apply on remand, and it will be for the agency to assess in the first instance the significance of the proposed activities on remand, as required by 43 U.S.C. 4336(b).

Finally, the Supreme Court recently issued a "course correction" for judicial review under NEPA. *Seven Cnty*, 2025 WL 1520964, at *20. In reviewing a 2021 NEPA document, the Supreme Court explained its view that "[s]ome courts have strayed and not applied NEPA with the level of deference demanded by the statutory text and this Court's cases." *Id.*, at *8. Because of this deviation from NEPA's text and precedent, the Court determined it was "important to reiterate and clarify the fundamental principles of judicial review applicable in those [NEPA] cases." *Id.*, at *14-15. Namely, "NEPA does not mandate particular results, but simply prescribes the necessary process for an agency's environmental review of a project[,]" and "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id*, at *13, 21 (internal citations omitted). *See also id.,* at *6 ("Simply stated, NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it.").

In summary, no NEPA or NEPA compliance document should be vacated here. As the text of NEPA now makes clear, an EIS is reserved for major federal actions with a "reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). The CEQ regulations guiding an agency's assessment of "significance" have now been rescinded, and the Supreme Court has now clarified the scope of "reasonably foreseeable" effects and the deference owed to the agency in defining the scope of those effects. Under this new less restrictive NEPA regime, it is likely that the errors identified by the Court can be cured on

remand and cannot be characterized as serious.  To the extent the two equitable factors remain

relevant to whether NEPA documents should be vacated, this factor weighs against vacatur.

### C.  Vacatur of the Remaining IVM Program Documents Would Have Significant Disruptive Consequences

Even if the Court were to find the agency's NEPA errors to be serious, the Court should

still not vacate the IVM Program documents, because doing so would lead to disruptive

consequences to the government, its implementation partners, the public, and the environment.

Vacatur would require BLM to stop ongoing crucial non-commercial work and prevent

implementation of both commercial and non-commercial restoration treatments at the pace and

scale necessary to address the urgent ecological need in the Rogue Valley.  These treatments are

both required by the 2016 RMP and necessary for protecting the forest and local communities

from massive wildfires and other severe disturbances.  Burghard Decl. ¶¶ 3-10, 12-14, 20-27, 29,

32-33; Stephens Decl. ¶¶ 3-4; Bey Decl. ¶¶ 4-7.

For the sake of clarity, BLM has at times discussed non-commercial and commercial

treatments as separate actions.  But the two treatment types are intertwined.  BLM must

implement both commercial and non-commercial restoration work on the same landscape to see

the forest health and ecosystem restoration benefits.  *See* Burghard Decl. ¶ 9.  Mechanical

treatments (thinning) and prescribed burning are the only effective tools available to accomplish

landscape-scale restoration that will improve forest resilience within a meaningful timeframe,

acreage, and treatment intensity.  *See, e.g.*, AR 2963-64 (summarizing analysis in the Final

Environmental Impact Statement, or FEIS, for the 2016 RMP); Burghard Decl. ¶ 12.

Much of the restoration work needed to increase wildfire resilience in the Rogue Valley

involves conducting small-diameter thinning of underbrush and young trees to reduce surface

and ladder fuels in a wildfire, as well as reintroducing low-severity prescribed fire. *Id.*, at ¶¶ 13, 20, 25. But those non-commercial actions alone are not enough to reduce wildfire risk to adjacent Rogue Valley communities and NSO nesting-roosting habitat. *Id.*, at ¶ 20. It is also important to implement density reductions by thinning out some mid-sized trees greater than eight inches in diameter, generally implemented through commercial treatments, to create breaks in canopy cover that discourage crown fires. AR 2631, 2772. This commercial thinning encourages and protects larger, structurally complex, and more drought- and fire-resistant trees, and introduces ecological heterogeneity that sets forests up to persist and thrive in the face of wildfires. Burghard Decl. ¶¶ 14, 20; *see also* Stephens Decl. 3; Bey Decl. ¶ 3.

