ADAM R. F. GUSTAFSON
Acting Assistant Attorney General

ALEXIS G. ROMERO
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-5885
alexis.romero@usdoj.gov

*Counsel for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, *et al.*, <br><br> APPLEGATE SISKIYOU ALLIANCE, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendant, <br><br> AMERICAN FOREST RESOURCE COUNSEL; ASSOCIATION FOR O&C COUNTIES <br><br> Intervenor-Defendants. | Case No.: 1-23-cv-00519-CL (Lead Case) <br> Case No.: 1-23-cv-01163-CL (Trailing Case) <br><br><br> Honorable M.J. Mark D. Clarke <br><br><br> **DECLARATION OF ELIZABETH BURGHARD** |

I, Elizabeth Burghard, declare as follows:

1.    I am the District Manager for the U.S. Bureau of Land Management (BLM)

Medford District in Southwestern Oregon.  I have performed in my current position since July

1   -   DECLARATION OF ELIZABETH BURGHARD

11, 2016.  I have been an employee of the BLM for twenty-five years.  I graduated from St. Olaf

College with a Bachelor's degree in 1998, and I obtained a Master's degree in Anthropology

from the University of Wyoming in 2004.

2.     As Medford District Manager, I am familiar with the Integrated Vegetation

Management for Resilient Lands (IVM) Program, including the prescriptions and proposed

action described in the IVM Environmental Assessment (EA), the Late Mungers timber sale, and

the contracts and agreements BLM has formed with partners to implement non-commercial

projects.  I am familiar with the Medford District's current budget, staffing, and prioritization of

work and projects, and limitations that available budget and staffing place on conducting needed

landscape restoration.  I am familiar with the landscapes in the Medford District, and current

ecological conditions, including those in the IVM project area.

## Ecological Conditions in the Rogue Valley

3.     The Rogue Valley in southwestern Oregon is a fire-prone landscape.  There is an

immediate, urgent need to implement restoration treatments across landownerships in the Rogue

Valley to improve resilience to wildfire, drought, disease outbreaks, and other natural

disturbances in the valley's dry forests. Nearly half of the 50 communities in Oregon with the

highest cumulative wildfire risk from large fires are located in southwestern Oregon, as is

documented in the 2023 update to the Pacific Northwest Quantitative Wildfire Risk Assessment.

4.     The Rogue Basin Strategy, which is coauthored by expert scientists from the U.S.

Fish and Wildlife Service, the U.S. Forest Service, BLM, the Oregon Department of Forestry,

and respected forest restoration organizations, recognizes the urgent need to increase the pace

and scale of restoration actions on BLM-managed lands to increase wildfire resilience.  To

support the treatment needs identified in this Strategy, my staff have determined that BLM

2   -   DECLARATION OF ELIZABETH BURGHARD

Medford District would need to implement approximately 16,000 acres of restoration treatments per year.

5.      I have attended numerous workshops, collaborative meetings and field trips engaging with a wide variety of scientists with decades of experience in these landscapes, who consistently identify the growing need and urgency to address these conditions with restoration actions. This need intensifies year-to-year.  I have seen the results of ecological forestry treatments, their effectiveness in creating safer conditions, and the various types of treatment options to protect communities and other sensitive resource values while increasing safety of wildland firefighters.

6.      Over the last decade, well-respected members of the scientific community who are leaders in the field of forest health management, as well as state and local agencies and federal land managers and wildlife experts, have increasingly advocated for a more active restoration approach to managing forest reserves using ecological forestry principles.  In the 2011 Revised Recovery Plan for the Northern Spotted Owl (NSO), the U.S. Fish and Wildlife Service (Service) recognized the need for actively managing dry forest in the Klamath Province to reduce fire hazard, given the risk that wildfires pose for NSO habitat loss and the survival and recovery of this species.

7.      BLM-managed lands allocated to the Late Successional Reserve (LSR) land use allocation in the 2016 Southwestern Oregon Resource Management Plan (RMP) are no exception to the fire risk facing the broader Rogue Valley.  Historical fire exclusion and plantation forestry practices have encouraged vast acres of overly dense, mid-seral stands in Medford District LSR. These mid-seral LSR stands are not pristine old growth; the trees average less than 20 inches in diameter. The stands are severely in need of restoration treatments.

