**U.S. Department of the Interior**
**Bureau of Land Management**

# DETERMINATION OF NEPA ADEQUACY WORKSHEET

**BLM Office:** Medford District Office

**NEPA No:** DOI-BLM-ORWA-M000-2024-0003-DNA

**Proposed Action Title/Type:** Agate Oak Project

**Location of the Proposed Action:** The Agate Oak Project (Project) is approximately 5 miles East of the city of Medford, 8 miles East/SE of White City and Eagle Point, Oregon. The Project will occur on BLM managed lands in the following legal locations:
- T36S R01E Sec 11 and 12
- T36S R02E Sec 6, 7
- T37S R01W Sec 1
- T37S R01E Sec 2, 5, 7, 9, 11, 12, 13, 14, 15, 17, 21, 23, 24, 25, 26, 27 and 35
- T37S R02E Sec 17, 19, 20, 21, 27, and 29

See Map 1 (below) of the Project Area. The proposed action crosses multiple Land Use Allocations (Table 1).

**Background:** On March 2, 2022, the Bureau of Land Management (BLM) Medford District published the final Integrated Vegetation Management (IVM) Environmental Assessment (EA, BLM 2022a). Concurrently, the BLM signed a Finding of No Significant Impact (FONSI, BLM 2022b). The BLM has also issued a programmatic Decision Record (DR) for the IVM program of work (Programmatic DR, BLM 2022c), selecting Alternative C, as modified, as the "Selected Alternative". The IVM Decision Record authorized a suite of treatments, including up to 20,000 acres of commercial thinning, 60,000 acres of small-diameter thinning, and 70,000 acres of prescribed fire over a 10-year period within a 684,185-acre potential "Treatment Area" (BLM 2022a, pp. 1-4). Details regarding the Agate Oak Project, including individual treatment units, the timing, and specific treatment methods selected from the suite of treatments authorized in the IVM DR are described below.

## A.    Description of the Proposed Action and any applicable mitigation measures:

The Agate Oak Project's proposed action is to implement small-diameter thinning and prescribed fire (handpile burning and underburning) consistent with the IVM Selected Alternative (BLM 2022a, Appendix 1, pp. 89-91, 108-110), on up to 6,713 acres over five years. Approximately 801 of these acres were treated for fuel reduction since the year 2000.

*Table 1 Land Use Allocation acreage distribution for Agate Oak proposed action by treatment type*

| Treatment Type | Land Use Allocation Acres | | | | | | |
|---|---|---|---|---|---|---|---|
| | Late Successional Reserve - Dry | Riparian Reserve - Dry | District Defined Reserve | District Defined Reserve - TPCC | Harvest Land Base - LITA | Harvest Land Base - UTA | TOTAL |
| Small Diameter Thinning and Prescribed Fire | 1131 | 1321 | 102 | 2546 | 307 | 1305 | 6713 |

The proposed action is primarily in dry mixed oak conifer and non-conifer oak plant communities (oak woodlands, oak savannas, oak chaparral, and meadows) (see Table 2).

*Table 2. Potential Vegetation Type distribution within the Agate Oak proposed action compared to the IVM Treatment Area as described in the IVM EA. Data reflects Integrated Landscape Assessment Project (ILAP) data used in IVM EA (BLM 2022a p. 127). Detailed oak habitat information is based on Klamath-Siskiyou Oak Network Oak Target mapping (KSON 2023) and acreage is a sub-set of the total Oregon white oak acreage.*

| Potential Vegetation Type (PVT) | Agate Oak | | IVM EA (EA p. 127, Table 33) | |
|---|---|---|---|---|
| | Acres | % of Acres | Acres | % of Acres |
| Douglas-fir - Dry | 2,789 | 42 | 415,394 | 54 |
| Douglas fir - Moist | - | - | 41,785 | 5 |
| Jeffrey pine | - | - | 10,054 | 1 |
| Not Modeled (e.g. developed areas) | 140 | 2 | 30,014 | 4 |
| Oregon white oak[1] | 2,364 | 35 | 33,905 | 4 |
| Oak Savanna | 346 | 5 | - | - |
| Oak Chaparral | 32 | 0.5 | - | - |
| Oak Woodland | 927 | 14 | - | - |
| Oak Conifer | 840 | 13 | - | - |

[1] The numbers for Oak Savanna, Oak Chaparral, Oak Woodland, and Oak Conifer listed below are a subset of the numbers listed in this row.

| Potential Vegetation Type (PVT) | Agate Oak | | IVM EA (EA p. 127, Table 33) | |
| --- | --- | --- | --- | --- |
| | Acres | % of Acres | Acres | % of Acres |
| Ponderosa pine - Dry | 297 | 4.4 | 10,370 | 1 |
| Tan oak – Douglas fir – Dry | - | - | 81,850 | 11 |
| Tan oak – Douglas fir – Moist | - | - | 19,770 | 3 |
| Western hemlock – Hyperdry | - | - | 4,788 | 1 |
| Western hemlock – Intermediate | - | - | 9,606 | 1 |
| White fir – Cool | - | - | 10,250 | 1 |
| White fir – Intermediate | 1,095 | 16 | 95,569 | 12 |
| **Total** | **6,685[2]** | **99.4** | **774,348** | **98** |
| PVTs < 1% are not represented. | | | | |

The BLM is proposing to conduct small diameter thinning (less than 8 inches but could be up to 12 inches diameter at breast height (DBH)). Thinning treatments would target removing conifers, reducing resprouting hardwood trees (EA, BLM 2022a, pp. 89-90, 108-110) and shrubs more than one foot tall and less than seven inches in DBH to approximately 25-foot by 25-foot spacing. Oak and pine trees will be the primary retention tree species. Thinning of trees up to 12" DBH would occur in areas such as within the dripline of larger fire-resistant oak and pine. Conifers between six and 14 inches DBH would be pruned up to 10 feet above ground level. When pruning re-sprouting hardwoods, one to three dominant and vigorous widely spaced stems would be left. Pruning of black oak and white oak would be avoided. Variable sized skips of untreated vegetation will be left in proposed treatment areas outside of the Community at Risk (CAR)[3], as operationally feasible (EA, BLM 2022a, Appendix 1, C.2.2., p. 108).

The type, timing, and parameters around application of prescribed fire (handpile burning and underburning) will be consistent with the EA (EA, BLM 2022a, Appendix 1, pp. 90-91). Additionally, disturbed sites in non-conifer treatments would be restored with native species, via seeding and planting

---

[2] Total acreage does not reflect exact project acres, due to resolution of PVT data.
[3] Community at Risk (CAR) is defined as a geographic area within and surrounding permanent dwellings (at least 1 home per 40 acres) with basic infrastructure and services, under a common fire protection jurisdiction, government, or tribal trust or allotment, for which there is a significant threat due to wildfire.

with appropriate site-specific species mix, including culturally significant native plant species (EA, BLM 2022a, p. 108).

The Proposed Action does not include any commercial thinning actions, new permanent or temporary road construction, or use of heavy equipment.

The Proposed Action includes 6,713 acres, which represents 1 percent of the 684,185-acre potential Treatment Area evaluated in the EA (BLM 2022a, p. 1).

This project implementation would begin as early as 2025 and would take up to five years dependent on funding, staffing, and contracting tools. The BLM estimates that annual small diameter thinning and prescribed fire treatments (i.e. fuels treatments) would be implemented at approximately 1,500 acres per year, beginning with treatments along Potential wildfire Operational Delineations (PODs), within partner projects, and adjacent private lands.
Implementation of the Proposed Action would contribute 1,500 acres toward the annual small diameter thinning limit (6,500 acres/year), and 6,713 acres toward the decadal small diameter thinning limit (60,000 acres/10-years) described in the EA (BLM 2022c, p. 3).

Implementation of the Proposed Action would contribute 1,500 acres toward the annual prescribed fire limit (7,500 acres/year), and 6,713 acres toward the decadal prescribed fire limit (70,000 acres/10-years) described in the EA (BLM 2022c, p. 3).

Implementation of the Proposed Action would improve 6,713acres of habitat for Special Status plants and/or wildlife, 6,713acres of special plant communities or special areas (critical habitat, FMAs).

The proposed action includes BLM-administered lands within Klamath Siskiyou Oak Network's (KSON) Upper Rogue Oak Initiative (UROI) geography. The UROI project plans to treat over 3,000 acres of oak habitat within three watersheds east and northeast of White City and Medford, Oregon. Treatments will remove conifers that are crowding oaks, use prescribed fire where feasible, reduce noxious weeds, and reestablish a native understory. The KSON will also be treating adjacent private lands in the project area.

The proposed action includes BLM-administered lands within the Oregon Department of Forestry and Jackson County Fire District #3 Agate Fuel Reduction Project. The Agate Fuel Reduction Project will treat hazardous fuels around communities adjacent to the high traffic corridor of East Antelope Road on the boundary between Upper Antelope Creek and Lower Antelope Creek sub-watersheds within the Little Butte Creek Watershed. Oregon Department of Forestry will also be treating adjacent private lands in the project area.

The proposed action includes additional acres identified by BLM within the Upper Rogue River Sub-Basin within the Ashland Field Office and along the northern portion of Hwy 140 within the Butte Falls Field Office.

**B.**    **Land Use Plan Conformance**

**Name of Land Use Plan (LUP):** Southwestern Oregon Record of Decision and Resource Management Plan (SWO ROD/RMP).
**Date Approved/Amended:** August 2016.

The Proposed Action, as described in section A, is in conformance with the applicable LUP because it is specifically provided for in the following management direction in the SWO and RMP/ROD decision (BLM 2016a) to meet the IVM purpose and need (EA pp. 3-8):

To promote and maintain safe and effective wildfire response and reduce wildland fire risk to HRVAs, there is a need to:

- "Create fuel beds or fuel breaks that reduce the potential for high-intensity/high-severity fire spread within the wildland urban interface or in close proximity to highly valued resources." (BLM 2016a, p. 91).
- "Treat both management activity fuels and natural hazardous fuels [to]….
  - Modify the fuel profile (e.g., raise canopy base heights or reduce surface and ladder fuels and crown bulk density)
  - Reduce potential fire behavior (e.g., crown fire activity, wildfire spread, and intensity)
  - Reduce potential fire severity
  - Improve effective fire management opportunities within the Wildland Urban Interface or in close proximity to other highly valued resources." (BLM 2016a, p. 91).

To promote and maintain fire and disturbance resilient lands and fire-resistant stands, there is a need to:
- "Apply thinning or prescribed fire to forest stands as needed to achieve appropriate stocking and density levels." (BLM 2016a, p. 92).
- "Conduct integrated vegetation management [to]…
  - Promote the development and retention of large, open grown trees and multi-cohort stands.
  - Develop diverse understory plant communities.
  - Increase or maintain vegetative species diversity.
  - Restore and maintain habitat for Bureau Special Status species.
  - Promote or enhance the development of structural complexity and heterogeneity
  - Create growing space for hardwood and pine persistence and regeneration
  - Create and maintain areas for hardwood and shrub dominance.
  - Adjust stand composition or dominance.
  - Reduce stand susceptibility to disturbances such as a fire, windstorm, disease, or insect infestation." (BLM 2016a, p. 72).
- "Modify fuel beds to produce characteristic fire behavior and fire effects representative of the fire regime. Implement interim fuels treatments (e.g., hand pile and burn) in areas that are highly departed from natural conditions in order to facilitate prescribed fire in the future." (BLM 2016a, p. 75).
- "Apply prescribed fire in low/mixed severity or high-frequency fire regimes to emulate historic fire function and processes. Apply prescribed fire across the landscape to create a mosaic of spatial and temporal stand conditions and patterning (appropriate to the fire regime)" (BLM 2016a, p. 75).
- "Apply prescribed fire and mechanical or hand fuels treatments to reduce the potential for uncharacteristic wildfires. Apply maintenance treatments at appropriate intervals to retain or improve fire-resilient conditions" (BLM 2016a, p. 75).

- To promote and develop habitat for special status plant Species and unique native plant communities, there is a need to: "Maintain or restore natural processes, native species composition, and vegetation structure in natural communities through actions such as applying prescribed fire, thinning, removing encroaching vegetation [and] retaining legacy components (e.g., large trees, snags, and down logs)…" (BLM 2016a, p. 106).
- In the DDR-timber production capability classification (TPCC) LUA, "Apply silvicultural or fuels treatments, including prescribed fire, that restore or maintain community-level structural characteristics, promote desired species composition, and emulate ecological conditions produced by historic fire regimes, in areas identified as unsuitable for sustained-yield timber production through the Timber Production Capability Classification system." (BLM 2016a, pp. 55-56).
- "Manage naturally occurring special habitats to maintain their ecological function, such as … natural meadows, …oak savannah/woodlands…" (BLM 2016a, p. 115).
- "Manage habitat to maintain populations of ESA-listed, proposed, and candidate plant species." (BLM 2016a, p. 106).
- Manage mixed conifer communities to maintain and enhance ponderosa (*Pinus ponderosa*), Jeffrey pine (*Pinus jeffreyi*), and sugar pine (*Pinus lambertiana*) persistence and structure by removing competing conifers, thinning, and applying prescribed fire, to the extent consistent with management direction for the land use allocation." (BLM 2016a, p. 107).
- "Manage mixed hardwood/conifer communities to maintain and enhance = (*Quercus* spp.) persistence and structure by removing competing conifers, thinning, and prescribed fire, to the extent consistent with management direction for the land use allocation." (BLM 2016a, p. 107).
- "Manage ESA candidate and Bureau Sensitive species consistent with any conservation agreements or strategies including the protection and restoration of habitat…and other strategies designed to conserve populations of the species." (BLM 2016a, p. 106)

## C.     Identify applicable National Environmental Policy Act (NEPA) documents and other related documents that cover the Proposed Action.

Integrated Vegetation Management for Resilient Lands Environmental Assessment, Finding of No Significant Impact and Decision Record (DOI-BLM-ORWA-M000-2020-0001-EA) (March 2, 2022).

Formal Consultation for Endangered Species Act (ESA) Section 7(a)(2) Programmatic Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Consultation for the BLM's Forest Management Program for Western Oregon (FOMBO) (WCR-2017-7574) (March 9, 2018).

Medford and Roseburg BLM Southwest Oregon Dry Forest Resilient Lands Biological Assessment (March 11, 2021).

Resilient Lands BA – Errata (March 16, 2021).

Medford and Roseburg BLM Southwest Oregon Dry Forest Resilient Lands Biological Assessment Amendment (October 20, 2021).

Formal Consultation on the Medford and Roseburg Districts of the Bureau of Land Management's Southwest Oregon Dry Forest Resilient Lands Activities (Reference Number 01EOFW00-2021-F-0597) (December 20, 2021).

Assessment of Activities That May Affect the Federally Listed Plan Species Gentner's Fritillary and Cook's Lomatium, on the Medford District BLM, Biological Assessment (October 1, 2020).

Informal Consultation on the Medford District Bureau of Land Management's Proposed Activities on Federally Listed Plant Species and Designated Critical Habitat (#01EOFW00-2021-I-0017) (November 10, 2020).

Proposed Resource Management Plan/Final Environmental Impact Statement (PRMP/FEIS) (August 5, 2016).