The scientific literature is clear that implementing a combination of commercial and non-commercial types of restoration actions is necessary to reduce wildfire hazard effectively. AR 2630; Burghard Decl. ¶ 21. For example, a recent article in the Journal of Forest Ecology and Management concluded: "[t]here is overwhelming evidence across dry to moist mixed conifer forests of the western U.S. that reducing surface and ladder fuels *and tree density* through varying treatments lowers subsequent wildfire severity by, on average, 62–72%." *Id.* (emphasis added); *see also id.*, at ¶¶ 22-23 and Attachment 2 (documenting empirical findings from BLM's Fuel Treatment Effectiveness Monitoring program). Vacating all commercial treatments would therefore be significantly disruptive to forest health and ecosystem restoration, because it would prevent BLM and its partners from implementing the full suite of necessary treatments at the

pace and scale urgently needed to protect Rogue Valley communities.[6]  Burghard Decl. ¶¶ 4, 10, 28; Bey Decl. ¶ 1; *see also* Stephens Decl. ¶¶ 3-4.

Vacating the IVM Program would require the shutting down of ongoing non-commercial projects, with cascading effects across a half-dozen local conservation partners.  Burghard Decl. ¶¶ 31-34; Stephens Decl. ¶¶ 4-5; Bey Decl. ¶¶ 4-7.  Given that the Court expressed little, if any, disagreement on the ecological value of small-diameter thinning and prescribed fire, the Parties entered a stipulation in 2024 allowing that work to continue.  ECF No. 55, at 3.  To date, BLM has implemented 764 acres of small-diameter thinning and 752 acres of prescribed fire under the IVM Program.  Declaration ¶ 26. Additional treatments are currently underway during the 2025 operating season.  Burghard Decl. ¶ 26.  Vacatur would require BLM to direct its implementation contractors and partners—including Grayback Forestry, Lomakatsi Restoration Project (Lomakatsi), Klamath Bird Observatory, Klamath-Siskiyou Oak Network (KSON), Southern Oregon Forest Restoration Collaborative, and Rogue Forest Partners—to stop working because BLM would no longer have the necessary NEPA analysis in place to support continued implementation of those restoration activities.  *See id.*, at ¶¶ 32-33.  Representatives from two of those implementation partners have prepared declarations explaining their participation and support of the IVM Program, as well as the disruptive consequences their organizations and others would face as a result of vacatur.  Stephens Decl. ¶¶ 1, 4-5; Bey Decl. ¶¶ 1, 4-7.  Additional sources of subsidiary funding would also be voided and could not be distributed to

_____

[6] These commercial treatments also protect nesting-roosting NSO habitat by reducing the risk of habitat loss through wildfire.  Burghard Decl. ¶ 8.

FEDERAL DEFENDANT'S REMEDY BRIEF
     *Klamath-Siskiyou Wildlands, et al. v. BLM*, Case No. 1-23-cv-00519-CL

those organizations, and financial investments already made would be lost. Burghard Decl. ¶ 33; Stephens Decl. ¶¶ 4-5; *see* Bey Decl. ¶ 6.

Vacatur of the IVM Program would thus undermine the all-lands approach being implemented by BLM and its partners. Burghard Decl. ¶¶ 22, 27, 31 (discussing how an all-lands approach, or "meeting [] neighbors at the fence[,]" increases "the overall treatment footprint and effectiveness" of restoration actions); Stephens Decl. ¶ 5 (explaining that cancellation of BLM's Agate Oak non-commercial project under the IVM Program would have "cascading impacts" to the Upper Rogue Oak Initiative and that given "the complicated checkerboard ownership of the Rogue Basin, leaving the BLM lands unrestored would reduce positive impacts at the landscape-scale").