3    -    DECLARATION OF ELIZABETH BURGHARD

**BLM's Management Framework**

8.      Following the Recovery Plan, BLM worked in consultation with the Service in preparing the 2016 RMP to develop management direction designed to improve fire resiliency in the reserve network to slow the loss of NSO habitat to major wildfires in southwestern Oregon. Instead of designating LSR lands as off-limits to commercial and non-commercial restoration treatments and leaving hundreds of thousands of acres of public land in southwestern Oregon to self-management and loss in wildfires, the RMP recognized this ecological need in the Rogue Valley to manage LSR proactively.  For example, the RMP contains management direction to conduct integrated vegetation management treatments in LSR, including commercial thinning to reduce stand average relative density to within 20 to 45 percent, and, in dry forest stands, the RMP calls for conducting at least 17,000 acres of commercial thinning per decade within the Medford District, as well as applying prescribed fire.  The specific purpose of this management direction was to ensure that the Medford District would implement restoration treatments in LSR to reduce the risk of losing more acres of late-successional habitat to wildfire where needed for the conservation and recovery of ESA-listed species like the northern spotted owl.

9.      The RMP Final Environmental Impact Statement (FEIS) analyzed the effects of conducting these 17,000 acres of LSR treatments by: 1) including the assumption that this work would be completed in the RMP's vegetation modeling; 2) relying upon that assumption and vegetation modeling in projecting the development of large blocks of NSO habitat in the Klamath-Siskiyou physiographic province; and 3) relying upon that assumption and vegetation modeling in projecting the overall fire risk from RMP implementation.  The RMP vegetation modeling assumed implementation of the same types of prescriptions included in the IVM

Project. In short, achieving the outcomes projected in the RMP FEIS is premised upon the

Medford District being able to carry out the very prescriptions included in the IVM Project.

10.     The BLM Medford District prepared a landscape-wide EA for the IVM program,

both to implement the RMP and to increase the pace and scale of these much-needed restoration

treatments.

11.     Within this management framework, the RMP serves as a regionwide strategic

plan.  The IVM EA and Decision Record serve as a tactical plan to implement that strategic plan

within the Medford District, incorporating a conditional set of sideboards and criteria to guide

the development of site-specific individual implementation projects that fit within the IVM

framework.

## Ecological Forestry Restoration Tools

12.     Mechanical treatments (thinning) and prescribed burning are the only effective

tools available to accomplish landscape-scale restoration that will improve forest resilience

within a meaningful timeframe, acreage, and treatment intensity. No other effective land

management techniques or tools exist, and inaction is not an option.

13.     Small-diameter thinning and prescribed fire treatments are needed to reduce the

underbrush and young trees that serve as surface and ladder fuels in a wildfire. These non-

commercial treatments can be implemented by local contractors or partners under service

contracts or through stewardship agreements.

14.     In addition, density reductions of mid-sized trees (ranging from eight to thirty-six

inches in diameter) are also necessary to create breaks in canopy cover to discourage crown fires,

introduce ecological heterogeneity, and allow larger, structurally complex, and more drought-

and fire-resistant trees to develop. These thinning actions produce economically marketable

5   -   DECLARATION OF ELIZABETH BURGHARD

timber as a restoration byproduct, and BLM therefore typically auctions the commercial component of these projects to timber operators rather than funding their removal from the forest with appropriated funds, as is done for small-diameter thinning and prescribed fire activities. Commercial-sized trees harvested from LSR for ecological purposes do not count toward BLM's Allowable Sale Quantity under the O&C Act and the 2016 RMP, but fifty percent of the revenue BLM generates from auctioning a commercial thinning project in LSR still goes to local counties in western Oregon to fund public services such as schools and emergency services.