## D.    NEPA Adequacy Criteria

**1. Is the new Proposed Action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)? Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?**

Yes, the Proposed Action to conduct small-diameter thinning and prescribed fire (handpile burning and underburning) primarily in dry mixed oak conifer and non-conifer oak plant communities (oak woodlands, oak savannas, oak chaparral, and meadows) (see Table 2) to treat up to 6,713 acres over five years is a feature of the proposed action analyzed under the Alternative C in the EA (BLM 2022a, pp. 11-14, 86-94, 103-110).

The EA evaluated a 684,185-acre potential Treatment Area, which includes the project area for the new Proposed Action. The geographic and resource conditions within the project area are consistent with those considered in the EA. Therefore, the project is within the same analysis area.

On March 2, 2022, the BLM approved the EA and selected a modified Alternative C. This modified alternative authorized includes activities such as commercial treatments, small diameter thinning, prescribed fire, and installation/construction of barriers, boardwalks and/or rehabilitation of ground disturbance to protect sensitive plant populations and special areas. Although the selected alternative was modified to eliminate permanent road construction and only include temporary road construction, the current proposed action does not include any temporary road construction.

The Agate Oak Project Inter Disciplinary Team (IDT) designed the Proposed Action to conform with Alternative C of the IVM EA. The IDT performed field surveys or reviewed existing survey records. The IDT conducted surveys and field visits to the Proposed Action Project Area to ensure that resource conditions align with those analyzed within the IVM EA. Additionally, under the existing EA, specific treatment unit locations were not identified, therefore no project biological and cultural surveys were completed during the preparation of the EA. However, some treatments units have existing cultural and/or biological survey information on file with the BLM, allowing field offices to conclude that new surveys are unnecessary for those units. Below details how the field office determined whether new biological and/or cultural surveys were needed, what the conclusions of such surveys were, and how the results of these surveys demonstrate that the assumptions regarding geographic and resource conditions in the IVM EA remain valid within the [project] area.

The proposed actions are among the types of actions analyzed in Alternative C (BLM 2022a, p. 11). The new proposed action includes the following elements:

- The Project Area is located within the 684,185-acre potential Treatment Area of the EA. The geographic and resource conditions within the Project Area are consistent with those considered in the EA.

Agate Oak Project
DOI-BLM-ORWA-M000-2024-0003-DNA                                                                 7

- Best Management Practices (BMPs) are a suite of techniques that guide or may be applied to management actions to aide in achieving desired outcomes. Project Design Features (PDF) are measures incorporated into the site-specific design of the project to eliminate or minimize adverse impacts to the environment as well as meet the project objectives. Where site-specific conditions and resource issues warranted, the team incorporated appropriate BMPs and PDFs (Appendix 2), as called for in the IVM EA to ensure project effects remain within those effects identified in the IVM EA.

**Cultural Resources**

NEPA and the National Historic Preservation Act (NHPA) direct the BLM's management of cultural resources. NEPA requires federal agencies to determine if an undertaking will have a significant impact on cultural resources considering both the context of the action and the intensity of the effect. NEPA's implementing regulations call for agencies to consider the degree to which a proposed action may adversely affect cultural resources listed or eligible for listing in the National Register of Historic Places (NRHP) (40 CFR 1501.3(d)(2)).

Section 106 of the NHPA requires federal agencies to take into account the effects of their undertakings on historic properties, where "historic property" means any prehistoric or historic district, site, building, structure, or object included in or eligible for inclusion in the NRHP (36 CFR 800.16(l)(1)). It further requires agencies to seek ways to avoid, minimize, or mitigate adverse affects to historic properties (36 CFR 800.1(a)). An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify it for inclusion in the NRHP in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association (36 CFR 800.5(a)(1)).

In Oregon, the 2015 State Protocol between the BLM and Oregon State Historic Preservation Office (SHPO) delineates how the BLM will meet its responsibilities under the NHPA. The Protocol directs the BLM to treat cultural resources that have not been evaluated for the NRHP as if they were eligible; therefore, the BLM must consider both historic properties and unevaluated cultural resources when assessing the impacts of proposed project activities.

As specific locations of treatment units were not identified in the IVM EA, that analysis was not able to specifically address potential impacts to cultural resources. Now that those locations have been identified, additional work must be done to ensure compliance with Section 106 of the NHPA by identifying historic properties and determining the undertaking's effects on them.

Proposed treatments are expected to occur over the course of five years. Prior to implementation in any unit, the archaeologist will complete all necessary background research and field survey, document all cultural resources, and determine appropriate protections. Field survey needs will be determined based on the applicability of exemptions in the 2015 BLM-SHPO Protocol, the presence of adequate previous survey, and the area's potential to contain cultural resources based on standard modeling incorporating topographic and hydrographic data. All site and survey documentation as well as the results of pre-field research will be included in a cultural resource inventory report that will be submitted to the SHPO and the three federally recognized tribes who take interest in this area (Confederated Tribes of the Grand Ronde Community [CTGR], the Confederated Tribes of the Siletz Indians [CTSI], and the Cow Creek Band of Umpqua Tribe of Indians [Cow Creek]).

Pre-field research shows that previous cultural surveys cover a little over half of the 6,713-acre proposed project area and the proposed units contain 12 previously documented archaeological sites that remain unevaluated for the NRHP. If the archaeologists identify additional archaeological sites, either through tribal consultation or field survey, they will flag those sites for avoidance unless the BLM, with SHPO and tribal consultation, determines that the proposed treatment will not constitute an adverse effect, or the site is determined not eligible for the NRHP.

**Project Design Features (PDFs) for the Protection of Cultural Resources**

The EA describes how projects will be implemented in a way that avoids adversely affecting significant cultural resources and contains PDFs for the protection of cultural resources. As stated on page 239 of the EA, "Because all appropriate cultural resource surveys, site recordation and protections will be completed prior to any ground-disturbing activities, effects are not expected under any of the alternatives."

Below is the list of cultural resource protection PDFs refined for relevance to this proposed action.

- Archaeologists will conduct pre-field examinations of existing cultural site, survey, and other relevant information to determine what areas of proposed projects require cultural resource survey.
- Cultural resource surveys will be completed prior to project implementation. All cultural resource surveys will be led by qualified cultural resource specialists familiar with the BLM/SHPO Protocol and Section 106 of the NHPA.
- Prior to project implementation, previously recorded cultural sites will be revisited and updated as needed, and newly identified sites will be documented to district standards. If sites that need to be avoided or otherwise protected are located within the project area, they will be flagged for avoidance and/or identified to the project proponent/implementor on a map as avoidance areas.
- No project activities may occur within cultural sites, with two important exceptions. The first exception is if a qualified archaeologist has completed, in consultation with SHPO and Tribes per 36 CFR §800.4(c)(1), a formal Determination of Eligibility concluding that the site is not eligible for the NRHP. The second is if the archaeologist has determined, in consultation with SHPO and any Tribe that attaches religious and cultural significance to the site, that the activity will not cause an adverse effect. This would be on a case-by-case basis and could cover actions such as hand-treating vegetation within sites to reduce fuel loading and lessen their visibility on the landscape. For each case, procedures would be put in place to specify how adverse effects would be avoided.
- Cultural sites that are located within or adjacent to prescribed fire units will have hand lines constructed around them as necessary to protect the resource from fire.
- Any fire lines leading to or near cultural sites that originate from roads shall be blocked after project implementation to prevent unauthorized vehicle use.
- Trees will not be felled into cultural sites. Any trees that are felled near sites will be felled away from the sites.
- Culturally modified trees (trees modified by people by carving, peeling, stripping, etc.) will be left standing whenever possible. If a culturally modified tree poses a hazard and needs to be cut, it will be left on the ground and not removed.

- If tribes identify large patches of culturally significant plants that they would like to be protected from project activities, those patches will be flagged for avoidance and/or identified to the project proponent/implementor on a map as avoidance areas.
- If previously unidentified cultural resources are discovered during project implementation, work will be halted in the immediate vicinity of the find, a 100-foot buffer will be established, and the agency official and agency archaeologist will be notified before the end of the workday in which the discovery is made. The agency archaeologist will determine the appropriate course of action which may include: evaluation of the resource for NRHP eligibility; project redesign to avoid impacts; and/or development of mitigation measures in consultation with SHPO and Tribes.
- If suspected non-modern human remains are identified during project implementation, work will be halted and a 300-foot buffer established. The remains will be covered from view and protected from damage and exposure, and no photographs will be taken. The agency official and agency archaeologist will be notified immediately, and they will take the additional steps necessary for law enforcement, SHPO, Legislative Commission on Indian Services (LCIS), and tribal notification. No work may be resumed in this area until a plan is developed and carried out between the Oregon State Police, SHPO, LCIS, and appropriate Native American Tribes and official notice to proceed has been given.
- Follow BLM Handbook H-8270-1 to determine known Condition 1 and Condition 2 paleontological areas or collect information through inventory to establish Condition 1 and Condition 2 areas, determine resource types at risk from the proposed treatment, and develop appropriate measures to minimize or remove adverse impacts to paleontological resources.

<u>Tribal Consultation</u>

The BLM notified the three Tribes who take interest in this area (CTGR, CTSI, and Cow Creek) of this Project by certified mail on May 6, 2024, with electronic carbon copies to the appropriate tribal staff on May 6, 2024. The Tribes were invited to formally consult and/or provide information regarding any tribal concerns or comments at that time. To date, no Tribes have requested to formally consult on this project. It should also be noted that the BLM invited the Tribes to consult during the development of the EA and incorporated tribal input into that document.

**Recreation, National Conservation Lands, and Visual Resources**
This project falls within two Field Offices (FO), Butte Falls and Ashland. Butte Falls FO lies to the north of Hwy 140 and Ashland FO to the south of Hwy 140 within the project area. There are neither Wild and Scenic Rivers (WSR), National Monuments, Wilderness Study Areas nor lands managed for their Wilderness Characteristics (LWC) within the project area. The Cascade Siskiyou National Monument, the Soda Mountain Wilderness and Grizzly Peak Special Recreation Management Area (SRMA) lie to the south of the proposed treatments and project area and will not be affected.

Butte Falls Field Office:
The planning area boundary located within the Butte Falls FO includes approximately 330 acres of land within the Green Top Mountain Extensive Recreation Management Area (ERMA) at Township 35 South, Range 1 East, Section 35, however there are currently no treatment areas prescribed within The Green Top Mountain ERMA or other Recreation Management Areas (RMAs) for the Agate Oak Project (See map 1). The recreation frameworks state that the target Recreation Setting Characteristics for Green Top Mountain ERMA is Middle

Country, and a Visual Resource Management classification of IV. Treatment activities are allowed if they are compatible with recreation objectives, don't interfere with recreational opportunities, and meet Recreation Setting Characteristics (RSCs) (BLM 2016b, p. 113). As stated above, no treatment areas are prescribed within the ERMA under this DNA planning area.

Limited treatment acreage (~550 ac) is proposed within the Butte Falls Field Office under this DNA and those lands are classified as VRM IV. Key Observation Points (KOP) were not identified from Highway 140, or from the Salt Creek road (36-2-7) and any changes to the project treatment units will not significantly alter the visual land characteristics, nor be readily observable from the general public given the level of screening from private lands adjacent to the roadways and lack of viewing from the roadways.

Ashland Field Office:

The Visual Resource Management (VRM) classification target class within the Agate Oak project area is generally VRM IV, with isolated segments of VRM III within the Antelope Creek corridor along Antelope Road. By definition, VRM class IV allows for "major modification of the existing character of the landscape", while VRM class 3 allows for "moderate levels of change to the landscape" with management objectives to partially retain the existing character of the landscape. VRM class III and IV objectives are met because a forested setting would be maintained in all the proposed units and proposed treatment activities would not attract attention to the casual observer. Antelope Creek has been found not suitable for inclusion into the Wild and Scenic River system as documented by the 2015 DOI, BLM Wild and Scenic Rivers Suitability Report, Southwest Oregon.

Although visual effects to the project area may occur in the short-term timeframe, they are not expected to be generally observable by the casual individual, nor be substantial from a VRM perspective as shown in the VRM assessments conducted for this project under the Lost Antelope EA analysis. Long-term positive effects would result in lower fuels accumulation for wildland fire events and improved habitat for plant and wildlife species as well as providing and promoting a more historical visual viewshed.

## Biological Resources (ESA and Bureau Sensitive)

*Wildlife*

- Threatened and Endangered (T&E) Terrestrial Wildlife:
  - Since the final IVM EA, the Northwestern Pond Turtle (*Actinemys mamorata*) has been proposed threatened under the Endangered Species Act of 1973 (ESA) (88 FR 68370). Favorable aquatic habitat is characterized by deep, slow-flowing pools with underwater cover and emergent basking sites with warm water, but northwestern pond turtles can also be found in fast-moving aquatic habitat (ODFW, 2015). Overwintering sites include shrubby and forested areas, the bottom of muddy ponds and other aquatic habitats, and undercut banks along streams. On land, northwestern pond turtles overwinter at sites up to 500 meters from the water (Reese and Welsh 1997), but most individuals overwinter at sites ≤ 200 meters from water (Pilliod et al. 2013). Terrestrial overwintering sites tend to have a deep layer of duff or leaf litter under trees or shrubs with some solar radiation.
    - The western pond turtle habitat probability model predicts aquatic habitat quality and the likelihood of western pond turtle presence. The model ranks habitat quality as non-

habitat, low, moderate, high, and very high probability. For the purposes of this analysis, both high and very high probability were used as indicators of suitable turtle habitat. Approximately 618 acres of the project unit is within 200 meters of high probability habitat and 1379 acres are modeled within 500 meters of high probability habitat. There are 230,712 acres of high probability habitat modeled throughout Oregon. 1379 acres of 230,712 acres would be affected by the Agate Oak project, an insignificant amount that would affect <0.6 percent of the available habitat within Oregon. Project actions would not have a significant impact on habitat availability for the species.

- The BLM has included project design features to minimize impacts to aquatic species, including northwestern pond turtles. If the Service lists the northwestern pond turtle under the ESA, the BLM would consult with the Service to mitigate effects. The potential future listing of northwestern pond turtle would not substantially change the effects analysis to the species in the EA. Therefore, the new information regarding this species would not substantially change the analysis of the proposed action.

o Critical habitat has been designated for the coastal distinct population segment of the Pacific marten under the ESA (89 FR 46576). The project would not occur within the historic range of the Pacific marten coastal distinct population segment (*Martes caurina*; coastal marten) and would not occur within an identified Extant Population Area (EPA). Additionally, none of the project's proposed actions would occur within designated critical habitat for the coastal marten. The closest project unit is approximately 28 miles to the northeast of the nearest EPA.

o On December 17, 2024, the Service proposed to list the Suckley's cuckoo bumble bee as an endangered species under the ESA. On December 12, 2024, the Service proposed to list the monarch butterfly as threatened under the ESA. The Agate Oak project is within the range of both species, however, there have been no observations of either of these species within the project area or surrounding lands according to data attained from GeoBOB on February 24, 2025. The BLM has included project design features to minimize impacts to Franklin's bumble bee, other pollinators and their habitat for this project, which would in turn minimize impacts to the monarch butterfly, Suckley's cuckoo bumble bee, and their habitat. If the Service lists the monarch butterfly or Suckley's cuckoo bumble bee under the ESA, the BLM would consult with the Service to mitigate effects to these species. The potential future listing of this species would not substantially change the effects analysis of the proposed action.

o The project is within the range of the Northern Spotted Owl (NSO; Strix occidentalis caurina). Pre-project NSO surveys were conducted within the Proposed Action area to confirm consistency with the conditions (identified/assumed) in the IVM EA. The BLM used the Protocol for Surveying Proposed Management Activities That May Impact Northern Spotted Owls (USDI FWS 2012), which remains the best available science for detecting NSO presence.