Vacating the commercial components would also be significantly disruptive. As this Court acknowledged, the 2016 RMP directs BLM's Medford District to complete at least 17,000 acres of commercial restoration treatments in Late Successional Reserves per decade. ECF No. 53 at 12; AR 2944. Plaintiffs may argue that BLM could simply do smaller-scale projects to meet this direction. But in the ten years since the 2016 RMP was adopted, BLM has been able to achieve only ten percent of the LSR target as part of one-off projects. Burghard Decl. ¶ 27. In fact, it was in recognition of the need to increase the pace and scale of such restoration efforts that BLM prepared a landscape-scale NEPA analysis in the IVM EA. *Id.*, at ¶¶ 10, 29. Plaintiffs' demand for separate NEPA analyses for each individual restoration project ignores the science demonstrating both the consequences of inaction and the benefits of implementing a combination of restoration actions at a *programmatic* scale for widespread improvements across the landscape. *See* Burghard Decl. ¶¶ 4, 6, 21-23, 29; Bey Decl. ¶ 3. Particularly considering the years of delay that have already occurred, the scale of work here matters in truly improving the

landscape.  *See* Burghard Decl. ¶¶ 17-18 and Attachment 1 (supportive news article from 2020 explaining that the IVM Program's "17,000 acres" scale was favorable, and that "the IVM-RL Project is proposing an adequate amount of work in the woods to actually make a difference!"). In sum, BLM can engage in additional analysis on remand, including addressing the Court's FLPMA ruling, while simultaneously moving forward with a subset of crucial commercial restoration treatments in the meantime.  *See* Burghard Decl. ¶¶ 27, 30.

For similar reasons, vacating the FONSI would have disruptive consequences.  On multiple occasions, the Ninth Circuit has upheld FONSIs for vegetation management programs much like the IVM Program.  *See*, *e.g.*, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1236 (9th Cir. 2005) (upholding a FONSI for a thinning and prescribed burning project "designed to reduce the potential for large-scale, high intensity, stand-replacing fire in the [project] vicinity"); *All. For the Wild Rockies v. Pena*, 865 F.3d 1211, 1215, 1217-20 (9th Cir. 2017) (upholding a FONSI for a "forest restoration project" with "commercial timber harvest treatments, road maintenance, stream restoration, and culvert replacements.").  These cases explicitly recognize the value of projects like the IVM Program and implicitly acknowledge the disruptive consequences to the environment of delay.

Requiring an EIS may lead to the most disruptive consequences of all.  Having spent almost six years conducting meaningful public participation for the development and implementation of the IVM Program since 2019, BLM lacks the funding or resources to engage in new multi-year long effort.  Burghard Decl. ¶¶ 28-29.  Members of the community want restoration work sped up, not slowed down.  *Id.*, at ¶¶ 15-18.  For example, BLM has partnered with private landowners who are in strategic locations adjacent to high-priority BLM-managed lands to assist with restoration work.  Stephens Decl. ¶ 6.  A court order vacating the IVM

Program until a new multi-year EIS was completed would cause substantial public confusion, and it would erode public trust for these and other community members.  Stephens Decl. ¶ 6 (explaining that, under the Agate Oak Project, BLM and its partners "have been successfully recruited for restoration actions[,]" and stranding those neighbors would risk "negatively impacting community support for active forest management").

Relatedly, vacatur here would undercut the Ninth Circuit's decision in *Pacific Rivers*, *Pacific Rivers v. BLM*, 815 Fed. Appx. 107 (9th Cir. 2020), which upheld the 2016 RMP after significant public input and analysis.  As discussed, it is the 2016 RMP, not the IVM Program, that serves as the document requiring BLM Medford District to engage in 17,000 acres of commercial thinning per decade.  AR 48813-18; Burghard Decl. ¶¶ 6, 8, 15, 18.  Project-level NEPA is not a vehicle for revising RMP policies nor is it an avenue for delaying decadal targets that have already been set.  *See* 43 C.F.R. 1610.5-6; Burghard Decl. ¶¶ 8, 24.

In summary, BLM analyzed dozens of concrete environmental resource issues in the IVM EA.  Nearly all these issues were not challenged in this litigation.  Requiring the agency to start from scratch with an EIS, on the grounds that BLM should have conducted more analysis on two resource areas (fire risk and NSO nesting-roosting-habitat), would be lead to great harm to BLM, the public, and the environment.  *Los Padres ForestWatch v. Forest Serv.*, 25 F.4th 649, 664 (9th Cir. 2022) (remanding a forestry project, but not specifying whether future analysis must occur in an EA or EIS).