## Public Participation in the IVM Program

15.    BLM initiated the IVM NEPA process in 2019 and engaged extensively with the public during this process, including: public scoping, two rounds of public review, multiple public meetings in local communities within the Applegate Valley, a presentation before the Jackson County Board of Commissioners, a public webinar (in lieu of an in-person site tour due to the COVID-19 pandemic), and an extended 62-day public comment period. All told, BLM received and considered approximately 1500 public comment letters and emails during the IVM NEPA process, and my staff made numerous changes to the EA in response to feedback from members of the public, including from the plaintiffs in this litigation. By way of example, BLM excluded the Cascade-Siskiyou National Monument and wilderness areas from the IVM project area at least in part in response to comments from the Rogue Valley Audubon Society and others. This NEPA process culminated in a comprehensive environmental assessment with numerous appendices, in which BLM analyzed and disclosed the environmental effects not just for the agency's proposed program of work (Alternative C), but also for full-fledged alternatives proposed by the KS Wild et al. plaintiffs (Alternative B) and the Applegate plaintiff (Alternative A). BLM also addressed and explained in the EA why over 50 issues were not analyzed in detail

6    -    DECLARATION OF ELIZABETH BURGHARD

and provided 60 pages (in fine print) of thorough responses to over 130 substantive public

comments.  In direct response to a request by Plaintiff Applegate, BLM committed in the IVM

Decision Record to public involvement on all future implementation projects that include

commercial harvest.  In line with that commitment, BLM has solicited public comments and

hosted an in-person field trip for the first and only proposed implementation project involving

commercial harvest (Late Mungers), but the District has gone even further, providing

opportunities for public comment even on purely non-commercial implementation projects (*i.e.*,

projects limited to small-diameter thinning and prescribed fire), such as the Agate Oak project.

     16.     The plaintiffs in this litigation represent a discrete subset of the public who

support a "hands-off" approach to the reserve network on BLM-managed lands; they do not

represent a broad swathe of the general public in southwestern Oregon.  For example, in August

2019 BLM received a scoping comment from a local resident expressing concern that after

decades of a hands-off approach to the local forests, "[t]he level of dead/dying trees in our areas

is frightening, and becoming worse each year[,]" creating "a ripe opportunity for a catastrophic

fire even for our communities[,]" and stating that "[i]n the event of a fire[,] access roads and

open areas/clear cuts would be most beneficial in containing/controlling the damage."  During

public review of Chapters 1 and 2 of the draft EA, BLM received a comment from another local

resident saying that "thinning of overly dense forests and return of fire to the landscape[]" is

"[p]articularly important" and that "[a]ctivities whose purpose is to 'restore' structural and

functional integrity to an ecosystem, such as is proposed in the IVMP for dry forests, are

certainly worth pursuing to promote more resilient forests in southwest Oregon."  In public

comments on BLM's Late Mungers commercial implementation project in May 2022, yet

another member of the public stated that "thinning the firs is a good idea" to address "fire

7   -   DECLARATION OF ELIZABETH BURGHARD

security," as well as habitat for NSO. Josephine County expressed support for the project because "reducing the fuel load" would help protect the county's adjacent property.

17.     In addition, while news media editorials have certainly covered the full spectrum of public opinion regarding forest management in southwestern Oregon, editorial pieces published by a local resident in the Mail Tribune during the IVM NEPA process (Attachment 1) as well as by a representative from the Healthy Forests Healthy Communities nonprofit have expressed support for BLM taking action to conduct thinning treatments to promote a more resilient landscape, as well as frustration at the federal agencies' inability to implement these restoration actions more quickly.

18.     Given the extensive public involvement and outreach BLM already conducted during the IVM NEPA process, conducting outreach to the public to undertake yet another paperwork effort would be confusing to many members of the public who expressed support for BLM conducting restoration treatments to help make the region safer in the face of increasing wildfire risk to their homes and communities. Ordering BLM to reopen the paperwork exercise and comment periods would confuse the public as to BLM's intentions by wrongly suggesting that BLM is considering taking no action to reduce the present risks they face, which would be in derogation of the RMP's management directives to restore LSR forests in the Rogue Valley using well-accepted ecological forestry tools. In the IVM EA, BLM already analyzed both of the plaintiff groups' preferred alternatives for using a passive management or "light touch" approach. Requiring BLM to redo this analysis would necessarily require BLM to revisit its well-documented rejection of these alternatives. Vacatur would erode public confidence that BLM can and will take timely, on-the-ground action to reduce risks to Rogue Valley communities and would risk confusing the public regarding the urgency of this restoration need.