- There are 10 known historic spotted owl sites within 1.2 miles of the proposed treatments (project is within the Oregon Cascades Province). None of these 10 sites have been occupied by NSOs in the past six years following protocol surveys.
- The proposed treatments would modify but maintain the habitat function of all NSO habitat (Nesting-Roosting and Foraging (NRF) and dispersal-only).
- Approximately 52 percent (3,485 of 6,713 acres) of the Agate Oak proposed treatment acres are currently not functioning as NSO habitat. There are 2,025 acres of nesting/roosting or foraging habitat (NRF), and 1,203 acres of dispersal-only habitat

proposed for treatment. Field evaluations, LiDAR, and GIS habitat modeling determined these habitat types. Field verification would be completed as necessary prior to implementation to ensure no treatment occurs in NR habitat within late-closed stands in high Relative Habitat Suitability (RHS) within LSR.

- There are approximately 1,131 acres proposed for treatment within the Late-Successional Reserve (LSR) land use allocation. Within the LSR proposed treatment acres, approximately 927 acres are currently functioning as NSO habitat (596 acres of NRF habitat, and 331 acres of dispersal-only).

- Approximately 1,167 acres of treatment would occur in the December 2021 designated Critical Habitat (Unit 10, KLE 5) (USDI FWS 2021a). Of these total acres, 385 acres are currently functioning as NRF habitat, and 277 acres are dispersal-only habitat. The remaining 505 acres are not currently functioning as NSO habitat because they do not contain the characteristics required for NSO nesting, roosting, foraging, or dispersal.

o The Agate Oak project is within the historic range of the Franklin's bumble bee (FRBB; B. franklini). Surveys for Franklin's bumble bee have not been conducted in the Agate Oak Project Area. The Franklin's bumble bee has not been detected since 2006 despite regular surveys of historic locations and suitable habitat in SW Oregon. The project is approximately 15 miles north of the last Franklin's bumble bee detection.

- The U.S. Fish & Wildlife Service developed Franklin's bumble bee High Priority Zones (HPZs), which contain all known historic observation locations of Franklin's bumble bee in addition to modeled habitat conditions and floral resources most likely to support the species within its historic range. HPZs also include a 1.9-mile buffer around each historic Franklin's bumble bee observation, thus encompassing a buffer area the species is considered most likely to utilize for foraging, nesting, dispersal, and overwintering (USDI FWS 2024, p. 13-14). The Project overlaps an identified HPZ, with approximately 822 acres (11 percent) of the proposed treatment area overlapping the HPZ.

- Franklin's bumble bees require a constant and diverse supply of flowers that bloom from spring to fall (USDI FWS 2018, p. 18), typically found in open meadows in proximity to seeps and other wet meadow environments. Franklin's bumble bee habitat is further described in the Franklin's Bumble Bee (Bombus franklini) Endangered Species Act Section 7(a)(2) Voluntary Implementation Guidance Version 2.0 as Substantial Floral Resources (SFRs) and Unsubstantial Floral Resources (UFRs).

- Agate Oak activities would occur within dry mixed oak conifer and non-conifer oak plant communities (oak woodlands, oak savannas, oak chaparral, and meadows). FRBB habitat and species surveys have not been conducted, however, GIS habitat modeling indicates 16,221 acres of potential SFR and UFR habitat within the 3km Analysis Area and 902 acres of potential SFR and UFR habitat within the Project Area. Approximately 180 acres of these 902 fall within an HPZ. Potential Franklin's bumble bee habitat would be field evaluated prior to implementation or seasonally restricted following the appropriate PDFs. If SFR habitat is found, in coordination with U.S. Fish and Wildlife Service (USFWS), the BLM will drop units or modify proposed prescriptions to avoid and minimize adverse effects to the extent possible, and to avoid incidental take of Franklin's Bumble Bee.

- Critical habitat has not been designated for this species; as such, none would be affected.

**Wildlife Project Design Features:**

- Seasonal restrictions during the breeding season (March 1 – July 15) would be applied for unsurveyed suitable NSO habitat and for sites assumed occupied within the disruption distances.
- To avoid harm to fledgling spotted owls, additional seasonal restrictions would be implemented from July 15th – August 15th within unsurveyed NRF habitat or occupied nest patches – unless surveys indicate either non-occupancy or non-nesting of spotted owls.
- Large pieces of down wood would be protected from full consumption, where feasible during understory burning.
- No burning will occur in the nest patch of occupied NSO sites (or sites assumed occupied) even outside of the critical breeding season.
- The proposed project would not reduce the dispersal-quality habitat or landscape level connectivity function across the corresponding 5th field watersheds.
- In the LSR, no treatment would occur in spotted owl nesting-roosting habitat within late-closed stands in high relative habitat suitability (RHS).
- No known nest trees would be removed.
- Small diameter fuels reduction treatments may be permitted in the 0.5-mile core-use area of active spotted owl sites depending on the proximity to the active use area and if NR components can still be maintained (i.e., layering, coarse woody material, etc.).
- No vegetation treatments in field-verified Recovery Action 32, structurally complex stands (USDI FWS 2011) located in the LSR LUA would occur.
- Habitat determinations for the Agate Oak HFR Project units were based on GIS and have not been field verified. Therefore, the exact habitat conditions and structure are unknown at this time but were conservatively assigned to the NRF habitat type when data was not available to identify nesting-roosting or foraging habitat. Field habitat evaluations would be conducted in all NRF units prior to initiating any HFR treatments within the 0.5- mile core use areas and home ranges of occupied or assumed occupied spotted owl sites associated with the Agate Oak HFR Project.
- If field habitat evaluations locate nesting-roosting habitat (as opposed to foraging or dispersal-only habitat), the fuels specialist would work with the wildlife biologist to modify the prescription (i.e., retain more understory and utilize winter/early spring burning windows) to ensure that key habitat features, such as complex structure and multi-layered canopy structure would be retained post-treatment to maintain nesting roosting habitat function.
- Seasonal restrictions would be implemented for any HFR treatments proposed to occur in NRF habitat, where habitat evaluations and spotted owl surveys are not current at the time of implementation. These seasonal restrictions would be waived if field habitat evaluations determine the units are dispersal-only habitat or if protocol surveys (project clearance or demography protocol) determine resident single or territorial pairs are not present.
- Prescriptions designed to maintain NRF or Dispersal-only habitat function will follow the appropriate/existing Rogue or Umpqua Basin Level 1 guidelines for maintaining habitat function.
- When operating within an HPZ, avoid any type of habitat modifying actions within meadows or open areas containing Substantial Floral Resources (SFRs) between May 15 and August 31.
- When operating within meadows or open areas containing SFRs or that are predominantly native grasses, leave untreated or unburned areas to operate as "islands" of undisturbed habitat for bureau sensitive pollinators and other bureau sensitive invertebrates.
- Do not remove overstory trees within 330 feet of bald eagle, golden eagle, or great grey owl nests, except for removal of hazard trees.

- Prohibit activities that will disrupt bald eagles, golden eagles or great grey owls that are actively nesting. Depending on the site, this may include restricting chainsaw operations, heavy equipment use, and prescribed burning up to ¼ mile no line of site and ½ mile line of site around nest sites.

<u>Other Special Status Species</u>
There has been no change in the 2021 OR/WA State Director's Special Status List since the final IVM EA. There is no potential for significant effects beyond those analyzed in the Western Oregon PRMP/FEIS (pp. 830–852) to which the EA is tiered. There is no new information about any of these species that would change the conclusions of the analysis completed in the EA. Therefore, the existing analysis in the EA is still valid.

Consultation with USFWS has been completed per IVM EA p. 281 (NAID 13) and the Resilient Lands Consultation. A Resilient Lands Consultation Compliance Report was submitted to the USFWS for the Agate Oak Project on December 13, 2024. BLM received USFWS concurrence on March 18, 2025.

*Fish*
**T&E Fish and designated Critical and Essential Fish Habitat**
Southern Oregon/Northern California Coast (SONCC) Chinook are currently under status review by the National Marine Fisheries Service (NMFS) for potential listing under the ESA. No determination has been finalized as of March 2025. There are no proposed units in this project adjacent to Chinook bearing habitats, and hence a future listing of SONCC Chinook under the ESA would not change any conclusions regarding potential effects to listed fish species or their Critical Habitat.

o Proposed project units occur within sub-watersheds and with proximity to streams with listed SONCC Coho Salmon and/or their Critical Habitat and Essential Fish Habitat. No treatments would occur within 60 feet of fish bearing or perennial streams and would retain 50% or greater canopy cover in riparian areas beyond 60 feet from fish bearing and perennial streams. The NMFS verified that activities proposed for the Agate Oak Project are consistent with the Programmatic Biological Opinion for the BLMs Forest Management Program for Western Oregon (FOMBO).

**Special Status and Native Fish (includes T&E species)**
Special Status fish within project area streams include steelhead trout, Pacific Lamprey, and Chinook and Coho Salmon. Native fish include Klamath small-scale suckers and sculpin. PDFs to minimize potential impacts to aquatic species and their habitat include no treatments buffers of 60 feet that would be retained adjacent to all perennial and fish bearing streams, and canopy cover requirements in inner zones of Riparian Reserves that would retain 50% or greater canopy cover. These PDFs are designed to reduce or eliminate any potential adverse effects to water quality and aquatic habitat from fuels treatment activities.

**Plants**
*Special Status Plants*
There have been no new T&E listings, proposed listings, designated critical habitat, or proposed critical habitat since the IVM EA. The range of two T&E plant species are partially within the project area for proposed treatments. *Limnanthes pumila* ssp. *grandiflora*, Large-flowered meadowfoam, range overlaps the project area, however it only occurs in vernal pools in the White City area of Jackson County with no known sites on BLM-managed land. The range of *Fritillaria gentneri,* Gentner's fritillary, also partially overlaps the project area.

To ensure the proposed action is consistent with Consultation and the IVM EA, valid botanical clearance surveys must be completed by qualified botany personnel prior to signing of the decision document and project implementation as described in Appendix A of the 2*020 Biological Assessment of activities that may affect the federally listed plant species, Gentner's Fritillary and Cook's Lomatium, on the Medford District* and as described in PDF 140 of the IVM EA.  Botanical clearance surveys will identify federal T&E species, Sensitive species on the Oregon/Washington State Director's Special Status Species List, and non-native invasive plant infestations. Clearance surveys are valid for 10 years from the year of survey however once the decision is signed, the clearance surveys for that project and those acres are valid, even if implementation does not occur immediately. The Decision Record will document completion of botanical surveys.

*T&E Plants*
There is one known site of *Fritillaria gentneri,* Gentner's fritillary, within the proposed treatment units, within Unit 11-1, T36 S, R01E Sec11.  Project design criteria within the consultation will be followed and are incorporated in the IVM EA Project Design Criteria.

  These include PDFs:
- 140: Conduct soil-disturbing vegetation treatments in Gentner's fritillary and Cook's lomatium populations when plants are dormant, generally between July 1 and February 15. Thinning and scattering slash within populations or piling slash outside buffers is permitted outside those dates under the direction of the project botanist.
- 154: Restrict broadcast burning within T&E and Sensitive plant sites to the dormant season (generally July 1 - February 15).
- 159: For manual treatment, maintain 25-foot no-treatment buffers around (T&E) plant sites during the growing season. Treatment inside of buffers is allowed in the dormant season (July 1 - February 15), but remove cut material within buffer to at least 25 feet away from plant site boundary.
- 179: Do not burn landing slash within 100 feet of (T&E) plant sites.
- 181: Construct landings at least 100 feet from (T&E) plant sites. Permit use of previously existing landings when more than 100 feet away from plant sites.
- 182: Realign new proposed logging road corridors, truck turn arounds, and staging areas to maintain 100-foot buffers. Permit use of existing roads, even when located less than 100 feet from (T&E) plant sites.

The protection measures would ensure that the new action would be "no effect" or "not likely to adversely affect" the T&E species. The treatment units without completed surveys fall outside of known *Frittilaria gentneri* range and are thus unlikely to have *Frittilaria gentneri* present, however this will be verified through the project clearance surveys and documented in the Decision Record.  If *Frittilaria gentneri* is found, the above PDFs would apply to ensure the action would "not likely to adversely affect" the T&E species.  Within treatment units with no T&E plant sites, there is "no effect" to T&E plant species.

*Sensitive plants*
BLM has or will conduct surveys to identify sensitive species populations during the botanical clearance surveys described above.  The following sensitive plant species are present in treatment units: *Didymodon norrisii, Plagiobothrys greenei, Porella bolanderi, Ranunculus austrooreganus, Limnanthes floccosa* ssp. *bellingeriana, Cheilanthes intertexta, Arabis modesta, Nemacladus capillaris*.

In accordance with the IVM- RL EA project design feature 146: BLM will implement protection measures for Special Status plant sites on a site-by-site basis, taking into consideration the species and its habitat

requirements, the proposed treatment, management recommendations if available, and current environmental conditions at the site. In particular buffered activity boundaries will be established around sensitive species sites, buffer sizes and guidance are listed in the following PDFs,

- Prior to project implementation, BLM Botanists will mark listed plant sites on the ground using yellow plant site signs and the population boundary will be flagged with yellow and black "bumble bee" flagging. Additionally, orange and black plant buffer flagging will be used to distinguish the treatment restrictions typically in a buffered area. These boundaries will comply with population buffering distances in the PDFs.
- 159: For manual treatment, maintain 25-foot no-treatment buffers around plant sites during the growing season. Treatment inside of buffers is allowed in the dormant season (July 1 - February 15), but remove cut material within buffer to at least 25 feet away from plant site boundary as determined by the project botanist.
- 179: Do not burn landing slash within 100 feet of plant sites.
- 181: Construct landings at least 100 feet from plant sites. Permit use of previously existing landings when more than 100 feet away from plant sites.
- 182: Realign new proposed logging road corridors, truck turn arounds, and staging areas to maintain 100-foot buffers. Permit use of existing roads, even when located less than 100 feet from plant sites.
- When cutting shrubs around meadows with known sensitive species populations, pile slash where the shrubs lived and not in the open meadow.

If additional sensitive species were found, the same PDFs would apply.

With implementation of PDFs, the proposed action would not trend Sensitive plants toward listing, per the IVM EA (NAID, pp. 234-236).