## III.    The Court Should Not Impose Additional Instructions or Restrictions on BLM's Activities After Remand

In remanding this matter to BLM, with or without full or partial vacatur, the Court should reject any request to impose ongoing injunctive relief.  Following remand, it is the agency's

responsibility "to deal with the problem afresh, performing the function delegated to it by Congress." *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947).  When a plaintiff requests that a court impose restrictions on future actions, the plaintiffs must demonstrate that injunctive relief is appropriate based on the traditional four-factor injunctive relief test.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010).

In *Monsanto*, the district court below found a NEPA violation.  *Id.* at 156.  But in addition to vacating the project, the district court took two further steps—enjoining the agency from taking additional action "pending completion of the mandated EIS," and prohibiting certain future action whatsoever.  *Id.*  The Supreme Court explained that these latter injunctive remedies went beyond vacatur and were in fact a permanent injunction, and that "[t]he traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation." *Id.* at 157 (citing *Winter v. NRDC*, 555 U.S. 7, 31-33 (2008)).  There are at least two areas where an injunction would inappropriately intrude on BLM's function.

First, the Court should not issue instructions about the type of NEPA analysis BLM must pursue on remand.  *Monsanto*, 561 U.S. at 160 (noting that the agency could prepare an "onerous EIS" or issue a decision "on the basis of a new EA").  While BLM has not decided which procedural avenue it will take—as that will require further analysis on remand—the Court need not "prejudge" that analysis.  *San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*, 449 F.3d 1016, 1035 (9th Cir. 2006).  Instead, the well-established approach after finding a NEPA violation is to "leave that [NEPA document] decision for the [agency] to consider in the first instance on remand."  *N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 831 (9th Cir. 2025).

Second, the Court should not impose restrictions on the timing, location, or scale of BLM's future commercial or non-commercial restoration actions. Both Plaintiffs have distinct policy preferences for where and when and how BLM should engage in its forest health and ecosystem restoration treatments. AR 2633, 33264-72, 39187; Burghard Decl. ¶¶ 15, 18, 28. But those preferences cannot dictate the terms of a permanent injunction. *See Monsanto*, 561 U.S. at 161 (rejecting the use of injunctions even as a "prophylactic measure" against potential future actions within particular "geographic area[s]").

Both restrictions, and others not explicitly referenced, should not be ordered here. Plaintiffs cannot show that (1) they would suffer irreparable injury unless BLM were enjoined for years, (2) that an injunction would be an appropriate remedy, or (3) that the balance of hardships or the public interest tilt in their favor, for many of the reasons outlined above. *Id.* at 162. Therefore, should Plaintiffs request forward-looking injunctive relief, the Court should deny that request or provide BLM an opportunity to respond in more detail.

## CONCLUSION

For all these reasons, the Court should enter the following remedy:

1.    The IVM Decision Record is vacated with respect to the Ecosystem Resilience Open and Ecosystem Resilience Intermediate commercial treatments.

2.    The Late Mungers Decision Record is vacated with respect to the Ecosystem Resilience Open and Ecosystem Resilience Intermediate Commercial treatments.

3.    All remaining parts of the IVM Program and Late Mungers implementation project, as well as the corresponding NEPA documents, are remanded without vacatur for BLM to conduct additional analysis consistent with the Court's opinion.

DATED: June 20, 2025

ADAM R. F. GUSTAFSON
Acting Assistant Attorney General

*/s/ Alexis G. Romero*
ALEXIS G. ROMERO
Trial Attorney (DC Bar # 90006907)
Environment & Natural Resources Division
Natural Resources Section
Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 353-5885
alexis.romero@usdoj.gov

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of June 2025, I filed the above pleading with the

Court's CM/ECF system, which provided notice of this filing by email to all counsel of record.


_/s/ Alexis G. Romero_
Alexis G. Romero

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies the word count limitation set forth by Local Rule 7-2(b) because it contains 6,271 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.


*/s/ Alexis G. Romero*
Alexis G. Romero

*Counsel for Defendant*