8  -   DECLARATION OF ELIZABETH BURGHARD

Furthermore, numerous members of the public have been engaged in the planning, development and implementation of the IVM program over the last six years. Revisiting the EA with any kind of public involvement would incur greater costs and time, not just on the part of the BLM, but also from members of the public. Many individuals have expressed frustration to me regarding the time that project planning currently entails, including people I meet in the field who are conducting restoration work, local fire district representatives who want to see more fuels reduction, and residents of the communities of Jacksonville, Merlin, Illinois Valley and the Applegate who want restoration work scaled up to protect their homes.

### Public Resources

19.     Preparing an Environmental Impact Statement (EIS) or new landscape EA would also be wasteful of limited public resources, for the following reasons.

20.     In designing the framework for the IVM program that implements these RMP management directives, the Medford District prioritized protecting and promoting NSO nesting-roosting habitat in locations on the landscape with capacity to serve that function well in the face of a changing climate, such as on north-facing mid to lower slopes and cool bottoms. In other locations, however, such as hot, dry ridgetops, south-facing slopes, and areas near human communities, the District designed the IVM program to prioritize resilience to natural disturbances, including wildfire. While the majority of the restoration work needed to increase wildfire resilience involves conducting small-diameter thinning to reduce ladder fuels and reintroducing low-severity fire, those non-commercial actions alone are not enough to reduce wildfire risk to adjacent Rogue Valley communities and NSO nesting-roosting habitat. It is also important to implement density reductions by thinning out some trees larger than eight inches in

9   -   DECLARATION OF ELIZABETH BURGHARD

diameter to reduce canopy fuels, create space to encourage and protect legacy trees, and set forests up to persist and thrive in the face of wildfires.

21.     Since the IVM Program was authorized, the body of science continues to accumulate confirming the importance of implementing a combination of all three of these types of restoration actions to reduce wildfire hazard.  For example, in a recent article in the Journal of Forest Ecology and Management, Davis et al. 2024 stated: "[t]here is overwhelming evidence across dry to moist mixed conifer forests of the western U.S. that reducing surface and ladder fuels *and tree density* through varying treatments lowers subsequent wildfire severity by, on average, 62–72%."  (Emphasis is mine.)

22.     Additionally, BLM's most recent Fuel Treatment Effectiveness Monitoring report, reflecting data collected through 2023, documents that 69 percent of such restoration treatments effectively moderated wildfire behavior on the nearly 9,000 acres that have been treated and then subsequently impacted by wildfires over the previous fifteen-year period (Attachment 2).  For those locations where treatments did not effectively moderate fire behavior, my office's observations indicated that the contributing factors included treatments that were more than fifteen years old, extreme wind events, stands that did not have any large-diameter trees, and treatment footprints that were too small to alter the fuel profile sufficient to change fire behavior during the given wildfire event.

23.     One such example of a more resilient landscape in action involves the Spencer Creek fire in 2018, which occurred four miles west of the community of Williams, Oregon.  This fire intersected with a site where BLM conducted restoration treatments in 2009, including commercially-harvested density reductions, small-diameter thinning, and prescribed burning, followed up with under-burning in 2013.  While several other fires in the region that same season

10     -     DECLARATION OF ELIZABETH BURGHARD

(*e.g.*, Taylor, Klondike, Miles, Snowshoe, Grave Creek, etc.) grew into large, long duration wildfires (*i.e.*, 8,000 – 175,000 acres and lasting multiple weeks), the 53 acres previously treated to reduce surface, ladder, and canopy fuel helped wildland firefighters contain the Spencer Creek fire at approximately 200 acres. The strategic location and combined treatment effects resulted in reduced fire intensity and flame lengths and slowed fire movement, providing safe and effective places for firefighters to use direct attack methods. BLM's past treatments enabled firefighters to create firelines more quickly because there was less vegetation to remove. Thinned canopies from the commercially-harvested density reductions also increased the effectiveness of aerial firefighting resources, allowing water and retardant to penetrate the canopy to the forest floor more effectively.