*Non-native Invasive Plants*
BLM has or will conduct surveys to identify non-native invasive plant infestations during the botanical clearance surveys described above. Non-native invasive plants observed in the treatment units include; *Centaurea debeauxii* (meadow knapweed), *Centaurea solstitialis* (yellow star-thistle), *Centaurea stoebe* ssp. *micranthos* (spotted knapweed), *Cirsium arvense* (Canada thistle), *Cirsium vulgare* (bull thistle), *Dipsacus laciniatus* (cutleaf teasel), *Lathyrus latifolius* (perennial pea), *Potentilla recta* (sulphur cinquefoil), *Rubus armeniacus* (Himalayan blackberry), and *Verbascum densiflorum* (denseflower mullein). Additionally annual grasses are present: *Taeniatherum caput-medusae* (Medusahead), *Ventenata dubia (*North Africa grass) and *Bromus tectorum* (cheatgrass). A similar suite of species is suspected to be found during the surveys of the additional units. If surveys identify populations of any class A weeds on the annual State Noxious Weed List compiled by the Oregon State Weed Board (OSWB), the field office botanist should be contacted, and additional protective measures would be put in place prior to project implementation.

Preventative measures implemented to minimize the introduction or spread of non-native invasive plants during project as described by the IVM EA include:

- 183: All rock, gravel, rip-rap, and other material utilized in the building, reconstruction, or maintenance of roads (temp, permanent, etc.) must be free of noxious weed seeds and either originate from an accredited, weed-free quarry approved by the project botanist or be crushed between the November 1 and June 15 immediately prior to application. Aggregate stockpiled between June 16 and October 31 of the previous year would not be accepted unless inspected by the project botanist.

- 280: Seed decommissioned roads at risk of invasion by nonnative invasive plants with native species for at least 30 feet from the intersection with a main route.
- Washing equipment before entering the project area to reduce the likelihood of introducing non-native species.

The new information about the presence of non-native invasive plant species in the treatment units does not change the analysis of the new action because the situation was described in the IVM EA (pp. 233-234) and assumptions are met that surveys will be conducted to identify infestations and preventative measures implemented to minimize the introduction or spread of non-native invasive plants during project implementation.

**Vegetation, Fuels, and Fire Risk**
The conditions within the Agate Oak Project proposed action are within the scope of those described in the affected environment in the IVM EA. The current balance of open and closed forest conditions within the Project Area are departed from the natural range of variability, with an overrepresentation of mid-seral forest, particularly in closed conditions and a deficit of late-seral forest, particularly in open conditions (Table 3), which is consistent with the affected environment described in the IVM EA (BLM 2022a, p. 17).

*Table 3 Natural Range of Variability (NRV) and Current Successional Condition/Structural Stage distribution across BLM-administered lands within the Agate Oak Project and the IVM EA Treatment Area.*

| Successional Condition/Structural Stage | NRV for Douglas Fir Dry and Moist: SW Oregon | Current Approximate Percent (Acres) Distribution for [PROJECT] Proposed Actions | Current Approximate Percent (Acres) Distribution for IVM Treatment Area BLM-administered lands |
|---|---|---|---|
| Early Seral | 7-17% | 3% (209) | 6% (40,546 acres) |
| Mid Seral Closed Canopy | 2-8% | 64% (4,232) | 70% (450,650 acres) |
| Mid Seral Open Canopy | 11-22% | 21% (1,385) | 10% (66,440 acres) |
| Late Seral Open Canopy | 40-55% | 2% (103) | 1% (7,521 acres) |
| Late Seral Closed Canopy | 16-25% | 10% (647) | 13% (82,184 acres) |

The current conditions within the project area are within the scope of those described in the affected environment in the IVM EA. Within the current project area, ladder fuels, expressed as canopy base height, is less than 5 ft for approximately 28 percent of the project area (Table 4), like conditions as described in the IVM EA (BLM 2022a, pp. 26, 172).

*Table 4 Current distribution of Canopy Base Height across the Agate Oak Project. Canopy Base Height data acquired from LANDFIRE (LF 2020).*

| CBH (feet) | Agate Oak Project Area | | IVM Treatment Area Distribution |
| --- | --- | --- | --- |
| | Acres | Percent Distribution | |
| 0 to <2 | 690 | 10.23% | 47% |
| 2 to <5 | 1177 | 17.45% | 32% |
| 5 to <8 | 2681 | 39.73% | 11% |
| 8 to <12 | 973 | 14.42% | 1% |
| 12+ | 301 | 4.46% | 9% |

As described in the IVM EA, most of the Agate Oak Project is represented by *very high* load forested surface fuel models (Table 7; BLM 2022a, pp. 26, 172, 173). *Moderate* load forest surface fuel models and grass-shrub fuel models also represent a combined 28 percent of the project area, like distributions described in the IVM EA (Table 5).

*Table 5 Approximate acres and percent distribution of Surface Fire Behavior Fuel Models (FBFM) (LF 2020) grouped by loading category descriptions and corresponding FBFM number code (Scott and Burgan 2005) across the Agate Oak Project.*

| Fuel Loading Description Categories (Fire Behavior Fuel Models) | Agate Oak | | IVM Treatment Area Distribution |
| --- | --- | --- | --- |
| | Acres | Distribution (%) | |
| Non-burnable (91,99) | 13 | .2% | 1% |
| Low load grass (101,102) | 147 | 2% | 3% |
| Low load grass - shrub (121) | 2 | 0.03% | 2% |
| Low load mixed conifer - hardwood (161) | .4 | 0.01% | 0.3% |
| Moderate load grass-shrub (122,142) | 835 | 12.4% | 16% |
| Moderate load mixed conifer - hardwood (162,183, 186, 188) | 1034 | 15.3% | 16% |
| High load shrub (147) | 14 | .2% | 0.03% |
| High load conifer (184,185,187) | 34 | 0.52% | 6% |
| Very High load mixed conifer-hardwood/understory (165,189) | 4667 | 69.17% | 55% |

In the IVM EA, the BLM analyzed how alternatives would contribute toward two general treatment strategies (i.e. linear fuel breaks and area-based treatments) intended to modify landscape-level fire growth and behavior, and thus reduce landscape wildfire risk (BLM 2022a, p.34). The BLM assumed locally developed Potential wildland fire Operational Delineation (POD) boundaries, which represent geographic features that could aid in wildfire containment and limit large fire growth, represent the extent of the "linear feature" fuel break strategy (BLM 2022a, p. 36). The BLM defined two area-based extents: "landscape-scale," based on PODs (e.g. polygon area) that contain the IVM Treatment Area and "local-scale," based on a focused component of the Wildland Urban Interface (WUI) represented by a quarter-mile buffer around Communities at Risk (BLM 2022a, p.36).

Lands within the Agate Oak Project are comprised of all ownerships and lie within strategic "linear feature" (e.g., POD boundary), local "area-based" (e.g., quarter mile around Communities at Risk), and landscape "area-based" (i.e., POD polygons) wildfire risk reduction extents, consistent with the IVM EA treatment area (BLM 2022a, p.36). There are 8 PODs encompassing the Agate Oak Project proposed actions (see Agate Oak Wildfire Risk Reduction Strategy Map).

The BLM used GIS to calculate the distribution of BLM-administered lands within the wildfire risk reduction strategy extents. The BLM-administered lands comprise 34 percent of the total PODs acreage (51,274), 30 percent of the strategic "linear features", and 15 percent of the local "area-based" extent (Table 6), consistent with percentages for the IVM Treatment Area.

*Table 6 BLM-administered lands relative to wildfire risk reduction strategy extents within the PODs encompassing the proposed action and comparison to IVM treatment area BLM-administered lands distribution.*

| IVM EA Risk Reduction Strategy Extent | All-Lands Distribution within selected PODs | BLM-administered lands within selected PODs | | BLM-administered Lands proportion of PODs encompassing IVM Treatment Area |
|---|---|---|---|---|
| | | Acres | Percent (%) | |
| "Linear features" [POD Boundaries] (300ft width) | 2,762 | 839 | 30% | 35% |
| Local "Area-based" [¼ Mile Around Communities at Risk] | 12,928 | 1,995 | 15% | 21% |
| Landscape "Area based" [PODs area] | 51,274 | 17,308 | 34% | 35% |



## Agate Oak IVM-RL Project Area

★ Cities

**Transportation**
- Interstate Highway
- State Highway
- Bureau of Land Management
- County route
- Forest Service
- Private, Muni or Unknown

**Partner Units**
- Oregon Dept. of Forestry
- Upper Rogue Oak Initiative

**Agate Oak Project Units**
- Agate Oak Project Units
- Bureau of Land Management
- Private Individual or Company
- Potential Operational Delineation Areas

**Community at risk (1/4 mile buffer)**

0      1      2
Miles

No warranty is made by the Bureau of Land Management as to the
accuracy, reliability, or completeness of these data for individual or aggregate
use with other data. Original data were compiled from
various sources and may be updated without notification.

**2. Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new Proposed Action, given current environmental concerns, interests, and resource values?**

Yes, the range of alternatives analyzed in the IVM EA is appropriate with respect to the new Proposed Action, given the current environmental concerns, interests, and resource values described above and to meet the EA purpose and need.

The BLM analyzed four alternatives for the management of the BLM-administered lands in the Treatment Area to meet the EA purpose and need: a No Action Alternative and three action alternatives (Alternatives A, B, and C). The action alternatives vary in number of acres treated per year and over 10-years and areas allowed for treatment type (commercial and non-commercial thinning and prescribed fire). Additionally, nine Alternatives were considered but eliminated from detailed analysis as described in the EA (USDI BLM 2022a, p. 216-222).

The purpose of the integrated vegetation management for resilient lands program is to promote and develop:
- Safe and effective wildfire response and reduced wildland fire risk to Highly Valued Resources and Assets (HRVAs), (specifically, Communities at Risk, northern spotted owl [NSO] [Strix occidentalis caurina] habitat and sites, marbled murrelet [Brachyramphus marmoratus] habitat and sites, special status plants, and special plant communities);
- Fire and disturbance resilient lands and fire-resistant stands;
- Habitat for Special Status Species and unique native plant communities.

**3. Is the existing analysis valid in light of any new information or circumstances (such as, rangeland health standard assessment, recent endangered species listings, updated lists of BLM-sensitive species)? Can you reasonably conclude the new information and new circumstances would not substantially change the analysis of the new Proposed Action?**

Yes, the IDT has reviewed the existing environment and has determined there is no new information or changed circumstances that would invalidate the existing analysis or substantially change the new Proposed Action. The new Proposed Action tiers to analysis for Alternative C in the EA which remains valid in light of new information.

The IVM EA tiers to the 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon (pp. 127-128, 318-333, 1205-1206). The IVM Selected Alternative protects forests which exhibit old growth character: the highest quality northern spotted owl habitat (Late-seral closed forest in landscape locations where it is likely to persist) and older, structurally complex forests (BLM 2022 p. 88, 107). As stated above, the range of alternatives evaluated in the EA remains valid for the current environmental concerns and interests, and it is reasonable to conclude these new circumstances would not substantially change the analysis of the new proposed action.

**4. Are the direct, indirect, and cumulative effects that would result from implementation of the new Proposed Action similar (both quantitatively and qualitatively) to those analyzed in the exiting NEPA document?**

Yes, the direct, indirect, and cumulative effects that would result from this Proposed Action are similar to the effects described in the IVM EA, both for the resources and issues that were analyzed in detail as well as where detailed analysis was not warranted. The Agate Oak Project is a feature of the Proposed Action analyzed in the IVM EA.

The EA evaluated potential effects to eight resources or issues in detail (BLM 2022a, pp. 15-62), and potential effects to 51 other resources and issues not analyzed in detail (BLM 2022a, pp. 223-292). As detailed in Section D (1), above, the IDT reviewed the Agate Oak Project and resource conditions and determined both that the proposed actions and effects are consistent with the activities analyzed in the IVM EA and that the geographic and resource conditions remain consistent with the conditions analyzed in the IVM EA.  There are no other actions that would have different cumulative effects with the Agate Oak Project than those described in the IVM EA. As described below, the BLM has quantified the effects to specific resources for the proposed treatment units for each of the eight issues which were analyzed in detail in the EA (BLM 2022a, pp. 15-62).

Where site-specific conditions and resource issues warranted, the team incorporated appropriate PDFs (attachment 2), as called for in the IVM EA to ensure project effects remain within those effects identified in the IVM EA.

***Are the effects of the new Proposed Action consistent with the effects analyzed in the IVM EA with respect to landscape scale resiliency in terms of successional class distribution (i.e., distribution of open and closed forest conditions) in the dry forest?***

As described in Section D (1) above, the conditions within the project area are within the scope of those described in the affected environment in the IVM EA. The current balance of open and closed forest conditions within the Project Area are departed from the historic range of variability, with an overrepresentation of mid-closed forest and a deficit of late-open forest conditions, which is consistent with the affected environment described in the EA (EA, BLM 2022a, p. 17). This proposed action does not include commercial thinning or selection harvest, so consistent with the EA, these actions would not result in a shift in forest structural stages (BLM 2022a, p. 16).

***Are the effects of the new Proposed Action consistent with the effects analyzed in the IVM EA with respect to stand level hazard or fire resistance in the fire-adapted dry forests?***

As stated above in the project description, the proposed action will be implemented in stands with dense continuous canopy, ladder, and surface fuels with the presence of suppressed fire tolerant species, and in previously treated areas, which is consistent with the IVM EA analytic assumptions (BLM 2022a, pp. 22).

As discussed above in D (1) actions and conditions within the Agate Oak Project are consistent with those analyzed in the IVM EA. Therefore, consistent with the analysis in the IVM EA, the combined direct effect of the Proposed Action to reduce surface and ladder fuels via small diameter thinning, and prescribed fire would alter the continuity of the fuel profile to result in *High* relative resistance to stand replacement fire for 100 percent of the Agate Oak Project Area acreage (BLM 2022a, pp. 28-29; Table 7).

Additionally, the Proposed Action which will leave variable sized untreated skips in areas outside of the CAR and apply prescribed fire that would result in effects to fuel heterogeneity, similar to those disclosed in the EA (BLM 2022a, pp. 31-32).

*Table 7 Agate Oak Project Contribution Toward Stand-Level Fire Resistance, Relative to IVM analytic effects.*

| IVM EA Treatment Type and Commercial Theme | Short-term Stand-Level Fire Resistance Rating | Percent of Agate Oak Project Proposed Acreage | Proposed Action Acreage | Percent of IVM EA Treatment Area |
|---|---|---|---|---|
| Small diameter thinning and prescribed fire treatments only | High | 100% | 6,713 | 1.0% |

Cumulative effects at the stand-level for all actions would be like those disclosed in the EA, requiring maintenance disturbance every of 10 to 30 years to maintain *low-moderate* loading surface fuel profiles (BLM 2022a, p. 32 - 34). A portion (801 acres) of the small-diameter and prescribed fire acreage in the new Proposed Action were previously treated for surface fuel reduction since the year 2000 and need such maintenance disturbance.

The direct, indirect, and cumulative effects of the new proposed action would be consistent with those disclosed in the issue analyzed in detail (BLM 2022a, p. 27-29, 31-32).

***Are the effects of the new Proposed Action consistent with the effects analyzed in the IVM EA with respect to short and long-term wildfire risk to forests and highly valued resources and assets, namely communities, or contribute toward safe and effective wildfire response?***

The conditions within the project area are within the scope of those described in the affected environment in the IVM EA (BLM 2022a, p.36-37).