24.     The RMP has set a policy direction across southwestern Oregon for active management within the reserves to reduce fire hazard and increase resilience to natural disturbances, paired with management direction to implement 17,000 acres of commercial treatments for this purpose within my District in particular. It is not within my delegated authority to use project-level NEPA analysis to revisit and effectively amend the RMP.

25.     Consistent with RMP management direction, the IVM Decision Record authorized BLM to implement the following restoration treatment metrics across the Medford District over a ten-year period: (1) 60,000 acres of small-diameter thinning; (2) 70,000 acres of prescribed fire; and, (3) 17,000 acres of commercial thinning of trees ranging from eight to thirty-six inches in diameter in LSR to reduce the average relative density of treated stands to within a range of twenty to forty-five percent, as specified in the RMP.

26.     To date, the Medford District has implemented 764 acres of small-diameter thinning and 752 acres of prescribed fire under the IVM program, with additional acres of these

11    -    DECLARATION OF ELIZABETH BURGHARD

"non-commercial" restoration treatments currently underway during the 2025 operating season until fire season restrictions go into effect.

27.      Commercial thinning restoration actions in LSR have also been limited, preventing BLM from meeting its neighbors at the fence.  To date, BLM has not been able to implement *any* of the 17,000 acres of LSR density reduction restoration treatments called for in the IVM Decision Record.  In ten years of RMP implementation, the agency has only been able to achieve approximately ten percent of the RMP's decadal minimum target for the Medford District LSR as an incidental part of other projects.

28.      In my experience, preparing an Environmental Impact Statement (EIS) or a new landscape-scale EA would take approximately two more years and would presumably be followed by several additional years of litigation by these same plaintiffs, given their policy objections to active management in LSR.  BLM began planning for the IVM Program in 2019, and with projected delays from a project-level EIS and additional litigation, it will have taken BLM nearly a decade to plan for IVM treatments with very little done on the ground to show for it. Additional delays will not achieve any increases in the pace and scale of much-needed restoration actions in reserves (small diameter thinning, prescribed fire, and density reductions). Given the thorough effort BLM already undertook during the IVM NEPA process and in the absence of any significant new information, going back to the drawing board to start over is not likely to improve or enhance the public's understanding of the IVM project or the potential effects of implementing it.

29.      Furthermore, preparing an EIS or new landscape-scale EA is a substantial and time-intensive effort that would impact nearly all of the Medford District's staffing resources, at the cost of developing other projects that are necessary for compliance with the O&C Act and

12    -    DECLARATION OF ELIZABETH BURGHARD

conformance with the 2016 RMP.  At this point, the District lacks the capacity to add such an endeavor to the workplan.  A court order to this effect would therefore prevent BLM from undertaking LSR treatments in a programmatic manner, thereby precluding the agency from implementing these much-needed restoration projects quickly and effectively for many years into the future.  The landscape approach BLM adopted in the IVM EA to streamline and scale up restoration work is in line with evidence from the NSO Recovery Plan and the recommendations of Norm Johnson and Jerry Franklin, who are respected academics and leaders in the field of ecological forestry.  From my perspective as a public land manager, further delays in critical public safety work, including improving wildland firefighting access and capabilities around Rogue Valley communities, is not good stewardship of the public lands and resources.

### Compliance with the Federal Land Policy and Management Act of 1976

30.     I understand that the district court, through adoption of Magistrate Judge Clark's Findings and Recommendation, has concluded several commercial thinning prescriptions authorized in the IVM Decision Record do not conform to the "20-year standard" management direction in the 2016 RMP, and thus that those prescriptions – Ecosystem Resilience-Open and Ecosystem Resilience-Intermediate – do not comply with the Federal Land Policy and Management Act of 1976 (FLPMA).  If permitted by court order, BLM would ensure all project prescriptions comply with the 20-year standard management direction as interpreted by the court in the design of site-specific commercial implementation projects and in conducting project-specific modeling.  BLM would also continue to provide an opportunity for public review and comment on each commercial implementation project, which would allow interested stakeholders to review BLM's conclusions with respect to FLPMA compliance for site-specific projects.