Consistent with the IVM EA analysis, the new Proposed Action would reduce the potential for stand-replacing crown fire (i.e., stand level hazard) by creating post-treatment conditions that set stands up to better receive fire (prescribed or wildfire) (BLM 2022, p. 39-42).  Where implemented, proposed actions would contribute toward wildfire risk reduction, consistent with the direct, indirect, and cumulative effects disclosed in the EA (BLM 2022a, p. 39 - 42). Agate Oak Project proposed actions would reduce wildfire risk on approximately 11% percent of the strategic "linear feature" (e.g., POD boundary), 11%  percent of the local "area-based" (e.g., quarter-mile around Communities at Risk), and 13% percent of the landscape (POD) "area-based" wildfire risk reduction extents (Table 8).

The cumulative effects of the proposed action and known adjacent implementation actions would be like those discussed in the IVM EA analysis (BLM 2022a, p. 42).

*Table 8 Agate Oak Project Contribution Toward IVM Risk Reduction Strategy Extents.*

| IVM EA Risk Reduction Strategy Extent | Agate Oak Proposed Actions | | Agate Oak Proposed Action relative to IVM Treatment Area (%) | Potential Maximum 10-year Implementation of IVM Treatment Area (%) |
|---|---|---|---|---|
| | Acres | Percent (%) | | |
| "Linear features" [POD Boundaries] (300ft width) | 296 | 11% | 0.04% | 3.9% |
| Local "Area-based" [¼ Mile Around Communities at Risk] | 1,444 | 11% | 0.2% | 15% |
| Landscape "Area based" [PODs area] | 6,570 | 13% | 1.0% | 35% |

***Are the effects of the new Proposed Action consistent with the effects analyzed in the IVM EA with respect to northern spotted owl habitat and critical habitat?***

The Agate Oak Project is consistent with the IVM EA analysis and conclusions because the project is following the IVM EA prescriptions. Additionally, as described below (and shown in Table 9), the effects from the new Proposed Action are within the estimated range of effects in the IVM EA.

*Table 9 Treatment effects and acres of NSO habitat types treated.*

| Activity Type | Effects to Nesting-roosting or Foraging | | | Effects to Dispersal- Only Habitat | |
|---|---|---|---|---|---|
| | Remove | Downgrade | Modify | Remove | Modify |
| Small Diameter Thinning Acres (% of EA analyzed acreage) | 0 acres | 0 acres | 2,025 acres (14.5%) | 0 acres | 1,203 acres (5.0%) |
| Understory/Handpile Burning Acres (% of EA analyzed acreage) | 0 acres | 0 acres | 2,025 acres (12.7%) | 0 acres | 1,203 acres (4.6%) |
| **TOTAL ACRES** | | | 2,025 | | 1,203 |

**Duplicate acres of small diameter thinning and understory/ handpile burning would be fuels reduction treatments on the same footprint.

The Agate Oak Project would modify, but maintain nesting-roosting, foraging, and dispersal-only habitat function on approximately 0.6 percent of the nesting-roosting or foraging habitat and 0.8 percent of the dispersal-only habitat within the IVM EA NSO Analysis Area. This is within the IVM EA effects analysis that concluded that treatments that would modify but maintain the function would impact approximately nine percent of nesting-roosting, 11 percent of foraging, and 35 percent of dispersal-only habitat within the EA NSO Analysis Area. The project would reduce the wildfire potential in 0.7 percent of the NSO habitat within the EA NSO Analysis Area, which is within the 18 percent benefit identified in the EA (BLM 2022a, p. 55).

Within the total treatment acres described above, treatment in approximately 385 acres of nesting-roosting or foraging habitat and 277 acres of dispersal-only habitat occur in the December 2021 designated Critical Habitat (Unit 10, KLE 5) (USDI FWS 2021a). The proposed modify but maintain treatments of nesting-roosting, foraging and dispersal-only habitat would not alter the intended function of providing connectivity within and between subunits. The Proposed Action would not result in a reduction of nesting- roosting, foraging or dispersal-only habitat within critical habitat in the IVM EA NSO Analysis Area. The treatment is well below the estimated modification in the EA analysis of 9,000 to 10,000 acres of nesting-roosting and foraging habitat, and 15,000 to 16,000 acres of dispersal-only habitat within designated critical habitat (BLM, 2022c, p. 13 and p. 185).

Spotted owl surveys within the Project Area will continue and if new owl detections occur, the project will be altered or seasonally restricted.  Small diameter fuels reduction treatments may still be permitted depending on the proximity to the active use area within the 0.5-mile core-use area and if nesting-roosting components can still be maintained (i.e., layering, coarse woody material, etc.) (USDI FWS 2021b, p. 31).

The cumulative effects from the project are consistent with the IVM EA because these acres were considered under the proposed actions in the IVM EA and no additional projects are proposed in the Project Area that were not considered in the IVM EA cumulative effects analysis in Section 3.5 (BLM 2022a, pp. 55-56).

***Are the effects of the new Proposed Action consistent with BLM's analysis and conclusions in the EA that the IVM program of work in the late-successional reserves will speed the development and not preclude or delay by 20 years or more the development of northern spotted owl nesting/roosting habitat?***

The Agate Oak Project is consistent with the IVM EA analysis and conclusions for this issue because as described above, the project is following the IVM EA prescriptions. The IDT reached this conclusion after a review of the Proposed Action. The Agate Oak Project is only proposing small diameter thinning and prescribed burning in the LSR LUA for the purpose of reducing surface fuels, ladder fuels, and canopy fuels within a Community at Risk. These treatments are not commercial treatments and are not silviculture treatments designed to develop or improve spotted owl nesting-roosting habitat. The proposed action would maintain the function of spotted owl foraging and dispersal-only habitats because key habitat elements would be retained such as overstory canopy cover and trees over 8" DBH.

***How would the new Proposed Action affect the Pacific marten (also known as "coastal" marten)?***

There would be no effects to Pacific martens (*Martes caurina*) or their proposed critical habitat from this project because the project is not within any known Extant Population Areas or within proposed critical habitat. Additionally, no Pacific martens have been observed in the Project Area.

***How would the new Proposed Action develop and promote special status plant habitat?***

The information for Special Status plant habitat specific to the Agate Oak Project is consistent with the analysis and conclusions in the EA for Special Status plant habitat and that analysis is incorporated here by reference (BLM 2022a, pp. 69-75).  Most Special Status vascular plant species known to occur in Agate project units commonly occur in oak woodland, oak savannah, oak chapparal, oak-conifer plant communities, which include vernal pool and wet meadow habitats and are generally shade intolerant and tend to respond to increased light and a reduction in competition with increased germination, growth, and reproduction (BLM 2022a, p. 73).

*Fritillaria gentneri* can be found in oak habitats and the project's proposed treatment of units dominated by oak habitats within the species known range totalling approximately 480 acres would have a beneficial impact. Many other sensitive species known to occur within the treatment area i.e. *Plagiobothrys greenei, Limnanthes floccosa ssp. bellingeriana, Ranunculus austrooreganus* and *Nemacladus capillaris* are commonly found in meadows inclusions across the oak communities. The treatments are not proposed to enhance meadows per se but enhance the health of the communities through the reduction of the risk of catastrophic stand-replacing wildfires. Proposed thinning and burning treatments would reduce encroachment, remove the buildup of thatch and fine fuels, and create openings in habitats that have developed closed canopies and dense understories in the absence of historic frequent fire return intervals. Restoring the more open canopy conditions in which many Special Status species evolved would improve habitat conditions by creating space and increasing light, water, and nutrients available to Special Status vascular and other native understory plants.

Botanical surveys have or will be conducted for the project area and a review of the existing populations has been completed. With the protection of existing and known populations through implementation of PDFs, the project is consistent with the proposed actions and vegetation type communities analyzed in the IVM EA (BLM 2022a, p. 70 and 235).

***How would the new Proposed Action promote and develop habitat in special plant communities or native plant communities, including those in Areas of Critical Environmental Concern?***

The proposed treatment does not occur in any Areas of Critical Environmental Concern and will have no effects on them. However, the proposed treatment does promote Oregon white oak habit and the nature of the project would create open canopy in some areas which could facilitate favorable conditions for native plant communities to diversify and expand as more sunlight and moisture reach the forest floor as described in the IVM EA (Section 3.9, pp. 75-82, especially Effects Common to All Action Alternatives, p. 79, and Alternative C, pp. 81-82.)

## 5. Are the public involvement and interagency review associated with the existing NEPA document(s) adequate for the current Proposed Action?

Yes, public involvement and interagency review conducted during the development of the IVM EA are adequate for this project. The BLM conducted extensive public outreach between 2019 and 2020 on the EA ("existing NEPA document"). Public scoping started on July 3, 2019. Scoping notices were sent to individuals, organizations and agencies via letter and email. The BLM provided a scoping notice to the following tribes on July 3, 2019, including the Karuk, Cow Creek, Klamath, Confederated Tribes of the Grande Ronde, Quartz Valley Indian Reservation, and Confederated Tribes of Siletz Indians. The scoping period ended on August 2, 2019 (BLM 2022c, pp. 12-13).

On October 29, 2019, the BLM provided the opportunity for the public to provide input on a preliminary version of Chapters 1 and 2 of the EA. The BLM sent notices to individuals, organizations and agencies via letter and email. Notifications were also made to the following tribes on October 30, 2019, including the Karuk, Cow Creek, Klamath, Confederated Tribes of the Grande Ronde, Quartz Valley Indian Reservation, and Confederated Tribes of Siletz Indians. The BLM also hosted meetings in Williams on November 5, 2019, and on November 13, 2019, in Applegate, and made a presentation before the Jackson County Board of Commissioners on December 10, 2019. The BLM also hosted a public open house at the Jackson County Expo on November 14, 2019 (BLM 2022c, pp. 12-13).

On August 19, 2020, the BLM initiated a 30-day public comment period on the complete EA. Notices were sent to individuals, organizations, and agencies via letter and email. Notifications were also made to the following tribes on August 25, 2020, including the Karuk, Cow Creek, Klamath, Confederated Tribes of the Grande Ronde, Quartz Valley Indian Reservation, and Confederated Tribes of Siletz Indians. A webinar was hosted by the BLM on August 27, 2020. The public comment period was extended on September 18, 2020, until October 19, 2020 (BLM 2022c, pp. 12-13).

On March 2, 2022, the BLM approved the EA. Notification via email and letter was made to approximately 1,340 individuals, organizations, and agencies of the approval of the project. Notifications of the project approval were also made on March 3, 2022, to the following tribes including the Karuk, Cow Creek, Klamath, Confederated Tribes of the Grande Ronde, Quartz Valley Indian Reservation, and Confederated Tribes of Siletz Indians. In addition to notifications, the BLM also released a press release on March 2, 2022, with the announcement of the project approval.

On May 20, 2024, the Medford District Office initiated a 28-day scoping period on the proposed treatment locations of the Agate Oak Project. The level of public and interagency review associated with the Programmatic EA and this project is adequate for the current proposed action.

### E. Persons/Agencies/BLM Staff Consulted

*Table 30 Agate Oak Project Interdisciplinary Team*

| Name | Resource/Role |
|---|---|
| Jena Volpe | Fire Ecology |
| Jesse Kiene | Fuels |
| Steve Haney | GIS |
| Georgia Thomas | Botany |
| Karla Alvarado | Botany |
| Jen Sigler | Cultural |
| Tatiana Watkins | Cultural |
| Amanda Huffman | Wildlife |
| Chris Volpe | Fish |
| Shawn Simpson | Hydrology / Soils |
| Todd Calvert | Recreation / SMA |
| Jason Tarrant | Livestock Grazing |
| Lisa Meredith | Silviculture |
| Kyle Sullivan | Public Affairs |
| Todd Bowen | NEPA |

Note: refer to the EA for a complete list of the team members participating in the preparation of the original environmental analysis.

**References:**

Bureau of Land Management (BLM). 2016a. Southwest Oregon Record of Decision and Resource Management Plan. Portland, Oregon. August.

BLM 2022a. Integrated Vegetation Management for Resilient Lands Environmental Assessment. Medford, Oregon. March.

BLM 2022b. Finding of No Significant Impact for the Integrated Vegetation Management for Resilient Lands Environmental Assessment. Medford, Oregon. March.

BLM 2022c. Decision Record for the Integrated Vegetation Management for Resilient Lands Environmental Assessment. Medford, Oregon. March.

Klamath Siskiyou Oak Network. 2023. Klamath Siskiyou Oak Network Ecological Monitoring Plan v1.0. Rep. No. KBO-2023-0001. Klamath Bird Observatory, Ashland, OR

Mote, P.W., J. et al. 2019. *Fourth Oregon Climate Assessment Report*. Oregon Climate Research Institute.

ODFW. 2015. Guidance for Conserving Oregon's Native Turtles including Best Management Practices. Oregon Dept. of Fish and Wildlife. 99 pp.

Pilliod, D. S., Welty, J. L., & Stafford, R. (2013). Terrestrial movement patterns of western pond turtles (Actinemys marmorata) in central California. *Herpetological Conservation and Biology*, *8*(1), 207-221.

Reese, D.A. and H.H. Welsh. 1997. Use of terrestrial habitat by Western Pond Turtles, Clemmys marmorata: implications for management. Pages 352–357 in Proceedings: conservation, restoration and management of tortoises and turtles. New York Turtle and Tortoise Society, Mamaroneck, New York.

Scott, J.H. et al. 2018. *Exposure of Human Communities to Wildfire in the Pacific Northwest*. Briefing paper.

88 FR 68370: Endangered and Threatened Wildlife and Plants; Threatened Species Status With Section 4(d) Rule for the Northwestern Pond Turtle and Southwestern Pond Turtle, Proposed Rule. Published in the Federal Register on October 3, 2023.

89 FR 46576: Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Coastal Distinct Population Segment of the Pacific Marten, A Rule. Published in the Federal Register on May 29, 2024.

89 FR 100662: Endangered and Threatened Wildlife and Plants; Threatened Species Status With Section 4(d) Rule for Monarch Butterfly and Designation of Critical Habitat, Proposed Rule. Published in the Federal Register on December 12, 2024.

89 FR 102074: Endangered and Threatened Wildlife and Plants; Endangered Species Status for Suckley's Cuckoo Bumble Bee, Proposed Rule. Published in the Federal Register on December 17, 2024.

**Conclusion**

Based on the review documented above, I conclude that this proposal conforms to the applicable LUP and that the NEPA documentation fully covers the Proposed Action and constitutes BLM's compliance with the requirements of NEPA.

**Signatures**

Authorized Official/Date: _____ 3-27-2025
                              (Signature)            (Date)

Lauren Brown
Field Manager
Ashland Field Office


Authorized Official/Date: _____ 3-27-25
                              (Signature)            (Date)

Scott Nagel
Field Manager
Butte Falls Field Office


**Note:** The signed <u>Conclusion</u> on this Worksheet is part of an interim step in the BLM's internal decision process and does not constitute an appealable decision. However, the authorization based on this DNA is subject to appeal under 43 Code of Federal Regulations Part 4 and the program-specific regulations.

**Attachment: Appendix 1 – Project Design Features**

# Appendix 1: Project Design Features

Project Design Features (PDFs) listed in the tables below apply to this project.