13    -    DECLARATION OF ELIZABETH BURGHARD

### Non-Commercial Stewardship Projects

31.     The Medford District generally implements small-diameter thinning and prescribed fire projects on BLM-managed public lands through service contracts and stewardship agreements formed with local implementation partners, such as Grayback Forestry, Lomakatsi Restoration Project (Lomakatsi), Klamath Bird Observatory, Klamath-Siskiyou Oak Network (KSON), Southern Oregon Forest Restoration Collaborative, and Rogue Forest Partners. Appropriated funds to cover the cost of non-commercial projects are limited, but stewardship agreements allow BLM's implementation partners to leverage outside sources of funding, sometimes with a matching requirement, to implement fire resilience projects on BLM-managed lands. Furthermore, insect infestations, disease, and wildfire do not stop at land ownership boundaries, and through these agreements, implementation partners are able to take an "all lands" approach, implementing projects on both BLM-managed lands as well as adjacent lands in other ownership, thereby increasing the overall treatment footprint and effectiveness.

32.     Vacating the IVM program would severely disrupt implementation of these important stewardship-driven restoration actions. Many outside funding sources have a "shovel-ready" requirement, meaning projects must have completed any required statutory compliance with NEPA, the Endangered Species Act (ESA), and the National Historic Preservation Act and be ready for implementation. Projects developed under the IVM program are therefore more competitive for outside funding sources, because BLM has already completed the IVM EA and ESA consultation with the Service.

33.     For example, the Oregon Watershed Enhancement Board (OWEB) is an important funding source with a NEPA-ready requirement. OWEB requires a 25 percent match, so partners leverage this source to bring additional (non-federal) dollars to help fund restoration

14    -    DECLARATION OF ELIZABETH BURGHARD

projects on BLM-managed lands within the Medford District.  Vacatur of the IVM Program would interrupt the Agate Oak project, which is one of the non-commercial projects within the IVM Program that is currently underway.  This circumstance would necessarily trigger a discussion between BLM's Agate Oak implementation partner, Lomakatsi, who is also implementing KSON's Upper Rogue Oak Initiative, and the funder for that initiative, OWEB, regarding KSON's ability to spend all of its funds under the Upper Rogue Oak Initiative.  Half of those funds are earmarked for implementing actions on BLM-administered lands under the IVM project, Agate Oak.  Additionally, BLM's implementation of much of the Agate Oak project under its Indefinite Delivery Indefinite Quantity (IDIQ) service contract with Grayback Forestry is satisfying a significant component of the 25 percent match required by OWEB, and this in-kind work and match would also be voided.  OWEB's grant program is designed to fund functioning partnerships among multiple organizations, so KSON has contracted with multiple project partners to conduct various aspects of the Agate Oak project, including monitoring, engagement, and capacity, as well as technical assistance and implementation.  Therefore, an interruption would have cascading effects on all of the partner organizations engaged in the project, including Lomakatsi, which has received funding through KSON to conduct the technical assistance and implementation components of the OWEB grant.  Lomakatsi is also the implementing partner for a different OWEB-funded IVM non-commercial project involving Rogue Forest Partners' Rogue Forest Restoration Initiative, which would be satisfied through implementation of a portion of the Late Mungers non-commercial work and would be similarly impacted by vacatur of the IVM program.

34.    Additionally, BLM has already placed several hundreds if not thousands of acres on task order with its service contractor, Grayback Forestry, under the IDIQ contract, to

15   -   DECLARATION OF ELIZABETH BURGHARD

implement non-commercial, small-diameter thinning and prescribed fire projects under the IVM EA.  If the IVM Decision Record were vacated, BLM would be unlikely to have enough other NEPA-ready projects outside the IVM umbrella to meet its contractual guarantees to this local business, which has a budget plan and staff to pay.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 15, 2025 _____

ELIZABETH BURGHARD
Digitally signed by ELIZABETH BURGHARD
Date: 2025.06.15 08:56:09 -07'00'
_____
Elizabeth Burghard