***From the* Integrated Vegetation Management for Resilient Lands Environmental Assessment**

**Botanical Project Design Features**

| PDF # | Description |
|---|---|
| 140 | Conduct surveys to locate Special Status plants in all project areas where proposed actions could result in habitat modification or species' disturbance, following all applicable protocols and conducted by qualified botanists. |
| 142 | Follow all Project Design Criteria prescribed in the *Biological Assessment of Activities that May Affect the Federally Listed Plant Species, Gentner's Fritillary, Cook's Lomatium, and Large-flowered Woolly Meadowfoam, on Bureau of Land Management, Medford District and Cascade Siskiyou National Monument* (BLM 2020a). |
| 145 | Conduct soil-disturbing vegetation treatments in Gentner's fritillary and Cook's lomatium populations when plants are dormant, generally between July 1 and February 15. Thinning and scattering slash within populations or piling slash outside buffers is permitted outside those dates under the direction of the project botanist. |
| 146 | Implement protection measures for Special Status plant sites on a site-by-site basis, taking into consideration the species and its habitat requirements, the proposed treatment, management recommendations if available, and current environmental conditions at the site. |
| 154 | Restrict broadcast burning within T&E and Sensitive plant sites to the dormant season (generally July 1 - February 15). |
| 159 | For manual treatment, maintain 25-foot no-treatment buffers around (T&E) plant sites during the growing season. Treatment inside of buffers is allowed in the dormant season (July 1 - February 15), but remove cut material within buffer to at least 25 feet away from plant site boundary. |
| 163 | When re-vegetating degraded or disturbed areas, utilize locally adapted seeds and native plant materials appropriate to the location and site-specific conditions, and meeting management objectives for vegetation management and restoration activities. Use seeds and plant materials that are genetically appropriate and native to the plant community or region, to the extent practicable. |

| PDF # | Description |
|-------|-------------|
| 164 | Clean soil and plant parts from equipment prior to entering treatment areas to reduce the risk of introducing or spreading non-native invasive plants. |
| 172 | No heavy equipment within 100 feet of Gentner's fritillary or Cook's lomatium plant sites. |
| 173 | No new roads within 100 feet of Gentner's fritillary or Cook's lomatium plants. No new roads within Cook's lomatium critical habitat. |
| 179 | Do not burn landing slash within 100 feet of (T&E) plant sites. |
| 180 | No treatments in long-term monitoring plots in RNAs unless part of the monitoring plan. |
| 181 | Construct landings at least 100 feet from (T&E) plant sites. Permit use of previously existing landings when more than 100 feet away from plant sites. |
| 182 | Realign new proposed logging road corridors, truck turn arounds, and staging areas to maintain 100-foot buffers. Permit use of existing roads, even when located less than 100 feet from (T&E) plant sites. |
| 183 | All rock, gravel, rip-rap, and other material utilized in the building, reconstruction, or maintenance of roads (temp, permanent, etc.) must be free of noxious weed seeds and either originate from an accredited, weed-free quarry approved by the project botanist or be crushed between the November 1 and June 15 immediately prior to application. Aggregate stockpiled between June 16 and October 31 of the previous year would not be accepted unless inspected by the project botanist. |
| 280 | Seed decommissioned roads at risk of invasion by nonnative invasive plants with native species for at least 30 feet from the intersection with a main route. |

**Cultural/Tribal/Paleontological Project Design Features**

| PDF # | Description |
|-------|-------------|
| 19 | Consultation with Tribes and/or SHPO will be completed prior to the signing of any DR's completed under this EA. |
| 20 | Archaeologists will conduct pre-field examinations of existing site, survey and other relevant information to determine what areas of proposed projects (if any) will need to be surveyed. |

| PDF # | Description |
|---|---|
| 21 | Cultural resource surveys may need to be conducted prior to the signing of any DRs produced under this EA. These surveys will also search for paleontological resources. Previously recorded sites will be re-visited to complete records updates as needed. |
| 22 | All cultural sites within project areas may be evaluated for the NRHP. |
| 23 | Prior to any project decision that entails new road, landing, or skid trail construction, the field office archaeologist will evaluate whether new road and landing locations require cultural surveys, and any needed surveys will be completed. |
| 24 | All surveys will be conducted or led by qualified cultural resource specialists familiar with the BLM Protocol and Section 106 of the NHPA. |
| 25 | Cultural or paleontological sites occurring within activity areas may be flagged for avoidance, unless evaluated and treated or discharged from management. Sites that need to be protected will be identified to the project proponent/implementor on a map. |
| 26 | Cultural sites that are located within prescribed fire units will have hand lines constructed around them as necessary to protect the resource from fire. |
| 27 | Cultural Sites that are within treatment units may be hand-treated to reduce fuel loading, and to lessen their visibility on the landscape. These sites will be identified prior to project implementation by Medford District archaeological staff. |
| 28 | Large diameter trees (commercially viable) within archaeological sites will not be removed. All trees near cultural sites will be felled away from the site, rather than into them. |
| 29 | All materials cut from cultural sites, and any other cut materials will be piled off-sites for burning purposes. The Medford District archaeological staff will work with other BLM staff to identify suitable areas for pile burning. No trees or other vegetation shall be dragged through a cultural site. |
| 30 | Sensitive areas (such as flagged sites or areas identified by Tribes) will be discussed with the contractor to ensure that they understand the need to avoid those areas. The contractor will also be informed that they cannot collect artifacts or disturb cultural resource sites in any way. |
| 31 | Any fire lines leading to or near cultural or paleontological sites that originate from roads shall be blocked after project implementation to prevent unauthorized all-terrain vehicle use. |

| PDF # | Description |
|---|---|
| 32 | Only existing breaches or areas along ditch systems designated by Medford District archaeological staff shall be used for the removal of vegetation. If new crossings are needed to facilitate access, these areas will be developed with the archaeological staff and in consultation with SHPO. |
| 33 | Brush and tree removal within historic ditch systems will be discussed with archaeological staff prior to removal. Any wooden features (such as trellises, flumes and other wooden items of historical significance) within ditches must remain in place and will be protected. All brush and other woody materials will be piled away from the ditches for burning. |
| 34 | Prior to any underburning activities, all ditches or ditch segments will be examined by the archaeologists to identify any wooden features. Any wooden features (such as trellises, flumes and other wooden items of historical significance) identified will be flagged for avoidance. Appropriate mitigation for such features will be developed by archaeological staff. |
| 36 | Large patches of culturally significant plants (as identified by Tribes) will be protected from all treatment activities unless such activity will benefit the patch. |
| 37 | All areas designated for personal use firewood collection will be discussed with BLM archaeological staff and developed in cooperation with them in order to protect any cultural resources. |
| 38 | Tribes shall have access to project areas to collect Special Forest Products before treatment if culturally significant products are identified within treatment areas. Such products include bear grass, pine cones, acorns, several species of root plants, fir boughs, mushrooms, etc.). |
| 283 | Follow BLM Handbook H-8270-1 to determine known Condition 1 and Condition 2 paleontological areas, or collect information through inventory to establish Condition 1 and Condition 2 areas, determine resource types at risk from the proposed treatment, and develop appropriate measures to minimize or remove adverse impacts. |

**Road Project Design Features**

| PDF # | Description |
|---|---|
| 188 | Locate temporary and permanent roads and landings on stable locations, e.g., ridge tops, stable benches, or flats, and gentle-to-moderate side slopes. Minimize road construction on steep slopes (> 60 percent). |

| PDF # | Description |
|---|---|
| 189 | Where an EA alternative allows stream crossings, locate temporary road construction or improvement to minimize the number of stream crossings. |
| 190 | Locate roads and landings away from wetlands, RR, floodplains, and waters of the State, unless there is no practicable alternative. Avoid locating landings in areas that contribute runoff to channels. |
| 191 | Locate roads and landings to reduce total transportation system mileage. Renovate or improve existing roads or landings when it would cause less adverse environmental impact than new construction. Where roads traverse land in another ownership, investigate options for using those roads before constructing new roads. |
| 192 | Design road cut and fill slopes with stable angles, to reduce erosion and prevent slope failure. |
| 194 | Locate waste disposal areas outside wetlands, RR, floodplains, and unstable areas to minimize risk of sediment delivery to waters of the State. Apply surface erosion control prior to the wet season. Prevent overloading areas, which may become unstable. |
| 195 | Use temporary sediment control measures (e.g., check dams, silt fencing, bark bags, filter strips, and mulch) to slow runoff and contain sediment from road construction areas. Remove any accumulated sediment and the control measures when work or haul is complete. When long-term structural sediment control measures are incorporated into the final erosion control plan, remove any accumulated sediment to retain capacity of the control measure. |
| 196 | Minimize fill volumes at temporary stream crossings by restricting width and height of fill to amounts needed for safe travel and adequate cover for culverts. For deep fills (generally greater than 15 feet deep), incorporate additional design criteria (e.g., rock blankets, buttressing, bioengineering techniques) to reduce the susceptibility of fill failures. |
| 197 | Locate stream-crossing culverts on well-defined, unobstructed, and straight reaches of stream. Locate these crossings as close to perpendicular to the streamflow as stream allows. When structure cannot be aligned perpendicular, provide inlet and outlet structures that protect fill, and minimize bank erosion. Choose crossings that have well-defined stream channels with erosion-resistant bed and banks. |

| PDF # | Description |
|---|---|
| 198 | Design stream crossings to minimize diversion potential in the event that the crossing is blocked by debris during storm events. This protection could include hardening crossings, armoring fills, dipping grades, oversizing culverts, hardening inlets and outlets, and lowering the fill height. |
| 199 | Design stream crossings to prevent diversion of water from streams into downgrade road ditches or down road surfaces. |
| 200 | Effectively drain the road surface by using crowning, insloping or outsloping, grade reversals (rolling dips), and waterbars or a combination of these methods. Avoid concentrated discharge onto fill slopes unless the fill slopes are stable and erosion-resistant. |
| 202 | Install underdrain structures when roads cross or expose springs, seeps, or wet areas rather than allowing intercepted water to flow down gradient in ditchlines. |
| 203 | Design roads crossing low-lying areas so that water does not pond on the upslope side of the road. Provide cross drains at short intervals to ensure free drainage. |
| 204 | During roadside brushing, remove vegetation by cutting rather than uprooting. |
| 206 | Apply native seed and certified weed-free mulch to cut and fill slopes, ditchlines, and waste disposal sites with the potential for sediment delivery to wetlands, RR, floodplains and waters of the State. If needed to promote a rapid ground cover and prevent aggressive invasive plants, use interim erosion control non-native sterile annuals before attempting to restore natives. Apply seed upon completion of construction and as early as practicable to increase germination and growth. Reseed if necessary to accomplish erosion control. Select seed species that are fast-growing, provide ample ground cover, and have adequate soil-binding properties. Apply mulch that will stay in place and at site-specific rates to prevent erosion. |
| 207 | Place sediment-trapping materials or structures such as straw bales, jute netting, or sediment basins at the base of newly constructed fill or side slopes where sediment could be transported to waters of the State. Keep materials away from culvert inlets or outlets. |

| PDF # | Description |
|---|---|
| 208 | Suspend ground-disturbing activity if projected forecasted rain will saturate soils to the extent that there is potential for movement of sediment from the road to wetlands, floodplains, and waters of the State. Cover or temporarily stabilize exposed soils during work suspension. Upon completion of ground-disturbing activities, immediately stabilize fill material over stream crossing structures. Measures could include but are not limited to erosion control blankets and mats, soil binders, soil tackifiers, or placement of slash. |
| 209 | Apply water or approved road surface stabilizers/dust control additives to reduce surfacing material loss and buildup of fine sediment that can enter into wetlands, floodplains and waters of the State. Prevent entry of road surface stabilizers/dust control additives into waters of the State during application. For dust abatement, limit applications of lignin sulfonate to a maximum rate of 0.5 gallon/yard$^2$ of road surface, assuming a 50:50 (lignin sulfonate to water) solution. |
| 210 | Blade and shape roads to conserve existing aggregate surface material, retain or restore the original cross section, remove berms and other irregularities that impede effective runoff or cause erosion, and ensure that surface runoff is directed into vegetated, stable areas. |
| 211 | Stormproof open resource roads receiving infrequent maintenance to reduce road erosion and reduce the risk of washouts by concentrated water flows. Stormproof temporary roads if retained over winter. |
| 212 | Suspend stormproofing/decommissioning operations and cover or otherwise temporarily stabilize all exposed soil if conditions develop that cause a potential for sediment-laden runoff to enter a wetland, floodplain, or waters of the State. Resume operations when conditions allow turbidity standards to be met. |
| 215 | Prevent use of vehicular traffic utilizing methods such as gates, guard rails, earth/log barricades, to reduce or eliminate erosion and sedimentation due to traffic on roads. |
| 216 | Implement tillage measures, including ripping or subsoiling to an effective depth. Treat compacted areas including the roadbed, landings, construction areas, and spoils sites. |
| 217 | On active haul roads, during the wet season, use durable rock surfacing and sufficient rock depth to resist rutting or development of sediment on road surfaces that drain directly to wetlands, floodplains, and waters of the State. |

**Fish Project Design Features**

| PDF # | Description |
|---|---|
| 219 | Do no operate ground-based machinery for timber harvest within 50 feet of stream (slope distance), except where machinery is on improved roads, designated stream crossings identified in consultation with watershed specialists, or where equipment entry into the 50-foot zone would not increase the potential for sediment delivery into the stream. |
| 220 | Do not operate ground-based machinery for timber harvest on slopes > 35 percent in RRs. Mechanical equipment with tracks (e.g., excavators, loaders, forwarders, and harvesters) may be used on short pitch slopes of greater than 35 percent but less than 45 percent when necessary to access benches of lower gradient (length determined on a site-specific basis, generally less than 50 feet (slope distance). |
| 228 | Prevent streambank and hillslope disturbance on steep slopes (generally >60 percent) by requiring full suspension within 50 feet of definable stream channels. Yard the remaining areas across the RR using at least one-end suspension. |
| 230 | On active haul roads, during the wet season, use durable rock surfacing and sufficient rock depth to resist rutting or development of sediment on road surfaces that drain directly to wetlands, floodplains, and waters of the State. Prior to winter hauling activities, implement structural road treatments such as: increasing the frequency of cross drains, installing sediment barriers or catch basins, applying gravel lifts or asphalt road surfacing at stream crossing approaches, and armoring ditch lines. |
| 236 | Limit new permanent roads, temporary routes, and landing construction and road maintenance to the dry season (generally May 15 to October 15), or when soil moisture does not exceed 25 percent. Keep erosion control measures concurrent with ground disturbance to allow immediate storm-proofing. |
| 237 | Suspend ground-disturbing activity if forecasted rain would saturate soils to the extent that there would be potential for movement of sediment from the road to wetlands, floodplains, and waters of the state. Cover or temporarily stabilize exposed soils during work suspension. Upon completion of ground-disturbing activities, immediately stabilize fill material over stream crossing structures. Measures could include, but are not limited to, erosion control blankets and mats, soil binders, soil tackifiers, and slash placement. |

| PDF # | Description |
|---|---|
| 241 | Do not allow culvert removal and replacement from October 15 to May 15. Variations in these dates would be permitted dependent upon weather and soil moisture conditions and with a specific erosion control plan (e.g., rocking, waterbarring, seeding, mulching, barricading) as determined by the Authorized Officer in consultation with aquatic and/or soils scientists. |
| 242 | When permanently removing culverts, pull slopes back to the natural slope, or at least 2:1, to minimize sloughing and erosion and minimize the potential for the stream to undercut stream banks during periods of high stream flows. |
| 243 | Perform instream work during the instream work period as defined by ODFW; June 15 to September 15 for all areas except the Applegate and tributaries to the South Umpqua, July 1-September 15, and July 1-January 31 in the Klamath Basin (Jenny Creek). |
| 244 | De-water streams during culvert installation and replacement to maintain optimum bedding material moisture content and minimize the movement of sediment downstream. |
| 245 | Retain ground cover in ditch lines, except where sediment deposition or obstructions require maintenance. |
| 246 | Remove all possible excess sediment from stream channels during culvert removal, replacement, and installation in the same operational season the work is completed. |

**Fuels Project Design Features**

| PDF # | Description |
|---|---|
| 252 | When conducting prescribed fire in utility ROW, notify the ROW Holder/utility company of planned operations prior to burning. |
| 286 | Identify commercial units in conjunction with fuels specialists to facilitate the application of prescribed fire (i.e., underburning), as needed, particularly in strategic areas for wildfire containment. |
| 287 | Reduce fuel loads by whole tree yarding, and piling material, as necessary, prior to under burning in dry forest types where fuel loads are elevated. |

| PDF # | Description |
|---|---|
| 288 | As operationally feasible, avoid damage to trees established prior to 1850 and greater than 40 inches DBH (LITA, MITA, RR, and LSR) and Douglas fir and pine greater than 36 inches DBH and madrone, big leaf maple, and oak greater than 24 inches DBH (UTA and LSR-Dry) during prescribed fire application (e.g., prior to underburning pull duff and slash back from the base, or adjust firing patterns as needed). |

**Recreation Project Design Features**

| PDF # | Description |
|---|---|
| 289 | Monitoring for naturalness would be completed through field observations and GIS analysis to determine if projects, activities, or modifications have altered the landform, vegetation, water, color, or character of the landscape. (BLM Handbook 8320-1) |
| 15 | Manage activities in accordance with the planning frameworks for SRMAs and ERMAs. Frameworks are available at: https://www.blm.gov/or/plans/rmpswesternoregon/recreation.php. (SWO ROD/RMP p. 107) |
| 16 | Protect recreation setting characteristics within SRMAs to prohibit activities that would degrade identified characteristics and allow activities that would enhance characteristics. (SWO ROD/RMP p. 107) |
| 18 | Utilize Visual Contrast Rating Sheets for projects; follow VRM Class objectives; adjust prescriptions as necessary to meet VRM Class objectives. (SWO ROD/RMP p. 114) |

**Hydrology Project Design Features**

| PDF # | Description |
|---|---|
| 258 | Prior to the wet season, construct water bars by hand in cable yarding corridors or in special yarding areas where substantial gouging occurs that could lead to the capture and conveyance of water and/or contribute to soil erosion, as determined by the soil scientist and directed by the Authorized Officer. Pull available slash on skyline-cable yarding corridors or special yarding areas if gouging of mineral soil occurs for a continuous distance of 20 feet or more that could lead to the capture and conveyance of water and/or contribute to soil erosion. |
| 259 | Construct water bars on skid trails using guidelines in Table C-6 (USDI BLM 2016c, p. 191) where potential for soil erosion or delivery to waterbodies, floodplains, and wetlands exist. |

| PDF # | Description |
|---|---|
| 262 | Apply erosion-control techniques (e.g., water bar, seed, mulch, scatter chipped material, or scatter limbs and other fine material) on skid trails, forwarder trails, yarding corridors, landings, and other disturbed areas where potential for soil erosion or delivery to waterbodies, floodplains, and wetlands exist, or as identified by the Authorized Officer. |
| 263 | Designate skid trails in locations that channel water from the trail surface away from waterbodies, floodplains, and wetlands, or unstable areas adjacent to them. |
| 264 | Use full or partial suspension when skyline-cable yarding. Require full suspension overflowing streams, non-flowing streams with highly erodible beds and banks, and jurisdictional wetlands. |
| 265 | Prior to the wet season, provide effective road surface maintenance. Clear ditch lines in sections where there is lowered capacity or obstructed by dry ravel, sediment wedges, small failures, or fluvial sediment deposition. Remove accumulated sediment and blockages at cross-drain inlets and outlets.  Grade natural surface and aggregate roads where the surface is uneven from surface erosion or vehicle rutting.  Restore crowning, outsloping or insloping for the road type for effective runoff. Remove or provide outlets through berms on the road shoulder.  After ditch cleaning prior to hauling, allow vegetation to reestablish or use sediment entrapment measures (e.g., sediment trapping blankets and silt fences). |
| 285 | For RRs adjacent to fish bearing and perennial streams where commercial thinning is proposed in the outer zone, a resource specialist will evaluate the existing condition of the inner zone of the RR to ensure that greater than 40 percent canopy cover exists; if canopy cover is found to be less than 40 percent in the inner zone, thinning in the outer zone will not be allowed. The intent is to ensure that shade to the stream is not reduced in those rare instances where inner zones may be open canopy, while outer zones are more closed (i.e., a meadow reach adjacent to a stream surrounded by forested stands within the SPTH buffer width). |

**Range Project Design Features**

| PDF # | Description |
|---|---|
| 9 | During vegetative treatment activities, protect rangeland developments and improvements by using techniques such as directional falling to prevent damage to fences, cattle guards, livestock watering troughs and other improvements. |
| 10 | If damage to range improvements does occur, contractors/operators would be required to notify the BLM immediately and proper repair or replacement would occur within two weeks. Proper repair of fences and gates includes keeping wire properly attached to posts, splicing or replacing broken wire in kind, repairing structures such as corners, stress panels or gates, and any other work necessary to keep improvements functional. Repair of structures such as stress or corner panels and gates requires pre-approval by BLM staff. Repair or cleaning of cattle guards damaged or filled with sediment by logging activities would require approval of BLM road engineering staff for structural integrity and public safety compliance. |
| 11 | During vegetative treatment activities, contractors/operators would keep all gates closed and all livestock containment systems functional to keep livestock in authorized areas. |

**Recreation Project Design Features**

| PDF # | Description |
|---|---|
| 12 | Actions outside of the river corridor that have the potential to impact outstandingly remarkable values (ORVs) must also meet the protect and enhance standard set forth in Section 10 of the WSR Act. |
| 282 | Conduct Visual Contrast Rating sheets at the project level to determine effects on WSRs to the scenery from actions outside of the corridors. |
| 289 | Monitoring for naturalness would be completed through field observations and GIS analysis to determine if projects, activities, or modifications have altered the landform, vegetation, water, color, or character of the landscape. |
| 15 | Manage activities in accordance with the planning frameworks for SRMAs and ERMAs. Frameworks are available at: https://www.blm.gov/or/plans/rmpswesternoregon/recreation.php. |

| PDF # | Description |
|---|---|
| 16 | Protect recreation setting characteristics within SRMAs to prohibit activities that would degrade identified characteristics and allow activities that would enhance characteristics. |
| 18 | Utilize Visual Contrast Rating Sheets for projects; follow VRM Class objectives; adjust prescriptions as necessary to meet VRM Class objectives. |

**Silviculture Project Design Features**

| PDF # | Description |
|---|---|
| 138 | Conduct prescribed underburning to minimize mortality to the residual stand to <15 percent on average. Limit mortality in trees 8-16 inches in diameter to <20 percent. Limit mortality in trees >16 inches DBH to <10 percent. |
| 218 | Where Port-Orford-Cedar is present, treatments must be consistent with management direction in the Port-Orford-cedar EIS. |
| E1 | Avoid damage to white fir and residual trees in general along haul routes, planned skid roads, or adjacent to major landings where heavy mechanical injury can occur during harvest operations to reduce tree susceptibility to fungal attacks and root rots. |

**Soils Project Design Features**

| PDF # | Description |
|---|---|
| 6 | As determined by a BLM soil scientist, no more than 20 percent of the treatment units to have detrimental soil disturbance including legacy disturbance as defined by the Forest Soil Disturbance monitoring protocol (Page-Dumroese et al. 2009a, 2009b) or similar updated protocols. Where the combined detrimental disturbance from implementation of current forest management operations and detrimental soil disturbance from past management operations exceeds 20 percent of the unit area, apply mitigation or amelioration to reduce the total detrimental soil disturbance to <20 percent of the treatment unit. |

| PDF # | Description |
|---|---|
| 42 | Restrict non-road, in unit, ground-based equipment used for harvesting operations to periods of low soil moisture; generally from May 15 to October 15. Low soil moisture varies by texture and is based on site-specific considerations. Low soil moisture limits will be determined by qualified specialists to determine an estimated soil moisture and soil texture. The Authorized Officer may issue a waiver, based on site conditions, ensuring operations would not cause detrimental soil disturbance such as rutting, erosion, or compaction. |
| 44 | Limit non-specialized skidders or tracked equipment to slopes less than 35 percent, except when using previously constructed trails or accessing isolated ground-based harvest areas requiring short trails over steeper pitches. Also, limit the use of this equipment when surface displacement creates trenches, depressions, excessive removal of organic horizons, or when disturbance would channel water and sediment as overland flow. |
| 45 | Limit the use of specialized ground-based mechanized equipment (those machines specifically designed to operate on slopes greater than 35 percent) to slopes less than 50 percent, except when using previously constructed trails or accessing isolated ground-based harvesting areas requiring short trails over steeper pitches. Also, limit the use of this equipment when surface displacement creates trenches, depressions, excessive removal of organic horizons, or when disturbance would channel water and sediment as overland flow. |
| 49 | DDR-TPCC: Maintain the values and resources for which the BLM has reserved these areas from sustained-yield timber production. |
| 257 | Use full log suspension whenever practicable on TPCC soils identified as prone to surface erosion, category FM. Use one-end suspension on these soils if full suspension is not practicable. |
| 267 | No commercial timber harvest (commercial thinning, selection harvest, or group selection thinning) in lands classified under the BLM DDR-TPCC system as "fragile non-suitable woodlands." Harvest allowed if the TPCC designation for the land is reclassified as discussed in the SWO ROD/RMP, pp. 4-5. |
| 268 | When conducting commercial timber harvest in lands classified under the TPCC system as "fragile suitable forest lands," follow the BMP's described in the SWO ROD/RMP (pp. 205-206) and any applicable recommendations or BMPs in the most current TPCC manual or handbook. |

**Wildlife Project Design Features**

| PDF # | Description |
|---|---|
| 78 | Follow Project Design Criteria (PDCs) and site and project specific reporting and monitoring requirements in wildlife consultation documents for T&E species. PDCs include seasonal restrictions to minimize disturbance effects. |
| 284 | For treatments in non-NSO nesting-roosting habitat where the objective is to speed the development of NSO nesting-roosting habitat or improve the quality of NSO nesting-roosting habitat in the stand or in the adjacent stand in the long-term, adjust site-specific treatment prescriptions as necessary to ensure they do "not preclude or delay by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment." |
| E2 | No commercial treatment of spotted owl NR (regardless of RHS or seral stand condition) in the 0.5-mile core-use area of active spotted owl sites. Small portions of stands proposed for treatment outside of the 0.5-mile core-use area that extend within the core-use area may be permitted as long as adverse effects to the site can be avoided. Yarding corridors are permitted if NR function can still be maintained post-harvest. Small diameter fuels reduction treatments and prescribed burning may be permitted depending on the proximity to the active area within the 0.5-mile core-use area and if NR components and function can still be maintained post-treatment (i.e., layering, coarse woody material, etc.). |
| 52 | Follow management direction for Siskiyou Mountains salamander consistent with the Conservation Agreement (August 17, 2007), or successor agreements. |
| 61 | Manage naturally occurring special habitats to maintain their ecological function, such as seeps, springs, rock outcrops, caves, cliffs, and talus slopes. |
| 292 | Implement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions. |
| 62 | Prior to implementing actions that could result in habitat modification or species disturbance in habitat for the vernal pool fairy shrimp, conduct surveys to determine species presence. |

| PDF # | Description |
|---|---|
| 63 | Vernal pools would be assumed occupied unless surveys indicate otherwise. Treatments in or adjacent to vernal pools will only occur during the dry season, which is when fairy shrimp have not hatched and are non-reproductive. This period generally occurs between April and November. The seasonal restriction and buffer distance may be waived if surveys determine the specific pool or pools are unoccupied by vernal pool fairy shrimp and the project is done in coordination with the FWS. |
| 290 | Prohibit activities that will disrupt bald eagles or golden eagles that are actively nesting. Depending on the site, this may include restricting chainsaw operations, heavy equipment use, and prescribed burning up to ¼ mile no line of site and ½ mile line of site around active bald or golden eagle nest sites |
| 64 | Do not remove overstory trees within 330 feet of bald eagle or golden eagle nests, except for removal of hazard trees. |
| 65 | Do not conduct timber harvest operations (including road construction, tree felling, and yarding) during the breeding season within 660 feet of bald eagle or golden eagle nests. Decrease the distance to 330 feet around alternate nests within a particular territory, including nests that were attended during the current breeding season but not used to raise young, or after eggs laid in another nest within the territory have hatched. |
| 66 | Prohibit operation of off-highway vehicles within 330 feet of bald eagle or golden eagle nests during the breeding season. In areas without forest cover or topographic relief to provide visual and auditory screening, prohibit operation of off-highway vehicles within 660 feet of bald eagle or golden eagle nests during the breeding season. |
| 70 | Restrict motor vehicle use within designated deer or elk management areas between November 1 and April 15 by techniques such as gating or signing to impose the restrictions. |
| 71 | Where forage for deer or elk is limited within designated deer or elk management areas, revegetate areas disturbed by IVM implementation actions including skid trails, burn piles, etc., as needed, with site appropriate native forage species. |
| 73 | Maintain ≥ 80 percent canopy cover within at least 50 feet of documented fisher natal and maternal dens. Maintain sufficient canopy cover on the remainder of the stand to support fisher denning post-project. |

| PDF # | Description |
|---|---|
| 74 | In stands with known natal or maternal denning sites, protect fisher denning structures ≥ 24 inches diameter (snags, down woody material, and live trees with cavities) within the stand. In this context, protect fisher denning structures means to retain the ≥ 24 inches diameter structures (i.e., snags, down woody material, and live trees with cavities) in the stand and if, for safety concerns, it is necessary to fall such snags or live trees with cavities, retain those cut trees or snags in the stand as additional down woody material. Do not apply vegetation treatments to all portions of the stand. |
| 75 | Within 5th field-watersheds (HUC 10) where fisher are documented by the BLM to occur, favor retaining trees that have structures (e.g., cavities, mistletoe, and rust brooms) that are typically used as denning or resting sites by fisher. |
| 77 | Before modifying marbled murrelet nesting habitat or removing nesting structure in (1) all LUAs within 35 miles of the Pacific Coast, and (2) Late-Successional Reserve and RR between 35–50 miles from the Pacific Coast and outside of exclusion Areas C and D (shown in Figure 2, p. 52, SWO ROD/RMP), assess for marbled murrelet nesting structure as required in the SWO ROD/RMP pp. 118-121 and follow all applicable RMP management direction, including survey or exclusion options. |
| 82 | Protect marbled murrelet occupied stands in LSR. In this context, protect marbled murrelet occupied stands means to prohibit activities in the occupied stand except for the following: felling of live or dead hazard trees, felling and removal of trees for habitat restoration, and the construction or maintenance of linear and nonlinear ROWs, spur roads, yarding corridors or other facilities, as long as the occupied stand continues to support marbled murrelet nesting. Implement wildfire management actions and activities needed to protect the overall health of the stand or adjacent stands, such as fuels reduction and insect and disease control, as long as the occupied stand continues to support marbled murrelet nesting. |
| 83 | In LSR and RR, during silvicultural treatment of stands, retain existing—Snags ≥ 6 inches DBH and Down woody material ≥ 6 inches in diameter at the large end and > 20 feet in length.  Except for safety, operational, or fuels reduction reasons. Retain snags ≥ 6 inches DBH cut for safety or operational reasons as down woody material, unless they would also pose a safety hazard as down woody material. A snag is "any standing dead, partially dead, or defective (cull) tree at least 6 feet tall." (USDI BLM 2016b, p. 313). |
| 84 | In LSR, where trees are cut for yarding corridors, skid trails, road construction, maintenance, and improvement, any trees that are both ≥ 40 inches DBH and that the BLM identifies were established prior to 1850, retain cut trees in the adjacent stand as down woody material. |

| PDF # | Description |
|---|---|
| 85 | In LSR, when conducting commercial harvest, in stands with less than 64 snags per acre > 10 inches DBH and less than 19 snags per acre > 20 inches DBH on average across the harvest unit, create one new snag > 10 inches DBH and one new snag > 20 inches DBH within 1 year of completion of yarding the timber in the timber sale (five in each category on the Coos Bay District portion of the Treatment Area). If insufficient trees are available in the size class specified, use trees from the largest size class available. Meet snag creation levels as an average at the scale of the harvest unit; snag creation levels need not be attained on every acre.  Create snags in a variety of spatial patterns, including aggregated groups and individual trees. Do not create snags within falling distance of power lines, structures, or roads that will remain open after harvesting activities are complete. If it is not possible to create snags beyond the falling distance of power lines, structures, or roads that will remain open after harvesting activities are complete, cut trees equivalent to the required number of snags and retain as down woody material within the harvest unit. Concentrate created snags in areas of the stand where the BLM does not presently anticipate skidding or yarding will occur within 20 years. |
| 86 | When conducting fuels reduction or prescribed fire treatments, in the RR-Dry or LSR-Dry, retain 2 percent cover of down wood greater than >4 inches diameter (6 percent or greater on the Coos Bay District portion of the Treatment Area). Meet down wood levels as an average at the scale of the Treatment Area following the treatment; down wood levels need not be attained on every acre. |
| 90 | Restrict the use of motorized equipment and vehicles to existing roads within the following naturally occurring special habitats to maintain their ecological function: seeps, springs, wetlands, natural ponds, and natural meadows. |
| 99 | To retain suitable microclimatic and substrate conditions in talus habitat, restrict ground disturbing activities (e.g., heavy equipment or yarding of trees) that displace or compact the substrate to 12 percent or less of the talus area. |
| 105 | No treatment in spotted owl nest patches in LSR except for strategic fuels reduction, insect and disease control, wildfire management, or habitat development. |
| 106 | No burning will occur within the nest patch of occupied or sites that are assumed to be occupied by spotted owl territorial pairs or resident singles, even outside of the critical breeding season. |
| 107 | Fire lines for prescribed fire will not be constructed through vernal pools. |

| PDF # | Description |
|---|---|
| 108 | In vernal pools on the top of Table Rocks, prescribed fire will occur in the fall when vernal pools are dry and outside of the reproductive season for fairy shrimp. |
| 109 | In watersheds with known fisher activity, debris piles associated with logging activity (slash and/or cull material piles) adjacent to roads or on landings would not be burned, chipped or made available for firewood cutting between February 1 and September 30 when the pile is mixed with various sized logs (multiple diameters) and there is some open space within the piled logs (not compact). Spring burning, chipping or firewood cutting could take place if a BLM wildlife biologist reviews the pile and determines it is not compatible with fisher denning/resting use. |
| 269 | Prescriptions designed to maintain nesting-roosting habitat (NR) habitat function in LSR at the stand scale post-treatment would retain key habitat elements important to owls, such as high canopy cover, large overstory trees, high basal area, multiple canopy layers, large snags, large down wood, and large hardwoods. Wildlife biologists would assess the ability of the stand to maintain NR habitat at the stand scale based on the amount of edge created, the proportion of the treated area compared to the untreated stand area, and the placement and size of skips and gaps within the stand.  In commercial harvest treatments in spotted owl NR, F, or dispersal habitat, place skips within similar habitat within the treated area to create desirable habitats and ecological conditions post-harvest. If the treatment unit and stand are the same or similar, then standard consultation PDCs to maintain habitat would apply. |
| 272 | Commercial harvest units with prescriptions designed to maintain NR or F habitat function in LSR would apply additional post-harvest fuels treatments, understory reduction, or pre-commercial thinning only if the existing post-harvest layering (especially the lower canopy layers) would not be removed as a result of the activity fuels treatments.  The post-harvest layering conditions and need for additional understory treatments would be assessed by the project wildlife biologist, fuels specialist, and prescription writer. |
| 279 | No treatment in structurally-complex forest in LSR within Marbled Murrelet Management Unit Zone 2. |
| 291 | Restrict burning to fall and winter (generally October to March) in meadow plant communities within the range of sensitive species pollinators Coronis fritillary, Mardon skipper, gray-blue butterfly, Oregon branded skipper, western bumblebee, and Franklin's bumble bee. |
| E3 | No habitat modifying actions in suitable Franklin's bumble bee habitat between May 15 and September 30 within the range of Franklin's bumble bee. |

*From the* **Determination of NEPA Adequacy**

**Cultural PDFs**

- Archaeologists will conduct pre-field examinations of existing cultural site, survey, and other relevant information to determine what areas of proposed projects require cultural resource survey.
- Cultural resource surveys will be completed prior to project implementation. All cultural resource surveys will be led by qualified cultural resource specialists familiar with the BLM/SHPO Protocol and Section 106 of the NHPA.
- Prior to project implementation, previously recorded cultural sites will be revisited and updated as needed, and newly identified sites will be documented to district standards. If sites that need to be avoided or otherwise protected are located within the project area, they will be flagged for avoidance and/or identified to the project proponent/implementor on a map as avoidance areas.
- No project activities may occur within cultural sites, with two important exceptions. The first exception is if a qualified archaeologist has completed, in consultation with SHPO and Tribes per 36 CFR §800.4(c)(1), a formal Determination of Eligibility concluding that the site is not eligible for the NRHP. The second is if the archaeologist has determined, in consultation with SHPO and any Tribe that attaches religious and cultural significance to the site, that the activity will not cause an adverse effect. This would be on a case-by-case basis and could cover actions such as hand-treating vegetation within sites to reduce fuel loading and lessen their visibility on the landscape. For each case, procedures would be put in place to specify how adverse effects would be avoided.
- Cultural sites that are located within or adjacent to prescribed fire units will have hand lines constructed around them as necessary to protect the resource from fire.
- Any fire lines leading to or near cultural sites that originate from roads shall be blocked after project implementation to prevent unauthorized vehicle use.
- Trees will not be felled into cultural sites. Any trees that are felled near sites will be felled away from the sites.
- Culturally modified trees (trees modified by people by carving, peeling, stripping, etc.) will be left standing whenever possible. If a culturally modified tree poses a hazard and needs to be cut, it will be left on the ground and not removed.
- If tribes identify large patches of culturally significant plants that they would like to be protected from project activities, those patches will be flagged for avoidance and/or identified to the project proponent/implementor on a map as avoidance areas.
- If previously unidentified cultural resources are discovered during project implementation, work will be halted in the immediate vicinity of the find, a 100-foot buffer will be established, and the agency official and agency archaeologist will be notified before the end of the workday in which the discovery is made. The agency archaeologist will determine the appropriate course of action which may include: evaluation of the resource for NRHP eligibility; project redesign to avoid impacts; and/or development of mitigation measures in consultation with SHPO and Tribes.
- If suspected non-modern human remains are identified during project implementation, work will be halted and a 300-foot buffer established. The remains will be covered from view and protected from damage and exposure, and no photographs will be taken. The agency official and agency archaeologist

will be notified immediately, and they will take the additional steps necessary for law enforcement, SHPO, Legislative Commission on Indian Services (LCIS), and tribal notification. No work may be resumed in this area until a plan is developed and carried out between the Oregon State Police, SHPO, LCIS, and appropriate Native American Tribes and official notice to proceed has been given.

- Follow BLM Handbook H-8270-1 to determine known Condition 1 and Condition 2 paleontological areas or collect information through inventory to establish Condition 1 and Condition 2 areas, determine resource types at risk from the proposed treatment, and develop appropriate measures to minimize or remove adverse impacts to paleontological resources.

**Wildlife PDFs**

- Seasonal restrictions during the breeding season (March 1 – July 15) would be applied for unsurveyed suitable NSO habitat and for sites assumed occupied within the disruption distances.
- To avoid harm to fledgling spotted owls, additional seasonal restrictions would be implemented from July 15th – August 15th within unsurveyed NRF habitat or occupied nest patches – unless surveys indicate either non-occupancy or non-nesting of spotted owls.
- Large pieces of down wood would be protected from full consumption, where feasible during understory burning.
- No burning will occur in the nest patch of occupied NSO sites (or sites assumed occupied) even outside of the critical breeding season.
- The proposed project would not reduce the dispersal-quality habitat or landscape level connectivity function across the corresponding 5th field watersheds.
- In the LSR, no treatment would occur in spotted owl nesting-roosting habitat within late-closed stands in high relative habitat suitability (RHS).
- No known nest trees would be removed.
- Small diameter fuels reduction treatments may be permitted in the 0.5-mile core-use area of active spotted owl sites depending on the proximity to the active use area and if NR components can still be maintained (i.e., layering, coarse woody material, etc.).
- No vegetation treatments in field-verified Recovery Action 32, structurally complex stands (USDI FWS 2011) located in the LSR LUA would occur.
- Habitat determinations for the Agate Oak HFR Project units were based on GIS and have not been field verified. Therefore, the exact habitat conditions and structure are unknown at this time but were conservatively assigned to the NRF habitat type when data was not available to identify nesting-roosting or foraging habitat. Field habitat evaluations would be conducted in all NRF units prior to initiating any HFR treatments within the 0.5- mile core use areas and home ranges of occupied or assumed occupied spotted owl sites associated with the Agate Oak HFR Project.
- If field habitat evaluations locate nesting-roosting habitat (as opposed to foraging or dispersal-only habitat), the fuels specialist would work with the wildlife biologist to modify the prescription (i.e., retain more understory and utilize winter/early spring burning windows) to ensure that key habitat features, such as complex structure and multi-layered canopy structure would be retained post-treatment to maintain nesting roosting habitat function.
- Seasonal restrictions would be implemented for any HFR treatments proposed to occur in NRF habitat, where habitat evaluations and spotted owl surveys are not current at the time of implementation. These seasonal restrictions would be waived if field habitat evaluations determine the units are dispersal-only habitat or if protocol surveys (project clearance or demography protocol) determine resident single or territorial pairs are not present.

- Prescriptions designed to maintain NRF or Dispersal-only habitat function will follow the appropriate/existing Rogue or Umpqua Basin Level 1 guidelines for maintaining habitat function.
- When operating within an HPZ, avoid any type of habitat modifying actions within meadows or open areas containing Substantial Floral Resources (SFRs) between May 15 and August 31.
- When operating within meadows or open areas containing SFRs or that are predominantly native grasses, leave untreated or unburned areas to operate as "islands" of undisturbed habitat for bureau sensitive pollinators and other bureau sensitive invertebrates.
- Do not remove overstory trees within 330 feet of bald eagle, golden eagle, or great grey owl nests, except for removal of hazard trees.
- Prohibit activities that will disrupt bald eagles, golden eagles or great grey owls that are actively nesting. Depending on the site, this may include restricting chainsaw operations, heavy equipment use, and prescribed burning up to ¼ mile no line of site and ½ mile line of site around nest sites.

**T&E Plant PDFs**

- 140: Conduct soil-disturbing vegetation treatments in Gentner's fritillary and Cook's lomatium populations when plants are dormant, generally between July 1 and February 15. Thinning and scattering slash within populations or piling slash outside buffers is permitted outside those dates under the direction of the project botanist.
- 154: Restrict broadcast burning within T&E and Sensitive plant sites to the dormant season (generally July 1 - February 15).
- 159: For manual treatment, maintain 25-foot no-treatment buffers around (T&E) plant sites during the growing season. Treatment inside of buffers is allowed in the dormant season (July 1 - February 15), but remove cut material within buffer to at least 25 feet away from plant site boundary.
- 179: Do not burn landing slash within 100 feet of (T&E) plant sites.
- 181: Construct landings at least 100 feet from (T&E) plant sites. Permit use of previously existing landings when more than 100 feet away from plant sites.
- 182: Realign new proposed logging road corridors, truck turn arounds, and staging areas to maintain 100-foot buffers. Permit use of existing roads, even when located less than 100 feet from (T&E) plant sites.

**Sensitive Plant PDFs**

- Prior to project implementation, BLM Botanists will mark listed plant sites on the ground using yellow plant site signs and the population boundary will be flagged with yellow and black "bumble bee" flagging. Additionally, orange and black plant buffer flagging will be used to distinguish the treatment restrictions typically in a buffered area.   These boundaries will comply with population buffering distances in the PDFs.
- 159: For manual treatment, maintain 25-foot no-treatment buffers around plant sites during the growing season. Treatment inside of buffers is allowed in the dormant season (July 1 - February 15), but remove cut material within buffer to at least 25 feet away from plant site boundary as determined by the project botanist.
- 179: Do not burn landing slash within 100 feet of plant sites.

- 181: Construct landings at least 100 feet from plant sites. Permit use of previously existing landings when more than 100 feet away from plant sites.
- 182: Realign new proposed logging road corridors, truck turn arounds, and staging areas to maintain 100-foot buffers. Permit use of existing roads, even when located less than 100 feet from plant sites.
- When cutting shrubs around meadows with known sensitive species populations, pile slash where the shrubs lived and not in the open meadow.

**Non-native Invasive Plants**

- 183: All rock, gravel, rip-rap, and other material utilized in the building, reconstruction, or maintenance of roads (temp, permanent, etc.) must be free of noxious weed seeds and either originate from an accredited, weed-free quarry approved by the project botanist or be crushed between the November 1 and June 15 immediately prior to application. Aggregate stockpiled between June 16 and October 31 of the previous year would not be accepted unless inspected by the project botanist.
- 280: Seed decommissioned roads at risk of invasion by nonnative invasive plants with native species for at least 30 feet from the intersection with a main route.
- Washing equipment before entering the project area to reduce the likelihood of introducing non-native species.